**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE NEW YORK TIMES COMPANY and
MARK MAZZETTI,

                  Plaintiffs,

                  v.

UNITED STATES DEPARTMENT OF
JUSTICE,

                  Defendant.

22 Civ. 1539 (JSR)

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT UNITED STATES DEPARTMENT OF JUSTICE'S MOTION FOR**
**SUMMARY JUDGMENT**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Counsel for Defendant
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2697/2528
peter.aronoff@usdoj.gov
natasha.teleanu@usdoj.gov

Of Counsel:

PETER ARONOFF
NATASHA W. TELEANU
Assistant United States Attorneys

## CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1
BACKGROUND ................................................................................................................. 1
ARGUMENT ..................................................................................................................... 4
    I.    Standards of Review ................................................................................................ 4
    II.   The FBI's Searches Were Adequate ....................................................................... 6
    III.  FBI Properly Withheld Records and Information Regarding FBI's Testing and
    Evaluation of an NSO Product ........................................................................................... 7
        A.      FBI Properly Withheld Records and Information Revealing Law Enforcement
        Techniques and Procedures Pursuant to Exemption 7(E) ............................................. 7
        B.      FBI Properly Withheld Classified Information Pursuant to Exemption 1....... 12
        C.      FBI Properly Withheld Information Concerning Intelligence Methods Pursuant
        to Exemption 3 and the National Security Act .......................................................... 14
        D.      FBI Properly Withheld Privileged Information Pursuant to Exemption 5 ...... 15
        E.      FBI Properly Withheld Names and Other Personally Identifying Information
        Pursuant to Exemptions 6 and 7(C) ........................................................................... 20
        F.      FBI Properly Withheld Limited Information Regarding Ongoing
        Investigations Contained in the Withheld Records Pursuant to Exemption 7(A) ...... 23
    IV.  FBI Has Disclosed or Will Imminently Disclose All Reasonably Segregable, Non-
    Exempt Information ............................................................................................................ 24
CONCLUSION ................................................................................................................... 25

# AUTHORITIES

Page(s)

**Cases**

*ACLU v. DOD,*
   901 F.3d 125 (2d Cir. 2018)...................................................................................... 5, 13
*ACLU v. DOJ,*
   655 F.3d 1 (D.C. Cir. 2011) .......................................................................................... 21
*ACLU v. DOJ,*
   681 F.3d 61 (2d Cir. 2012)................................................................................. 5, 14, 15
*Allard K. Lowenstein Int'l Human Rights Project v. DHS,*
   626 F.3d 678 (2d Cir. 2010).............................................................................................. 8
*Am. Civil Liberties Union v. NSA,*
   925 F.3d 576 (2d Cir. 2019).......................................................................................... 13
*Am. Oversight v. United States Dep't of Just.,*
   45 F.4th 579 (2d Cir. 2022) ........................................................................................... 20
*Amnesty Int'l USA v. C.I.A.,*
   728 F. Supp. 2d 479 (S.D.N.Y. 2010).......................................................................... 23
*Azmy v. U.S.,*
   *DoD*, 562 F. Supp. 2d 590 (S.D.N.Y. 2008).............................................................. 14
*Blackwell v. FBI,*
   646 F.3d 37 (D.C. Cir. 2011) .......................................................................................... 8
*C.I.A. v. Sims,*
   471 U.S. 159 (1985)............................................................................................. 4, 5, 14
*Carney v. U.S. Dep't of Justice,*
   19 F.3d 807 (2d Cir. 1994)................................................................................... 4, 5, 6
*Coastal States Gas Corp. v. Dep't of Energy,*
   617 F.2d 854 (D.C. Cir. 1980)....................................................................................... 18
*Ctr. for Nat. Sec. Stud. v. U.S. DOJ,*
   331 F.3d 918 (D.C. Cir. 2003)................................................................................. 5, 23
*Dep't of the Interior v. Klamath Water Users Protective Ass'n,*
   532 U.S. 1 (2001).................................................................................................... 4, 18
*DiBacco v. U.S. Army,*
   795 F.3d 178 (D.C. Cir. 2015)....................................................................................... 14
*DOD v. FLRA,*
   510 U.S. 487 (1994)............................................................................................... 21, 22
*Dutton v. DOJ,*
   302 F. Supp. 3d 109 (D.D.C. 2018) .............................................................................. 11
*Elec. Privacy Info Ctr. v. NSA,*
   678 F.3d 926 (D.C. Cir. 2012)....................................................................................... 15
*Fitzgibbon v. CIA,*
   911 F.2d 755 (D.C. Cir. 1990)....................................................................................... 15
*Grand Cent. P'ship v. Cuomo,*
   166 F.3d 473 (2d Cir. 1999)................................................................................... passim

*Hayden v. NSA*,
  608 F.2d 1381 (D.C. Cir. 1979) ........................................................................ 15
*Hickman v. Taylor*,
  329 U.S. 495 (1947) ........................................................................................ 20
*Hodge v. FBI*,
  703 F.3d 575 (D.C. Cir. 2013) ........................................................................ 24
*Hopkins*,
  929 F.2d ......................................................................................................... 16
*In re Cnty. of Erie*,
  473 F.3d 413 (2d Cir. 2007) ..................................................................... 18, 19
*In re Grand Jury Investigation*,
  399 F.3d 527 (2d Cir. 2005) ............................................................................ 19
*Info. Ctr. v. U.S. DEA*,
  401 F. Supp. 3d 37 (D.D.C. 2019) ..................................................................... 8
*Long v. Office of Pers. Mgmt.*,
  692 F.3d 185 (2d Cir. 2012) .............................................................................. 6
*N.Y. Times Co. v. DOJ*,
  756 F.3d 100 (2d Cir. 2014) .............................................................................. 6
*N.Y. Times Co. v. DOJ*,
  939 F.3d 479 (2d Cir. 2019) ..................................................................... 15, 20
*Nat'l Immig. Project of Nat'l Lawyers Guild v. DHS*,
  2014 WL 6850977 (JSR) ................................................................................... 5
*New York Times Co. v. DOJ*,
  390 F. Supp. 3d 499 (S.D.N.Y. 2019) ............................................................... 5
*New York Times Co. v. U.S. Dep't of Justice*,
  872 F. Supp. 2d 309 (S.D.N.Y. 2012) ............................................................... 5
*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975) ........................................................................................ 16
*NRDC v. EPA*,
  954 F.3d 150 (2d Cir. 2020) ............................................................................ 18
*Poitras v. DHS*,
  303 F. Supp. 3d 136 (D.D.C. 2018) ................................................................. 11
*Privacy Info. Center v. Dep't of Justice*,
  296 F. Supp. 3d 109 (D.D.C. 2017) ................................................................. 14
*Seife v. FDA*,
  43 F.4th 231 (2d Cir. 2022) ............................................................................... 4
*Tax Analysts v. IRS*,
  117 F.3d 607 (D.C. Cir. 1997) ........................................................................ 18
*Tigue v. DOJ*,
  312 F.3d 70 (2d Cir. 2002) ........................................................................ 15, 16
*U.S. Fish & Wildlife Serv. v. Sierra Club*,
  141 S. Ct. 777 (2021) ...................................................................................... 16
*Wilner v. NSA*,
  592 F.3d 60 (2d Cir. 2009) ................................................................... 5, 13, 14
*Wood v. FBI*,
  432 F.3d 78 (2d Cir. 2005) .............................................................................. 21

**Statutes**

5 U.S.C. § 552(a)(8)(i) ................................................................................................. 8
5 U.S.C. § 552(a)(8)(i)(I) ............................................................................................ 19
5 U.S.C. § 552(b) ...................................................................................................... 8, 28
5 U.S.C. § 552(b)(1) ..................................................................................................... 5
5 U.S.C. § 552(b)(3) ................................................................................................... 18
5 U.S.C. § 552(b)(5) ................................................................................................... 19
5 U.S.C. § 552(b)(6) ................................................................................................... 25
5 U.S.C. § 552(b)(7)(A) .............................................................................................. 27
5 U.S.C. § 552(b)(7)(C) .............................................................................................. 25
5 U.S.C. § 552(b)(7)(E) .............................................................................................. 12
50 U.S.C. § 3024(i)(1) ............................................................................................. 7, 18
U.S.C. § 552(b)(1) ...................................................................................................... 16

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................... 9
Federal Rule of Civil Procedure 26(b)(3) ................................................................. 24

## PRELIMINARY STATEMENT

In 2022, the Federal Bureau of Investigation ("FBI") disclosed that it had purchased a limited license for testing and evaluation of an electronic surveillance product created by NSO Group, an Israeli technology firm. This Freedom of Information Act ("FOIA") lawsuit concerns two requests made by plaintiffs the New York Times Company and Mark Mazzetti ("Plaintiffs") to the FBI, a component of defendant United States Department of Justice ("DOJ"), for certain records related to NSO Group. In responding to the requests, FBI performed an adequate search, reasonably calculated to discover the requested documents, and processed hundreds of pages of potentially responsive records. FBI has withheld certain records, or portions of records, pursuant to one or more of FOIA's exemptions. The majority of the withheld information is protected from disclosure because the records, or portions thereof, would reveal investigative techniques and procedures the disclosure of which would risk circumvention of the law. FBI also withheld classified and statutorily protected records and information that would reveal intelligence activities and methods, as well as privileged information, personally identifying information, and limited information about ongoing investigations. The declaration submitted by FBI logically and plausibly establishes that the withheld information is protected from disclosure pursuant to Exemptions 1, 3, 5, 6, and 7. *See* 5 U.S.C. § 552(b)(1), (3), (5), (6), (7). Accordingly, the Court should grant summary judgment to DOJ.

## BACKGROUND

In January 2022, plaintiff Mark Mazzetti submitted a FOIA request to FBI, seeking "all contracts, memoranda of understanding, and correspondence between the FBI and employees of NSO Group." Declaration of Michael G. Seidel ("Seidel Decl.") ¶ 6 & Ex. A. The next month, Mr. Mazzetti submitted a second FOIA request to FBI, seeking "all policies, reports, memoranda, or

1

guidelines regarding the use of NSO products; and all correspondence within the [DOJ], including the FBI, discussing the use of NSO products." Seidel Decl. ¶ 10 & Ex. D.

In March 2022, the FBI Director acknowledged in Congressional testimony that the FBI had purchased a limited license for testing and evaluation of an NSO technology product. *Id.* ¶ 35. The FBI tested and evaluated the product to determine what security concerns it may raise. *Id.* From a counterintelligence security perspective, the FBI needs to know what tools are available to adversaries for use against FBI agents. *Id.* This allows the FBI to identify security vulnerabilities and to develop and deploy countermeasures. *Id.* In addition, the FBI tested and evaluated the same NSO product for potential use in criminal investigations. *Id.* ¶ 36. The FBI considered whether it could be used to obtain lawful access to data on mobile devices for the prevention and investigation of crimes and terrorism, in compliance with privacy and national security laws. *Id.* The FBI ultimately determined, in July 2021, not to use the product in criminal investigations, and the FBI has not used the product operationally in any investigation. *Id.*

The FBI searched for records potentially responsive to Plaintiffs' FOIA requests, and produced responsive records to Plaintiffs in redacted form on August 31 and September 7, 2022.[1] *Id.* ¶¶ 16-17, 28-34. The FBI initially processed 815 pages of potentially responsive records, released one page in full and 61 pages in part, and withheld 753 pages in full. *Id.* ¶ 4. The FBI has since determined that of the 753 pages previously withheld in full, 285 pages are duplicates, cover sheets prepared after the search cut-off date, or not responsive to the FOIA request. *Id.* Of the remaining 468 pages, the FBI has since determined that 27 pages contain reasonably segregable, non-exempt information, and the FBI accordingly is processing those 27 pages for release in part

---

[1] On September 7, 2022, the FBI provided Plaintiffs with a supplemental release of 49 pages that were inadvertently omitted from the August 31, 2022 production. *Id.* ¶ 17.

to Plaintiffs, which it will finalize and release promptly. *Id.* The FBI has also identified an estimated 50 additional pages of responsive records, 32 of which are withheld in full and an estimated 18 of which will be released in part. *Id.*[2]

As stated in FBI's declaration and index, the FBI has withheld a total of 736 pages of records in full, and 106 pages in part, under one or more FOIA exemptions. *See id.* ¶¶ 4, 37-95 & Ex. K ("Index").[3] The withheld records and information fall into one or more of the following categories:

- Records and information regarding the acquisition of the NSO product, including contracts. This material is withheld under Exemptions 7(E), 1, and 3, in conjunction with the National Security Act, 50 U.S.C. § 3024(i)(1). One record in this category is also withheld under Exemption 5 and the deliberative process privilege.

- Records and information regarding the technical capabilities of the NSO product, and the FBI's testing and evaluation thereof. This material is withheld pursuant to Exemptions 7(E), 1, and 3 (National Security Act). Certain records in this category are also withheld pursuant to Exemption 5 and the deliberative process, attorney-client and/or work product privileges.

- Records and information regarding security issues presented by the NSO product, including the extent to which it could be used by adversaries to target intelligence and law enforcement personnel. This material is withheld under Exemptions 7(E), 1, and 3 (National Security Act), and in some cases Exemption 5.

- Records and information regarding the capabilities of the NSO product for potential use in criminal investigations. This material is withheld pursuant to Exemption 7(E), and in some cases Exemptions 1 and 3 (National Security Act). This category includes a substantial amount of predecisional, deliberative material that is also withheld pursuant to Exemption 5 and the deliberative process privilege, and in some cases the attorney-client and/or work product privileges.

- Records and information regarding how to respond to press inquiries regarding the

---

[2] The 32 pages, Bates 816-47, are being withheld in full. The remainder—an estimated 18 pages—are the estimated result of a narrow supplemental search that has not yet been completed; the index contains a placeholder for the results. *See* Index.

[3] The FBI is reprocessing certain email records (at Bates range 738-86 in the Index) previously released in part to remove an erroneous assertion of Exemption 3. *Id.* ¶ 4. The removal of this marking will not affect the content of the released records, as the information marked is subject to other applicable exemptions. *Id.* The FBI will complete reprocessing these records promptly. *Id.*

NSO product, including draft talking points. This material is withheld pursuant to Exemption 5 and the deliberative process privilege, and in some cases also Exemptions 7(E), 1, and 3 (National Security Act).

- Records and information regarding how to respond to a Congressional inquiry, including draft responses to the inquiry. These records are withheld pursuant to Exemption 5 and the deliberative process privilege, and in some cases also Exemptions 7(E), 1, and 3 (National Security Act).

- Records and information regarding how to respond to inquiries from other Executive Branch components, including draft talking points and draft briefing materials. This material is withheld pursuant to Exemption 5 and the deliberative process privilege, and in some cases also Exemptions 7(E), 1, and 3 (National Security Act).

- Certain responsive records also include a limited amount of information regarding pending enforcement proceedings that is withheld pursuant to Exemption 7(A).

- The responsive records include the names, email addresses, telephone numbers, and other personally identifiable information of FBI personnel below the SES level, other government personnel, an individual who provided information to the FBI, and a person of investigative interest, and third parties who are mentioned in the documents. This personally identifiable information has been withheld pursuant to Exemptions 6 and 7(C) and in some instances 7(E).

*Id.* ¶ 37.a-i.

## ARGUMENT

### I.    Standards of Review

While FOIA generally requires disclosure of agency records, the statute recognizes "that public disclosure is not always in the public interest," *C.I.A. v. Sims,* 471 U.S. 159, 166–67 (1985), and mandates that records need not be disclosed if "the documents fall within [the] enumerated exemptions," *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001); *see* 5 U.S.C. § 552(b). To withhold records under a FOIA exemption, the agency must determine that disclosure would foreseeably harm an interest protected by the exemption, or is prohibited by law. 5 U.S.C. § 552(a)(8)(i); *see Seife v. FDA*, 43 F.4th 231, 234 (2d Cir. 2022).

FOIA disputes are generally resolved by summary judgment. *See, e.g.*, *Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999); *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d

Cir. 1994). Summary judgment is warranted if a movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a FOIA case, an agency meets its burden through declarations showing a thorough search and providing "reasonably detailed explanations" for any asserted exemptions. *Carney*, 19 F.3d at 812 (footnote omitted).[4] The agency's declaration is "accorded a presumption of good faith." *Id.* (quotation marks omitted); *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009).

An agency's explanation for the application of exemptions is sufficient if it appears logical and plausible. *See ACLU v. DOD*, 901 F.3d 125, 133 (2d Cir. 2018) (as amended Aug. 22, 2018). In the area of national security, moreover, the government's declarations are entitled to "*substantial weight*." *ACLU v. DOJ*, 681 F.3d 61, 69 (2d Cir. 2012) (emphasis in original). This judicial deference extends both to the intelligence agencies' determinations as to whether disclosure of particular information would reveal intelligence sources and methods or law enforcement techniques and procedures, *see Sims*, 471 U.S. at 179, and to their predictive judgments regarding the potential harms that could reasonably be expected to flow from public disclosure, *see, e.g.*, *ACLU v. DoD*, 901 F.3d 125, 134 (2d Cir. 2018). This deference also encompasses law enforcement activities that implicate national security, *see Ctr. for Nat. Sec. Stud. v. U.S. DOJ*, 331 F.3d 918, 927-28 (D.C. Cir. 2003); *New York Times Co. v. DOJ*, 390 F. Supp. 3d 499, 517 (S.D.N.Y. 2019), as well as a law enforcement agency's assertion that records were compiled for a law enforcement purpose, *see id*. at 926.

---

[4] "The general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment, and Local Civil Rule 56.1 statements are not required." *New York Times Co. v. U.S. Dep't of Justice*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (internal quotation marks and alterations omitted); *accord Nat'l Immig. Project of Nat'l Lawyers Guild v. DHS*, 2014 WL 6850977 (JSR), at *1 n.1 (S.D.N.Y. Dec. 3, 2014). Accordingly, DOJ has not submitted a Local Rule 56.1 statement.

Here, FBI's declaration and index demonstrate that the agency adequately searched for responsive records and properly withheld certain records and information pursuant to one or more FOIA exemptions. FBI has logically and plausibly explained why the withheld records are exempt from disclosure, especially in light of the substantial deference owed to the agency's declaration. FBI is therefore entitled to summary judgment.

## II.    The FBI's Searches Were Adequate

An agency does not have a heavy burden in defending the searches it performed; it need only show "'that its search was adequate.'" *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012) (quoting *Carney*, 19 F.3d at 812). An agency's search for records is considered "adequate" if it was "reasonably calculated to discover" documents responsive to a FOIA request, not that the search "actually uncovered every document extant." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999). The search "need not be perfect, but rather need only be reasonable." *Id.*; *see also N.Y. Times Co. v. DOJ*, 756 F.3d 100, 124 (2d Cir. 2014) ("The adequacy of a search is not measured by its results, but rather by its method.").

The FBI met that standard here. As explained in the FBI's declaration, FBI's Record/Information Dissemination Section ("RIDS") conducted: (i) a search of FBI's Central Records System, a comprehensive index containing applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI; (ii) a search by FBI's Operational Technology Division ("OTD"), the division most likely to be involved in discussions regarding FBI's testing and evaluation of an NSO product; and (iii) searches of the classified and unclassified email accounts of the current and former Senior Executive Service

("SES") in employees in multiple branches and divisions[5] most likely to have been involved in discussions of NSO Group and its proprietary software, "Pegasus." Seidel Decl. ¶¶ 19, 27-34. The search of FBI's Central Records System, an entity search for "NSO Group" and "Pegasus," located no responsive records. Seidel Decl. *Id.* ¶¶ 27-28. OTD's search yielded a collection of classified documents. *Id.* ¶¶ 29-30. The email search, using the key terms "NSO Group" and "Pegasus," also located records responsive to Plaintiffs' requests. *Id.* ¶¶ 31-34.

FBI's declaration demonstrates that it conducted an adequate search that was reasonably calculated to discover documents responsive to Plaintiffs' FOIA requests. Accordingly, the Court should grant summary judgment to DOJ on the adequacy of FBI's searches. *See Grand Cent. P'ship*, 166 F.3d at 489.

### III.   FBI Properly Withheld Records and Information Regarding FBI's Testing and Evaluation of an NSO Product

The FBI's declaration and index logically and plausibly establish that the withheld records and information concerning FBI's testing and evaluation of an NSO product are exempt from public disclosure pursuant to one or more FOIA exemptions.

#### A.   FBI Properly Withheld Records and Information Revealing Law Enforcement Techniques and Procedures Pursuant to Exemption 7(E)

Nearly all of the information withheld is protected by Exemption 7(E), often in conjunction with other exemptions. Exemption 7(E) exempts from disclosure "records or information compiled for law enforcement purposes" that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk

---

[5] The Deputy Director's Office, National Security Branch, Criminal, Cyber, Response and Services Branch, OTD, Criminal Investigative Division, Counterintelligence Division, and Office of General Counsel. Seidel Decl. ¶ 31.

circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Law enforcement "[t]echniques and procedures" refer to "how law enforcement officials go about investigating a crime." *Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678, 682 (2d Cir. 2010).

FBI primarily applied Exemption 7(E) to withhold records and information concerning: (i) the acquisition of the NSO product; (ii) the technical capabilities of the NSO product, and the FBI's testing and evaluation thereof; (iii) security issues presented by the NSO product; and (iv) the potential use of the NSO product in criminal investigations. Seidel Decl. ¶ 81. In addition, portions of the records regarding how to respond to inquiries from the press, Congress, and other Executive Branch components contain information subject to Exemption 7(E). *Id.* FBI's declaration logically and plausibly establishes that the records and information withheld under Exemption 7(E) were compiled for law enforcement purposes, they would reveal FBI techniques and procedures used in law enforcement investigations the disclosure of which would risk circumvention of the law, and their disclosure would therefore foreseeably harm an interest protected by Exemption 7(E). *Id.* ¶¶ 65-66, 79-99; *see Elec. Priv. Info. Ctr. v. U.S. DEA*, 401 F. Supp. 3d 37, 47 (D.D.C. 2019) ("the requirement that a disclosure could reasonably be expected to risk circumvention of the law, 'sets a relatively low bar for the agency to justify withholding'" (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011))).

While the FBI's testing and evaluation of an NSO product and its ultimate decision not to use that product operationally have been publicly acknowledged, the details of the FBI's evaluation of this tool—including the agency's assessment of security issues presented by the NSO product, and how it came to the decision to not employ it operationally in criminal investigations— have not. *Id.* ¶ 81. Those details remain highly sensitive, as their public disclosure would assist potential criminals and other subjects of lawful investigation to circumvent the FBI's investigative

efforts. *Id.* The information withheld under Exemption 7(E) would reveal, among other things, the specific reasons why FBI considered this product for use in criminal investigations; precisely how this tool is similar to or different from other tools currently available to or used by the FBI; specific details of the FBI's testing and evaluation of this tool, and the FBI's conclusions about its capabilities, limitations, advantages, and disadvantages; specific details about security threats posed by this tool, and how it could potentially be used against the FBI by criminal or hostile entities; specific details about how this tool could have been employed in criminal investigations and prosecutions; and the specific reasons why FBI determined not to employ this tool operationally. *Id.*

Disclosure of the information withheld under Exemption 7(E) could reasonably be expected to assist potential criminals and other subjects of lawful investigation to circumvent the law by revealing the FBI's existing capabilities and limitations in gaining lawful access to encrypted communications in law enforcement investigations. *Id.* ¶ 82. This would make it substantially easier for criminals to deploy countermeasures to protect their communications from law enforcement scrutiny, which in turn will hamper the FBI's ability to conduct criminal investigations. *Id.* Disclosure of the records and information withheld under Exemption 7(E) would also reveal whether and precisely how the FBI might employ similar tools to gain access to encrypted tools in future criminal investigations and related prosecutions. *Id.* While the FBI ultimately determined not to deploy this particular product operationally, the FBI is continuing its efforts to identify and evaluate all available means for gaining lawful access to encrypted

information and communications in criminal investigations. *Id.*[6] Revelation of the details of the FBI's consideration of this particular tool would undermine the effectiveness of the FBI's use of other such tools, now or in the future.

These critical law enforcement interests were asserted in two distinct types of information, as reflected in the FBI's Index. *Id.*, Ex. K. First, the FBI protected the information gathered in connection with its testing and evaluation of an NSO product. *Id.* ¶ 84. The release of this information would disclose the methods used in the collection and analysis of electronic surveillance technology, including how and from where the FBI collects information, the methodologies employed to analyze it once collected, the FBI's specific considerations and concerns in relation to electronic surveillance technologies, and how the NSO product is similar to or different to other technologies available to the FBI. *Id.* Such disclosures would enable subjects of FBI investigations to circumvent the FBI's existing techniques and procedures for electronic surveillance, thereby diminishing their utility. *Id.* Release of this type of information would enable targets and subjects of criminal investigation to educate themselves about the techniques employed for the collection and analysis of information and thereby allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities. *Id.* Second, the FBI protected records concerning techniques for strategic and sensitive technology that were evaluated and tested as a computer network exploitation tool. *Id.* ¶ 85. Revealing any non-public

---

[6] The FBI is concerned about the serious threat posed by the use of robust encryption products that do not allow for authorized access or the timely decryption of critical evidence obtained through lawful electronic surveillance and search and seizure. *Id.* ¶ 80. On one hand, encryption is extremely beneficial when used legitimately to protect commercially sensitive information and communications. *Id.* On the other hand, the potential use of such products by criminals or terrorists raises a tremendous threat to public safety and national security. *Id.*

details of FBI's evaluation of this technology could undermine the collection of data and any limitations or risks gleaned from the testing and research conducted. *Id.*

The FBI also applied Exemption 7(E) to withhold three categories of sensitive information related to techniques or procedures for internal operations. Seidel Decl. ¶¶ 86-96. First, the FBI withheld internal FBI email addresses, non-public intranet web addresses, and telephone numbers contained within the responsive records because release of this information would provide Releasing this information would provide criminals with specific targets for possible cyber-attacks and/attacks on FBI secure communications. *Id*. ¶ 87. Considering the current cyber-security environment where government data breaches and other hacking attempts on government systems are prevalent, it is likely that the release of this type of information could provide hackers with avenues to exploit the FBI's Information Technology system, including by gaining unauthorized access to systems, which could increase the FBI's effectiveness and could enable criminals to circumvent the law. *Id.* Second, the FBI withheld the identity of a sensitive investigative database used for official law enforcement purposes. *Id.* ¶ 88. Revealing the context in which this database is of utility to the FBI, as well as the scope of information stored within it, would reveal key information about FBI investigative strategies, could reveal exactly where the FBI is storing and obtaining valuable investigative data, and makes the original source data an attractive target for compromise, corruption, or destruction. *Id.* ¶ 90. Third, FBI withheld sensitive investigative file numbers contained in four records. *See* ¶¶ 92-95 & Ex. K. FBI properly withheld all of this information pursuant to Exemption 7(E). *See, e.g.*, *Poitras v. DHS*, 303 F. Supp. 3d 136, 159 (D.D.C. 2018) (holding Exemption 7(E) protects internal FBI email addresses and intranet web addresses, collection or analysis of information, and sensitive file numbers); *Dutton v. DOJ*, 302 F. Supp. 3d 109, 124 (D.D.C. 2018) (holding Exemption 7(E) protects database identifiers).

### B.  FBI Properly Withheld Classified Information Pursuant to Exemption 1

FBI also withheld classified information pursuant to Exemption 1 in records and information concerning: (i) the acquisition of the NSO product, including contracts; (ii) the technical capabilities of the NSO product, and the FBI's testing and evaluation thereof; (iii) security issues presented by the NSO product; (iv) the potential use of the NSO product in criminal investigations; and (v) how to respond to Congressional, other Executive Branch components, and press inquiries. *See* Seidel Decl. ¶ 46. FBI's declaration logically and plausibly establishes that the material withheld under Exemption 1 is currently and properly classified. *Id.* ¶¶ 41-46. Their disclosure could reasonably be expected to cause harm to national security, thereby causing foreseeable harm to an interest protected by Exemption 1. *Id.* ¶¶ 47, 99.

Exemption 1 protects records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and [] in fact [are] properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Pursuant to Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13526"), information is properly classified if (1) an original classifying authority classified the information; (2) the information is "owned by, produced by or for, or is under the control of the United States Government;" (3) the information pertains to one or more of eight protected categories of information listed in section 1.4 of E.O. 13526; and (4) an original classification authority "determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and be "able to identify or describe the damage." E.O. 13526 § 1.1(a)(1)-(4); *see also* Seidel Decl. ¶ 43.

The declaration of Michael G. Seidel, an original classification authority, establishes that each of these criteria is met with respect to the information withheld under Exemption 1. The records and information withheld under Exemption 1 have been classified at the "Secret" level.

Seidel Decl. ¶ 41. They are owned by or are under the control of the United States government. *Id.* ¶ 43. Disclosure of the records and information withheld under Exemption 1 would reveal intelligence activities and methods protected under E.O. 13526 § 1.4(c).[7] Seidel Decl. ¶¶ 45-47. Specifically, it would reveal intelligence methods used by the FBI to test and evaluate technologies for intelligence gathering, as well as the capabilities, limitations, and potential vulnerabilities of the FBI's existing intelligence activities and methods. Mr. Seidel also explains that disclosure of the records and information withheld under Exemption 1 could reasonably be expected to cause damage to the national security by: (1) allowing hostile entities to discover current intelligence gathering activities and methods used by the FBI, and (2) revealing the capabilities and limitations of the FBI's existing intelligence activities and methods, which would make it easier for adversaries to exploit potential vulnerabilities to target FBI and other U.S. intelligence personnel. *Id.* ¶ 47. With the aid of this detailed information, hostile entities could severely disrupt the FBI's intelligence gathering capabilities. *Id.* This severe disruption would result in serious damage to the FBI's intelligence gathering efforts. *Id.*

Mr. Seidel's declaration logically and plausibly establishes that the records and information withheld under Exemption 1 are properly classified, *ACLU*, 901 F.3d at 133, and is entitled to "substantial weight," *Wilner*, 592 F.3d at 73, 76. The Court should therefore sustain FBI's Exemption 1 withholdings. *See, e.g.*, *Am. Civil Liberties Union v. NSA*, 925 F.3d 576, 600-01 (2d Cir. 2019) (intelligence program documents concerning intelligence sources and methods properly

---

[7] An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest. An intelligence method is used to indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization. Confidentiality must be maintained with respect to the activity or method if the viability, productivity, and usefulness are to be preserved. Seidel Decl. ¶ 45.

classified and withheld under Exemption 1); *Azmy v. U.S. DoD*, 562 F. Supp. 2d 590, 600 (S.D.N.Y. 2008) (approving withholding under Exemption 1 of a wide variety of information related to intelligence methods).

### C. FBI Properly Withheld Information Concerning Intelligence Methods Pursuant to Exemption 3 and the National Security Act

Under Exemption 3, matters "specifically exempted from disclosure by [a] statute" that "leave[s] no discretion on the issue" or "refers to particular types of matters to be withheld" need not be disclosed. 5 U.S.C. § 552(b)(3). Unlike most other FOIA exemptions, Exemption 3 "differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Wilner*, 592 F.3d at 72 (quotation marks omitted); *accord Sims*, 471 U.S. at 167.

FBI properly asserted Exemption 3 with respect to the same records or portions of records withheld under Exemption 1 to protect information that would reveal intelligence methods protected under the National Security Act, 50 U.S.C. § 3024(i)(1), as amended. That statute protects intelligence sources and methods from unauthorized disclosure. 50 U.S.C. § 3024(i)(1) (formerly codified at 50 U.S.C. § 403-1(i)(1)).[8] The National Security Act is an exempting statute within the meaning of Exemption 3. *See, e.g.*, *ACLU v. DOJ*, 681 F.3d at 73 (citing cases); *Sims*, 471 U.S. at 167-68 (citing predecessor statute).

---

[8] Specifically, the Act provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). Courts have recognized that members of the Intelligence Community may exercise this authority pursuant to delegation and guidance from the DNI. *See DiBacco v. U.S. Army*, 795 F.3d 178, 197-99 (D.C. Cir. 2015); *see also Elec. Privacy Info. Center v. Dep't of Justice*, 296 F. Supp. 3d 109, 121 (D.D.C. 2017) ("The DNI has delegated enforcement of this National Security Act mandate to the heads of the 17 agencies that constitute the 'Intelligence Community.'"); Seidel Decl. ¶¶ 51-52.

As described above, and in the Seidel declaration, disclosure of the records and information withheld under both Exemptions 1 and 3 would reveal information relating to intelligence methods. Seidel Decl. ¶ 53. They are therefore exempt from disclosure under Exemption 3 and the National Security Act. *See ACLU v. DOJ*, 681 F.3d at 73. Unlike classified information withheld under Exemption 1, the government need not show that disclosure would be harmful in order to protect intelligence sources and methods from disclosure under Exemption 3 and the National Security Act. *See Elec. Privacy Info Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012); *Fitzgibbon v. CIA*, 911 F.2d 755, 764 (D.C. Cir. 1990); *Hayden v. NSA*, 608 F.2d 1381, 1390 (D.C. Cir. 1979).[9] Nevertheless, disclosure of the information subject to Exemption 3 would harm national security for the same reasons discussed above with regard to Exemption 1. *See* Seidel Decl. ¶ 51 n.11.[10]

### D.  FBI Properly Withheld Privileged Information Pursuant to Exemption 5

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party… in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption is "universally read… to mean that agency documents that would be privileged in ordinary civil discovery are also protected from disclosure under FOIA." *N.Y. Times Co. v. DOJ*, 939 F.3d 479, 488 (2d Cir. 2019). Thus, if a document (or portion of a document) could not be obtained under ordinary discovery rules in litigation against an agency, it is exempt from FOIA release as well. *See Tigue v. DOJ*, 312 F.3d 70, 76 (2d Cir. 2002). As explained in the

---

[9] FOIA's "foreseeable harm" standard, *see* 5 U.S.C. § 552(a)(8)(i)(I), is inapplicable to Exemption 3, *see id*. § 552(a)(8)(B) ("Nothing in this paragraph requires disclosure of information that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under subsection (b)(3)."); *accord id*. § 552(a)(8)(A)(i) (an agency shall withhold information only if either (I) the foreseeable harm standard is met, or if (II) "disclosure is prohibited by law").

[10] Additionally, the FBI is reprocessing certain email records (at Bates range 738-86) previously released in part to remove an erroneous assertion of exemption 3. The removal of this marking will not affect the released content, as the information marked is subject to other exemptions. The FBI will complete reprocessing these records promptly. Seidel Decl. ¶ 4.

Seidel Declaration and detailed in the accompanying index, many of the responsive records are privileged and protected in whole or in part by Exemption 5, and their disclosure would foreseeably harm an interest protected by Exemption 5. Seidel Decl. ¶¶ 53-62, 99.

### 1. FBI Properly Withheld Records and Information Under Exemption 5 and the Deliberative Process Privilege

In enacting Exemption 5, "[o]ne privilege that Congress specifically had in mind was the 'deliberative process' or 'executive' privilege." *Hopkins*, 929 F.2d at 84. "[T]he deliberative process privilege shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *U.S. Fish & Wildlife Serv. v. Sierra Club*, 141 S. Ct. 777, 785 (2021) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). An agency record must satisfy two criteria to qualify for the deliberative process privilege: it "must be both 'predecisional' and 'deliberative.'" *Grand Cent. P'ship*, 166 F.3d at 482. "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Sierra Club*, 141 S. Ct. at 786. So long as the document "was prepared to assist [agency] decisionmaking on a specific issue," it is predecisional. *Tigue*, 312 F.3d at 80. In determining whether a document is deliberative, courts inquire as to whether it "formed an important, if not essential, link in [the agency's] consultative process." *Grand Cent. P'ship*, 166 F.3d at 483.

The FBI properly asserted Exemption 5 and the deliberative process privilege to protect intra- and inter-agency predecisional and deliberative records and information contained in several categories of the withheld records and information. Seidel Decl. ¶ 57. The FBI withheld communications, many of which are contained in emails, and associated memoranda and PowerPoints, reflecting predecisional deliberations about the capabilities and potential security

issues raised by the NSO product, whether the NSO product would be appropriate for potential use in criminal investigations, and the circumstances in which it could be lawfully used for that purpose, and how to respond to inquiries from the press, members of Congress, and other Executive Branch components regarding the FBI's testing and evaluation of the NSO product. *Id.* ¶ 57.a. This material includes conversations between FBI personnel and other agencies' personnel concerning FBI's testing, evaluation, and potential use of the NSO product. *Id.*

FBI also withheld draft documents regarding the potential use of the NSO product in criminal investigations, draft responses to Congressional and other inquiries, and a draft memorandum letter to the State of Israel's Defense Export Control Agency. *Id.* ¶ 57.b. This draft material was shared intra-or inter-agency, was pre-decisional (predated the final product), was deliberative (the material was shared to solicit feedback or edits), and its release would foreseeably harm the quality of agency decisionmaking, as further detailed in the Seidel Declaration. *Id.* ¶¶ 59, 99. FBI also asserted Exemption 5 to withhold talking points under the deliberative process privilege. *Id.* ¶ 57.c. The talking points, some of which are in draft format, contain proposed answers to anticipated questions and reflect the FBI's deliberations on how best to answer anticipated questions, and are not the final response provided to actual inquiries. *Id.*

The harms from disclosure are more fully detailed in the Seidel Declaration, but release of these predecisional and deliberative records would discourage or chill FBI employees' willingness to share their candid views and drafts in the future. *Id.* ¶ 57.a-c. This would harm agency deliberations about other technologies considered by the FBI in the future, including similar issues presented by other potential surveillance technologies, as well as future deliberations about the FBI's potential use of electronic surveillance technologies for lawful use in criminal investigations. *Id.* ¶ 57.a. In addition, if communications regarding the FBI's process for responding to press and

inquiries from Congress and Executive Branch components are disclosed, it would harm future deliberations concerning similar inquiries and confuse the public by revealing non-final information and formulations. *Id.* ¶ 57.b. Release of these records and information would therefore foreseeably harm interests protected by Exemption 5. *Id.* ¶¶ 57, 99; *see Dep't of the Interior v. Klamath Water Users Prot. Ass'n*, 532 U.S. 1, 8-9 (2001) ("The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news …."); *NRDC v. EPA*, 954 F.3d 150, 158 (2d Cir. 2020) ("The key question we keep in mind when assessing the application of the deliberative process privilege to an agency record is whether disclosure would tend to diminish candor within an agency." (internal quotation marks omitted)); *Grand Cent. P'ship*, 166 F.3d at 481 (the deliberative process privilege protects "against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action" (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). Accordingly, FBI properly withheld predecisional and deliberative communications, draft documents, and talking points under Exemption 5 and the deliberative process privilege.

### 2. FBI Properly Withheld Records and Information Under Exemption 5 and the Attorney-Client Privilege

"The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997). The purpose of the privilege "is to encourage attorneys and their clients to communicate fully and frankly and thereby to promote broader public interests in the observance of law and administration of justice." *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (citation and internal quotation marks omitted). Indeed, "the traditional rationale for the [attorney-client]

privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law . . . be encouraged to seek out and receive fully informed legal advice." *Id.* at 419 (quoting *In re Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005)).

Here, FBI properly withheld records and information pursuant to Exemption 5 and the attorney-client privilege. As explained in the Seidel Declaration, the FBI protected confidential communications and documents shared between and among FBI and DOJ attorneys and other FBI or DOJ employees that reflect the seeking and/or providing of legal guidance. Seidel Decl. ¶ 60. For example, FBI withheld a draft memorandum written by FBI attorneys containing proposed guidance to DOJ prosecutors on various matters related to potential criminal prosecutions in the event a determination was made to use the NSO product in criminal investigations. *Id.*, Ex. K at Bates 67-76. FBI also withheld communications, memoranda, draft guidelines, and draft talking points containing or reflecting the legal advice of FBI and/or DOJ attorneys concerning the potential use of the NSO product in criminal investigations, and the circumstances in which, in their legal judgment, it could be lawfully used for that purpose. *Id.* ¶ 60. Release of this information would foreseeably harm interests protected by Exemption 5 by discouraging the free exchange of information between agency counsel and their clients, chilling agency employees from seeking legal guidance, and endangering agency attorneys' ability to provide the best possible legal representation. *Id.* ¶¶ 60, 99; *see Cnty. of Erie*, 473 F.3d at 418. Furthermore, it would disclose information traditionally privileged in a legal context—including prosecution of criminal cases— and disrupt the adversarial process of litigation by providing access to information related to the government's potential strategies in civil or criminal litigation. Seidel Decl. ¶ 60. Accordingly, FBI properly withheld these communications under the attorney-client privilege and Exemption 5.

### 3.  FBI Properly Withheld Records and Information Under Exemption 5 and the Work Product Doctrine

The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects documents prepared in anticipation of litigation, and contemplates "[n]ot only an attorney's mental impressions and opinions about a case but also the results of the attorney's factual investigations in anticipation of the case." *N.Y. Times v. DOJ*, 939 F.3d at 489; *see also Am. Oversight v. United States Dep't of Just.*, 45 F.4th 579, 590 (2d Cir. 2022). Work product may be reflected in "interview statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).

The FBI withheld communications, memorandums, and draft guidelines prepared by attorneys concerning the potential use of an NSO tool in criminal investigations, and the circumstances in which it could be lawfully used for that purpose. Seidel Decl. ¶ 62. The records and information withheld under Exemption 5 and the work product privilege were created in anticipation of litigation, namely, any criminal prosecutions resulting from investigations in which the NSO product might be employed, and criminal discovery obligations that prosecutors would have in such litigation. *Id.* Disclosure of these materials would interfere with government attorneys' ability to properly prepare their legal theories and strategies, hinder them in providing the best possible representation of their clients, and thus foreseeably harm an interest protected by Exemption 5. *Id.* ¶¶ 64, 99; *see Am. Oversight*, 45 F.4th at 588 ("compelled disclosure of such attorney work product would have a seriously detrimental effect on the adversarial system"). Accordingly, FBI properly withheld this material as attorney work product.

### E.  FBI Properly Withheld Names and Other Personally Identifying Information Pursuant to Exemptions 6 and 7(C)

Exemption 6 exempts from disclosure information from personnel, medical, or other similar files where disclosure "would constitute a clearly unwarranted invasion of personal

privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes" whose release "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "Exemption 7(C) is more protective of privacy than Exemption 6 and thus establishes a lower bar for withholding material." *ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011) (quotation marks omitted)). Under both exemptions, if a protected privacy interest is found, the Court must balance the public's need for this information against the individual's privacy interest. *See Wood v. FBI*, 432 F.3d 78, 86 (2d Cir. 2005). The "only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding *of the operations or activities of the government*." *DOD v. FLRA*, 510 U.S. 487, 495 (1994) (emphasis in original).

FBI properly withheld certain information contained in the responsive records pursuant to both Exemptions 6 and 7(C), including: (i) names and contact information of FBI Special Agents and professional staff; (ii) names and contact information of non-FBI federal government personnel, (iii) names of third parties merely mentioned, (iv) the name and identifying information of a third party who provided information gathered by the FBI, and (v) the name and identifying information for a third party of FBI investigative interest. Seidel Decl. ¶¶ 67-76 & Ex. K.[11] Disclosure of the names and personally identifying information withheld by FBI would result in an unwarranted invasion of privacy under the standards of either Exemption 6 or 7(C).

On the privacy side of the balance, these groups of individuals have significant privacy interests in avoiding disclosure of their names and personally identifying information in the context

---

[11] Plaintiff does not challenge any of the Exemption 6 and 7(C) redactions in the records that FBI produced on August 31 or September 7, 2022.

of these records. Publicizing the names and contact information of FBI Special Agents and professional staff may prejudice other investigations and work of the FBI and subject them to unnecessary questioning regarding their duties, harassment, hostility, or violence. *See* Seidel Decl. ¶¶ 70-72. Revealing the names and contact information of personnel from non-FBI government agencies who were involved with the drafting of or discussions regarding the use of NSO products would result in publicity that could impair their effectiveness in assisting or participating in future FBI investigative activities, and subject them to unnecessary questioning regarding FBI activities and hostility. *Id.* ¶ 73. The third parties who are tangentially mentioned in the withheld records— who are not of investigative interest to the FBI—maintain substantial and legitimate privacy interests in not having their identities disclosed and thus connected with FBI law enforcement matters, which carries a negative connotation. *Id.* ¶ 74. Disclosure of the identities of these third parties would subject them to possible harassment or criticism, and focus derogatory inferences and suspicion on them. *Id.* Disclosure of the name and identifying information of a third-party who voluntarily provided information gathered by the FBI for purposes of discussions regarding the NGO group—who is not of investigative interest to the FBI—would carry a negative connotation, and could also discourage others from providing information and cooperation to FBI. *Id.* ¶ 75. *Id.* And disclosure of the name and identifying information of a third party who is of investigative interest to the FBI would carry a strong negative connotation and stigma, whether or not this individual ever committed criminal acts. *Id.* ¶ 76. Release of this person's identity could subject them to harassment or embarrassment and undue public attention and repercussions. *Id.*

On the public interest side of the balance, disclosure of the names and other identifying information withheld in each category would not contribute, let alone significantly, to the public's understanding of the operations or activities of the FBI. *Id.* ¶¶ 71-75; *see DOD v. FLRA*, 510 U.S.

at 495. Accordingly, the significant privacy interests outweigh any cognizable public interest in disclosure, and thus disclosure "would constitute a clearly unwarranted invasion of personal privacy" under Exemption 6, "could reasonably be expected to constitute an unwarranted invasion of personal privacy" under Exemption 7, and would foreseeably harm the privacy interests protected by those exemptions, Seidel Decl. ¶ 99.

### F. FBI Properly Withheld Limited Information Regarding Ongoing Investigations Contained in the Withheld Records Pursuant to Exemption 7(A)

Exemption 7(A) protects from disclosure "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). To justify withholding records under Exemption 7(A), the FBI must demonstrate that "(1) a law enforcement proceeding is pending or prospective and (2) release of the information could reasonably be expected to cause some articulable harm." *Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 525 (S.D.N.Y. 2010) (internal quotation marks omitted). For the first prong, it is sufficient that an ongoing investigation "is likely to lead to such [law enforcement] proceedings." *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F. 3d 918, 926 (D.C. Cir. 2003).

As explained in the Seidel declaration, Exemption 7(A) was asserted to protect internal FBI and/or DOJ discussions of ongoing investigations that appear in eight records. Seidel Decl. ¶ 66 & Ex. K.[12] Release of this information would reveal unknown information concerning pending enforcement investigations and would provide targets and subjects of ongoing criminal investigations with information about the government's investigation and enforcement strategies, allow them to predict and potentially thwart these strategies, and/or allow them to discover or tamper with witnesses, and/or destroy evidence. *Id.* Because of these risks, revealing this

---

[12] To be clear, the NSO product was not used in these investigations; it has not been used operationally in any investigation. Seidel Decl. ¶ 66 n.11.

information could reasonably be expected to interfere with pending enforcement proceedings, and would foreseeably harm an interest protected by Exemption 7(A). *Id.* ¶¶ 66, 99. Accordingly, FBI properly withheld this limited information pursuant to Exemption 7(A).

## IV.   FBI Has Disclosed or Will Imminently Disclose All Reasonably Segregable, Non-Exempt Information

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). An agency is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013) (quotation marks omitted). Here, there is no basis to disturb the presumption that FBI has disclosed or will imminently disclose[13] all reasonably segregable, non-exempt material in the withheld records. The FBI's declarant has affirmed that the agency undertook a segregability review of the records withheld in full or in part, and determined that all reasonably segregable, non-exempt material was either released or, to the extent a record contains discrete non-exempt information, release would not provide additional substantive content beyond what is provided in the FBI's index. Seidel Decl. ¶ 100 & Ex. K. Accordingly, FBI's withholdings are proper and should be upheld.

---

[13] As noted above, the FBI is currently processing or reprocessing approximately 45 pages to release a limited amount of segregable, non-exempt information. Seidel Decl. ¶ 4.

**CONCLUSION**

For the foregoing reasons, and the reasons set forth in the FBI's declaration and index,

DOJ's motion for summary judgment should be granted.

Dated: September 19, 2022
       New York, New York

<div style="margin-left: 50%;">

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:   */s/ Peter Aronoff*
      PETER ARONOFF
      NATASHA W. TELEANU
      Assistant United States Attorneys
      86 Chambers Street, Third Floor
      New York, New York 10007
      Telephone: (212) 637-2697/2528
      Facsimile: (212) 637-2717
      E-mail: peter.aronoff@usdoj.gov
              natasha.teleanu@usdoj.gov

</div>