UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                                    X
THE NEW YORK TIMES COMPANY and
MARK MAZZETTI,                                      :

                    Plaintiffs,                     :

            v.                                      :        No. 22-cv-01539 (JSR)

UNITED STATES DEPARTMENT OF JUSTICE,               :

                    Defendant.                      :
_____X


# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

                                            David E. McCraw
                                            Al-Amyn Sumar
                                            The New York Times Company
                                            Legal Department
Of Counsel:                                 620 Eighth Avenue
Samantha Hamilton                           New York, NY 10018
(Not Admitted in S.D.N.Y.)                  Phone: (212) 556-4031
                                            Facsimile: (212) 556-1009
                                            Email: mccraw@nytimes.com

                                            *Counsel for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................. ii

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND ......................................................................................................1

ARGUMENT ...............................................................................................................................3

    I.       The FBI's Search Was Inadequate ..............................................................................4

    II.     The FBI Has Improperly Withheld Material Under Exemptions 5 And 7(E) ..............7

          A.  The Legal Standards Applicable to Exemption 5 and Exemption 7(E) ..................7

          B.  The FBI's Legally Deficient Vaughn Index ..........................................................9

          C.  The Improper Withholding ..................................................................................10

    III.    The FBI Has Failed to Meet the Requirements of the 2016 FOIA Amendment .........19

    IV.   The Contract and Talking Points Documents Cannot Be Withheld Under Exemptions 1 and 3 .....................................................................................................................................20

    V.     At a Minimum, the Court Should Conduct *In Camera* Review of the Redactions .....24

CONCLUSION ..........................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*ACLU v. DHS,*
243 F. Supp. 3d 393 (S.D.N.Y. 2017) .......................................................................8, 9

*ACLU v. DOD,*
492 F. Supp. 3d 250 (S.D.N.Y. 2020) ..........................................................................23

*ACLU v. DOJ,*
901 F.3d 125 (2d Cir. 2018) ...........................................................................................4

*ACLU v. ODNI,*
2011 U.S. Dist. LEXIS 132503 (S.D.N.Y. Nov. 15, 2011) ....................................9, 22

*Amnesty Int'l USA v. CIA,*
728 F. Supp. 2d 479 (S.D.N.Y. 2010) ............................................................................5

*Associated Press v. DOD,*
554 F.3d 274 (2d Cir. 2009) ...........................................................................................3

*Associated Press v. DOD,*
498 F. Supp. 2d 707 (S.D.N.Y. 2007) ..........................................................................21

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.,*
601 F.3d 143 (2d Cir. 2010) .......................................................................................3, 4

*Brennan Ctr. for Justice v. DOJ,*
697 F.3d 184 (2d Cir. 2012) .....................................................................................8, 12

*Brennan Ctr. for Justice v. DHS,*
331 F. Supp. 3d 74 (S.D.N.Y. 2018) ..............................................................................9

*Brennan Ctr. for Justice v. DOJ,*
377 F. Supp. 3d 428 (S.D.N.Y. 2019) ............................................................................5

*Brennan Ctr. for Justice v. ICE,*
571 F. Supp. 3d 237 (S.D.N.Y. 2021) .......................................................................4, 25

*Campbell v. DOJ,*
164 F.3d 20 (D.C. Cir. 1998) ....................................................................................5, 21

*Carney v. DOJ,*
19 F.3d 807 (2d Cir. 1994) .............................................................................................4

*CIA v. Sims*,
471 U.S. 159 (1985) ...................................................................................................20

*Coastal States Gas Corp. v. DOE*,
617 F.2d 854 (D.C. Cir. 1980) ...................................................................................12

*CREW v. DOJ*,
2022 U.S. App. LEXIS 23202 (Aug. 19, 2022) .........................................................9

*Dep't of the Air Force v. Rose*,
425 U.S. 352 (1976) ....................................................................................................3

*Doherty v. DOJ*,
775 F.2d 49 (2d Cir. 1985) ..........................................................................................8

*Formaldehyde Inst. v. HHS*,
889 F.2d 1118 (D.C. Cir. 1989)...................................................................................8

*Founding Church of Scientology of Washington, D.C., Inc. v. NSA*,
610 F.2d 824 (D.C. Cir. 1979).....................................................................................5

*Gardels v. CIA*,
689 F.2d 1100 (D.C. Cir. 1982) .................................................................................21

*Goldberg v. Dep't of State*,
818 F.2d 71 (D.C. Cir. 1987) .....................................................................................21

*Grand Cent. P'Ship., Inc. v. Cuomo*,
166 F.3d 473 (2d Cir. 1999) .............................................................................5, 8, 13

*Judicial Watch, Inc. v. Dep't of State*,
2021 U.S. Dist. LEXIS 144516 (D.D.C. Aug. 3, 2021) ...........................................14

*Halpern v. FBI*,
181 F.3d 279 (2d Cir. 1999) .................................................................................21, 24

*King v. DOJ*,
830 F.2d 210 (D.C. Cir 1987) ......................................................................................9

*Knight First Amendment Inst. at Columbia Univ. v. CDC*,
560 F. Supp. 3d 810 (S.D.N.Y. 2021).......................................................................5, 6

*Lawyers Comm. for Human Rights v. INS*,
721 F. Supp. 552 (S.D.N.Y. 1989) ..............................................................................9

iv

*Mead Data Cent., Inc. v. Dep't of the Air Force*,
566 F.2d 242 (D.C. Cir. 1977) ...........................................................................................4

*Nat'l Immigration Project of the Nat'l Lawyers Guild v. DHS*,
2012 U.S. Dist. LEXIS 184036 (S.D.N.Y. Dec. 27, 2012) ...........................................5

*Navasky v. CIA*,
499 F. Supp. 269 (S.D.N.Y. 1980) ...................................................................................21

*NRDC v. EPA*,
19 F.4th 177 (2d. Cir. 2021) ............................................................................................13

*NRDC v. EPA*,
954 F.3d 150 (2d Cir. 2020) ..........................................................................................4, 8

*N.Y. Times Co. v. DOJ*,
939 F.3d 479 (2d Cir. 2019) ............................................................................................12

*N.Y. Times Co. v. DOJ*,
756 F.3d 100 (2d Cir. 2014) ............................................................................................21

*N.Y. Times Co. v. Dep't of State*,
2019 U.S. Dist. LEXIS 113743 (S.D.N.Y. 2019) ..........................................................25

*Providence Journal Co. v. Dep't of Army*,
981 F.2d 552 (1st Cir. 1992) ..............................................................................................8

*Quinon v. FBI*,
86 F.3d 1222 (D.C. Cir. 1996) ...........................................................................................9

*Reporters Comm. for Freedom of the Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) ......................................................................................19, 20

*Reporters Comm. for Freedom of the Press v. FBI*,
877 F.3d 399 (D.C. Cir. 2017) ...........................................................................................7

*Reporters Comm. for Freedom of the Press v. CBP*,
567 F. Supp. 3d 97 (D.D.C. 2021) .............................................................................19, 20

*Seife v. FDA*,
43 F.4th 231 (2d Cir. 2022) ........................................................................................3, 19

*Seife v. Dep't of State*,
298 F. Supp. 3d 592 (S.D.N.Y. 2018) ................................................................................9

*Tax Analysts v. IRS*,
117 F.3d 607 (D.C. Cir. 1997) ...................................................................12

*U.S. Dep't of State v. Ray*,
502 U.S. 164 (1991) ....................................................................................3

*Vaughn v. Rosen*,
484 F.2d 820 (D.C. Cir. 1973) .....................................................................9

*Wood v. FBI*,
432 F.3d 78 (2d Cir. 2005) ..........................................................................4

*Wilner v. NSA*,
592 F.3d 60 (2d Cir. 2009) .......................................................................4, 9

## STATUTES

5 U.S.C. § 552.................................................................................... *passim*

50 U.S.C. § 3024................................................................................22

## OTHER AUTHORITIES

Executive Order 13,526 .............................................................................22

Plaintiffs The New York Times Company and Mark Mazzetti (together, "The Times") respectfully submit this memorandum of law in support of their cross-motion for summary judgment and in opposition to Defendant's motion for summary judgment.

## PRELIMINARY STATEMENT

This litigation centers on two Freedom of Information Act ("FOIA") requests, both of which are seeking information that will illuminate for the public why the FBI was exploring the surveillance technology of an Israeli company called NSO Group—technology that has been used to violate the rights of human rights activists and others in nations across the globe. The FBI has responded, as it often does, with broad invocations of Exemption 5 (which protects deliberative material) and Exemption 7(E) (which shields from disclosure a narrow set of law enforcement documents) as well as Exemptions 1 and 3 (addressed to national security concerns). As set forth below, those exemptions have been stretched beyond what the law allows. And, as a threshold matter, the FBI has yet to conduct an adequate search for documents or present a Vaughn index that satisfies what FOIA requires.

## FACTUAL BACKGROUND

The surveillance technology developed by the highly controversial NSO Group ("NSO") has been used in countries around the world to spy on journalists, human rights activists, and dissenters. (*See* Declaration of Mark Mazzetti ("Mazzetti Decl.") ¶ 4.) Pegasus, one of NSO's products, has the extraordinary ability to collect vast swaths of information from people's smartphones—their call history, text messages, contacts, location data, and any data transmitted over apps—all without the Pegasus user needing to touch the target smartphone. (*Id.* ¶ 3.) Abusive uses of the technology were reported in various countries, including Saudi Arabia, the United Arab Emirates, and Mexico. (*Id.* ¶ 4.) So concerning was the NSO technology that the

Biden administration blacklisted NSO in November of 2021. (*Id*. ¶ 5.) By then, it was known that someone had deployed Pegasus against U.S. diplomats in Uganda. (*Id*. ¶ 6.)

In January of 2022, *The New York Times* ("*The Times*") revealed that, despite the history of authoritarian abuse by users of NSO's technology, the FBI in 2019 had obtained NSO's spyware, including a product called Phantom, which could target U.S. phones. (*Id*. ¶ 7 and Exh. A attached thereto.) It was later learned that, amid widespread negative press coverage of the abuses of NSO Group products elsewhere, the FBI secretly terminated its relationship with NSO. (Mazzetti Decl. ¶ 8.)

It was only in March 2022 that FBI Director Christopher Wray publicly confirmed at a congressional hearing that the FBI had purchased a license to test the Pegasus product, though he maintained that the agency decided not to operationalize the technology. (*See* Declaration of Michael G. Seidel ("Seidel Decl."), Dkt. 14, ¶¶ 35-36.) He claimed that the FBI has never "use[d] the products operationally in an investigation." "Hearing on Annual Worldwide Threats," U.S. House of Representatives, March 8, 2022, https://docs.house.gov/meetings/IG/IG00/20220308/114469/HHRG-117-IG00-Transcript-20220308.pdf. *The Times* in May 2022 revealed that the FBI had told the Israeli government at the time it was seeking to obtain NSO tools that it wanted to use the technology in criminal investigations. (Mazzetti Decl. ¶ 10 and Exh. B attached thereto.)

*The Times*'s stories in January and May of 2022 by reporters Mark Mazzetti and Ronen Bergman culminated a year-long investigation into NSO. (Mazzetti Decl. ¶ 7.) In fact, *The Times* had been writing about the abusive uses of NSO's spyware since at least 2016. (*Id*. ¶ 2.)

To further explore how the FBI had used NSO's Pegasus and Phantom, The Times on January 10, 2022, filed a FOIA request with the FBI, seeking "all contracts, memoranda of

understanding, and correspondence between the FBI and employees of NSO Group." (*See* Seidel Decl. ¶ 6 and Exh. A attached thereto.) After the agency failed to make a determination by the statutory deadline set by FOIA, The Times commenced this litigation on February 24, 2022. (Dkt. 1.) Separately, The Times filed a second request on February 7, 2022, seeking "[a]ll policies, reports, memoranda, or guidelines regarding the use of NSO products," and "[a]ll correspondence within [DOJ], including the FBI, discussing the use of NSO products." (*See* Seidel Decl. ¶ 10 and Exh. D attached thereto.) In response, the FBI said it could neither confirm nor deny whether the documents existed. (Mazzetti Decl. ¶ 15.) The Times, following an administrative appeal, filed an amended complaint on March 23, 2022, folding in the second request. (Dkt. 9.)

While this litigation was pending, Defendant made three productions of redacted documents, but withheld most of the responsive material. The list of documents produced and withheld is set forth in Exhibit K to the Seidel Declaration. (Dkt. 14-11.)

## **ARGUMENT**

FOIA requires that government records be made available to the public unless a statutory exemption applies. 5 U.S.C. § 552(a)(3)(A), (b)(1)-(9). "The basic purpose of FOIA reflect[s] a general philosophy of full agency disclosure." *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976) (cleaned up)). In light of this purpose, "FOIA exemptions are to be construed narrowly." *Associated Press v. DOD*, 554 F.3d 274, 283 (2d Cir. 2009). There is a "strong presumption in favor of disclosure [that] places the burden on the agency to justify the withholding of any requested documents." *Id.* (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)); *see Seife v. FDA*, 43 F.4th 231, 235 (2d Cir. 2022) ("All doubts are resolved in

favor of disclosure.") (cleaned up). "[W]hen an agency seeks to withhold information, it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977); *see* 5 U.S.C. § 552(b) (requiring the government to disclose "the exemption under which [each] deletion [to a record] is made"). An agency must also show that its explanation of the applicability of an exemption is logical and plausible. *ACLU v. DOJ*, 901 F.3d 125, 133 (2d Cir. 2018). The agency's failure to meet its burden requires disclosure of the requested documents. *See NRDC v. EPA,* 954 F.3d 150, 154 (2d Cir. 2020).

A court reviews de novo an agency's decision to withhold information from the public. *See* 5 U.S.C. § 552(a)(4)(B). The agency's decision as to the applicability of a given exemption is not entitled to judicial deference. *See Bloomberg*, 601 F.3d at 147. Although courts review reasonably detailed agency affidavits with a presumption of good faith, this primarily is for determining the need for further fact-finding. *See, e.g., Wood v. FBI*, 432 F.3d 78, 85 (2d Cir. 2005); *see also Wilner v. NSA*, 592 F.3d 60, 69, 73 (2d Cir. 2009) (presumption does not replace de novo review by courts).

## I.
## THE FBI'S SEARCH WAS INADEQUATE

To prevail at summary judgment, an agency bears the burden of demonstrating that its search was "reasonably calculated to discover the requested documents." *Brennan Ctr. for Justice v. ICE*, 571 F. Supp. 3d 237, 249 (S.D.N.Y. 2021) (Rakoff, J.). An agency can satisfy this burden by submitting affidavits or declarations "indicating that the agency has conducted a thorough search." *Carney v. U.S. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994). An agency generally

need not "search every record system," but it "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Campbell v. DOJ*, 164 F.3d 20, 27-28 (D.C. Cir. 1998); *accord, e.g.*, *Nat'l Immigration Project of the Nat'l Lawyers Guild v. DHS*, 2012 U.S. Dist. LEXIS 184036, at *12 (S.D.N.Y. Dec. 27, 2012). Even when the agency has described in "reasonable detail the scope and method of the agency's search," *Grand Cent. P'Ship., Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999), a requester may nonetheless produce "countervailing evidence" showing a genuine dispute of material fact as to the adequacy of the search, "and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 497 (S.D.N.Y. 2010) (quoting *Founding Church of Scientology of Washington, D.C., Inc. v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979)).

Here, the FBI has not established that its search for records was adequate. First, the FBI used insufficient search terms. "Where challenged, agencies have to explain why certain search terms, clearly relevant, were not used." *Brennan Ctr. for Justice v. DOJ,* 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019); *accord, e.g.*, *Knight First Amendment Inst. at Columbia Univ. v. CDC*, 560 F. Supp. 3d 810, 823 (S.D.N.Y. 2021) (hereinafter, "*CDC*"). The Seidel Declaration describes the FBI's process of searching for the records, including the files it searched and the terms it used. (Seidel Decl. ¶¶ 19-34.) The FBI used only two search terms: "NSO Group" and "Pegasus." (Seidel Decl. ¶¶ 28, 34.) It did not use a third obvious and significant term: "Phantom." The Phantom surveillance tool—which is capable of targeting U.S. phones, unlike Pegasus—was reviewed by the FBI, according to *The Times*'s reporting. (Exh. A to Mazzetti Decl.) That capability would be of obvious interest to a domestic law enforcement agency like the FBI. (Mazzetti Decl. ¶ 10.) Documents pertaining to Phantom are also clearly responsive to

The Times's requests. (*See* Exh. A to Seidel Decl. (request for correspondence and other documents between FBI and NSO); Exh. D to Seidel Decl. (request for documents about "NSO products").)

Second, the FBI did not search through files of individuals and units that were clearly involved in the NSO project. *See CDC*, 560 F. Supp. 3d at 826 (concluding that "it was unreasonable of the CDC to omit those individuals likely to have responsive documents from the search"). The FBI's declarant states that the FBI conducted a search of the Central Records System as well as the e-mail accounts of certain Senior Executive Service employees from the Deputy Director's Office; National Security Branch; Criminal, Cyber Response and Services Branch; Operational Technology Division, Criminal Investigative Division; Counterintelligence Division; and Office of General Counsel. (Seidel Decl. ¶¶ 28-34.) But, inexplicably, the FBI did not search the files of the FBI Director, even though it was his testimony before Congress in March 2022 that disclosed the NSO project and its cessation. (*See* Memorandum of Law in Support of Defendant United States Department of Justice's Motion for Summary Judgment ("FBI Mem."), Dkt. 13, at 2.)[1] Further, the FBI apparently did not search the Office of Congressional Affairs ("OCA"). OCA is mentioned repeatedly in the Vaughn Index—12 times, in fact—and was clearly a key player in the NSO affair as congressional critics began raising questions about the abuse of the technology. (*See* Exh. K to Seidel Decl.)

Third, the FBI's search failed to uncover extant documents. While an agency is not required to find every responsive document, and adequacy is judged by the search process not

---

[1] Though the FBI Director's testimony post-dated The Times's two FOIA requests, it is implausible that Mr. Wray—who began his term in August 2017—did not possess responsive records during the relevant timeframe.

the results, the absence of certain documents may raise doubts about a search's sufficiency. *See, e.g.*, *Reporters Comm. for Freedom of the Press v. FBI*, 877 F.3d 399, 402, 433 (D.C. Cir. 2017) (noting that "positive indications of overlooked materials" can bring into question the adequacy of a search). Here, for instance, the FBI's Vaughn index cites drafts of a response to inquiries by Senator Ron Wyden, and emails about it—but the production does not include either Wyden's correspondence with the FBI or the FBI's final response. (*See* Exh. K to Seidel Decl., Bates-numbered documents ("Docs") 136-42, 145-52, 162-71, 172-76, 177-80, 181, 183-85, 186-94, 305-07.)

## II.
## THE FBI HAS IMPROPERLY WITHHELD
## MATERIAL UNDER EXEMPTIONS 5 AND 7(E)

The Times does not challenge any withholding pursuant to Exemptions 6 and 7(C) (privacy) or Exemption 7(A) (pertaining to ongoing investigations). It challenges withholding under Exemptions 1 and 3 (dealing with national security materials) only as to (i) the contract with NSO and (ii) documents dealing with talking points, including drafts of talking points. (*See* Section IV below.) The Times's principal challenge is to the FBI's overly expansive invocation of Exemption 5 (deliberative documents) and Exemption 7(E) (documents concerning law enforcement techniques, procedures, and guidelines whose "disclosure could reasonably be expected to risk circumvention of the law"). The Times challenges the use of these two exemptions to withhold or redact in the groups of documents identified below in Subsection C.

### A.  The Legal Standards Applicable to Exemption 5 and Exemption 7(E)

Exemption 5 permits an agency to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Courts construe Exemption 5 to operate similarly to the privileges

applicable to discovery proceedings in civil litigation, specifically the deliberative process privilege, attorney-client privilege, and attorney-work product privilege. *NRDC*, 954 F.3d at 155. The deliberative process privilege, which is the primary Exemption 5 privilege that The Times is challenging, protects documents that are both "predecisional," *i.e.,* created prior to the agency's final decision on the matter, and "deliberative," *i.e.,* prepared to help the agency formulate its position. *Grand Cent. P'ship.*, 166 F.3d at 482. Both prongs are required to obtain protection of the privilege.

As a result, even predecisional documents may not fall within the privilege if they are not deliberative. *See, e.g.*, *Providence Journal Co. v. Dep't of Army*, 981 F.2d 552, 559 (1st Cir. 1992); *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1123 (D.C. Cir. 1989). A predecisional document will qualify as "deliberative" provided it (i) formed an essential link in a specified consultative process, (ii) "reflect[s] the personal opinions of the writer rather than the policy of the agency," and (iii) if released, would "inaccurately reflect or prematurely disclose the views of the agency." *Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184, 202 (2d Cir. 2012). Importantly here, "[p]urely factual material not reflecting the agency's deliberative process is not protected." *Grand Cent. P'ship.,* 166 F.3d at 482.

Exemption 7(E) permits an agency to withhold law enforcement records that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The exemption protects only techniques and procedures "not generally known to the public." *Doherty v. DOJ*, 775 F.2d 49, 52 n.4 (2d Cir. 1985); *accord, e.g.*, *ACLU v. DHS*, 243 F. Supp. 3d 393, 402 (S.D.N.Y. 2017). To justify withholding information under Exemption 7(E), the Government must establish

that the material was compiled for law enforcement purposes. *Brennan Ctr. for Justice v. DHS*, 331 F. Supp. 3d 74, 97 (S.D.N.Y. 2018). And, of significance here, an agency cannot rely on boilerplate generic descriptions of harm to carry its burden of showing that disclosure would cause circumvention. *ACLU*, 243 F. Supp. 3d at 403; *ACLU v. ODNI*, 2011 U.S. Dist. LEXIS 132503, at *34 (S.D.N.Y. Nov. 15, 2011); *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 566 (S.D.N.Y. 1989).

### B. The FBI's Legally Deficient Vaughn Index

As an initial matter, the Government should be denied summary judgment because its Vaughn index (Exh. K to Seidel Decl.) is legally insufficient.[2] Summary judgment is not granted where the agency's claims of exemption in a Vaughn index are "conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Seife v. Dep't of State*, 298 F. Supp. 3d 592, 607 (S.D.N.Y. 2018) (quoting *Quinon v. FBI*, 86 F.3d 1222, 1227 (D.C. Cir. 1996)). For each piece of withheld information, the agency must "discuss the consequences of disclosing the sought-after information," and it must show "that the information withheld is not reasonably segregable." *Lawyers Comm.,* 721 F. Supp. 552 at 560 (cleaned up). An agency's Vaughn index must contain "reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption." *Wilner*, 592 F.3d at 76. The purpose of the index is to "to correct, however imperfectly, the asymmetrical distribution of knowledge that characterizes FOIA litigation." *CREW v. DOJ*, 2022 U.S. App. LEXIS 23202, at *33 (Aug. 19, 2022) (quoting *King v. DOJ*, 830 F.2d 210, 218 (D.C. Cir 1987) (cleaned up)).

---

[2] To assist a court in its deliberations, a Vaughn index identifies documents withheld in response to a FOIA request and originated in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

The Government's submissions fall far below that standard here. The Vaughn index repeatedly fails to mention the senders or recipients of communications or what deliberation was taking place or, at times, even the date—all facts necessary to establish the applicability of Exemption 5. (*See, e.g.*, Exh. K to Seidel Decl., Docs 512-514 (no recipients); Docs 324-329 and 372-426 (no indication of relevant deliberation), Docs 372-426 (no dates), Docs 463-467 and 662-674 (no dates, no author, no recipient, no indication of relevant deliberation). Further, the FBI repeatedly relies on generic statements about how documents could conceivably fall within Exemption 7(E) but without trying to link any of that generic language to identifiable documents on the Vaughn index. (*See* FBI Mem. at 7-10.) To say, for instance, that the FBI protected "information gathered in connection with its testing and evaluation of an NSO product" or "concerning techniques for strategic and sensitive technology that were evaluated and tested as a computer network exploitation tool" undoubtedly describes the kind of information that theoretically could fall within Exemption 7(E)). (*See id.* at 10.) But the FBI fails to connect those wide-ranging descriptions to specific documents that are withheld.

## C. The Improper Withholding

Even the incomplete record made by the FBI leaves little doubt that the withholding here exceeds what the law permits. The documents to which The Times is challenging the invocation of Exemptions 5 and 7(E) are grouped below (with numbers referring to Bates stamps shown on the Vaughn index, Exh. K to Seidel Decl.).

An essential point, which is relevant to each group of documents below withheld under 7(E), is that the FBI has conceded that it determined in mid-July 2021 not to use NSO's technology. (*See* FBI Mem. at 2.) For that reason alone, the invocation of 7(E) is suspect. The heart of 7(E) is that the disclosure could disclosure investigative techniques or procedures and

assist in circumvention of the law. But there is nothing to be circumvented, and no secret technique or procedure to be revealed, when a law enforcement technology has been rejected and not deployed for investigations into crime. It is neither logical nor plausible to think that a document applicable to a technology that the FBI has publicly announced it will not use would assist any would-be lawbreakers in circumventing that technology in effort to evade law enforcement. For that reason, the FBI's use of 7(E) to withhold information in all the challenged documents should be rejected. In some instances, as noted below, the timing or subject matter of a document makes the invocation of Exemption 7(E) particularly dubious.

Likewise, the Government also says that documents pertaining to the acquisition of the NSO technology falls within Exemption 7(E). (*See* FBI Mem. at 8.) It is easy to imagine that there could be a discussion of acquisition that touches on current capabilities of the FBI, but it more easily imagined that much discussion of acquisition is about contract terms, negotiations with a counterparty, and the logistics of delivery—subjects not remotely connected to law enforcement information that would permit "circumvention" of the law, especially for a technology that was ultimately rejected by the FBI. And for that reason, such invocation of generic categories and rationales is insufficient to carry its burden under FOIA.

Similarly, as discussed more fully below, the FBI repeatedly tries to shoehorn documents into Exemption 5 even though nothing in the description from the Vaughn index would suggest either that the specific documents were in fact deliberative or that they were devoid of factual matter—factual matter that should be segregated from exempt passages by redaction and released as non-deliberative under established Exemption 5 precedents.

***Group A: Docs 1-2, 37-38, 39-40 (documenting meetings)***

The Vaughn index indicates that these documents will be released in part, but to date no release has been made. In all three instances, they are described as forms FD-1057, a form used for internal communications. In each instance, the Vaughn index refers to a meeting that took place on October 28, 2020, involving the Criminal Investigative Division and the Operational Technology Division on the topic of acquiring NSO surveillance tools. In two of entries, the DOJ is also identified as a participant, although it is not clear whether the documents pertain to a single meeting or multiple meetings on the same day.

FD-1057s are typically devoted to factual matters, including background on the topic and the specific elements of the topic under consideration. Such sections are not deliberative for purposes of Exemption 5 and should be released via redaction. To the extent 7(E) is applied, it fails for the reasons set forth above.

***Group B: Docs 41-65, 66 (CID guidance regarding NSO products)***

These two documents, setting out the Criminal Investigative Division's rules for the NSO product, fall outside the scope of Exemption 5. The description provides no hint that the guidance is subject to deliberation and debate, or—for the first document—that it contains material that is attorney-client privileged or work product. Instead, the guidance appears to fall squarely into the category of "working law"—rules that the FBI and prosecutors are to follow. *N.Y. Times Co. v. DOJ*, 939 F.3d 479, 490-91 (2d Cir. 2019) (guidance that is treated as binding on an agency or the public falls outside Exemption 5); *see also Brennan Ctr. for Justice,* 697 F.3d at 189; *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997); *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 859-60 (D.C. Cir. 1980) (policy at issue must be disclosed as an agency's working law even though it was not formally binding). The documents also likely contain factual

material that must be segregated and released. To the extent 7(E) is applied, it fails for the reasons set forth above.

### Group C: Docs 83-97 (SharePoint presentation from the Operational Technology Division about a "proposal of NSO product," dated July 22, 2021)

We know from the FBI's redacted document production that the agency decided to reject any use of the NSO product on July 22, 2021. On that date, at 11:24 in the morning, an internal email titled "FULL STOP" states, "All, after a conversation with the DD last night, EAD Turner and [sic] have agreed to cease all efforts regarding the potential use of [redacted] . . ." (Exh. D to Mazzetti Decl.) (While the name of the product is strangely redacted in the email, the Vaughn index says that it deals with "the cease of all efforts regarding the potential use of NSO product." Exh. K to Seidel Decl., Docs 516-518.) The FBI has failed to explain what decision requiring a "proposal" in the form of a slide show was being deliberated on the very day that the NSO spyware was rejected. More than that, it is inconceivable that a slide presentation contains no factual information, which must be released even if Exemption 5 otherwise applies. *Grand Cent. P'ship.*, 166 F.3d at 482. To the extent 7(E) is applied, it fails for the reasons set forth above.

### Group D: Docs 122-135, 143-44, 155-160, 526 (talking points documents)

The FBI does not specify who the intended audience was for these talking points, but presumptively the points were being developed to address persons outside the FBI. In some circumstances, agency deliberations about how to communicate policy may come within Exemption 5. *See NRDC v. EPA*, 19 F.4th 177, 189 (2d. Cir. 2021). But the agency's Vaughn index must nonetheless provide an indication that the "discussions concerned the agency's decision of what to say about the policy or how to formulate that message." *Id.* at 191. The FBI's barebones index patently fails to do that. Moreover, to the extent that the communications bore on talking points in final rather than draft format, they are categorically outside the scope of the

deliberative process privilege.[3] *See, e.g.*, *Judicial Watch, Inc. v. Dep't of State*, 2021 U.S. Dist. LEXIS 144516, at *20-21 (D.D.C. Aug. 3, 2021) ("While draft talking points or deliberations about talking points are usually protected, the same logic does not apply to final talking points that are viewed as ready for an official to use."). Once again, any factual matters in these documents must be also released.

The case for rejecting application of 7(E) is particularly compelling for these documents. It is neither logical nor plausible that these talking point materials would fall within the confidentiality imposed by that law enforcement exemption for two reasons. First, it is highly unlikely that talking points for an external audience would disclose information that would allow circumvention of the law. Nor has the FBI shown that any internal commentary about the draft documents veered away from political considerations, style, and scope of disclosure and instead started revealing 7(E) material. Second, having abandoned all plans to use the NSO product, the FBI has no basis now for asserting that proposed disclosures about NSO could lead to circumvention of the law. It is non-operational technology, and as a result there is nothing to circumvent.

### Group E: Docs 136-142, 145-152, 162-194, 305-307 (talking points for Wyden)

The law discussed immediately above also applies to the documents pertaining to talking points for Senator Wyden.

### Group F: Docs 284-286 (NSO information, Jan. 11-12, 2022)

This email chain, according to the Vaughn index, deals with "NSO information." The FBI gives no hint as to what about NSO is being discussed. And the timing is puzzling. The

---

[3] The FBI notes that "[s]ome" of the talking points it withheld "are in draft format." (Seidel Decl. ¶ 57(c).)

emails are dated January 11 and 12, 2022—in other words, at a time nearly six months after the FBI had already rejected NSO's technology. Yet, the document is withheld in full under Exemption 7(E). There is no explanation, either stated or obvious, for what law enforcement concerns would pertain to documents coming so long after the decision to not use NSO products.

### Group G: Docs 308-309, 310-318 (getting Israeli approval to obtain the technology)

Small segments of these documents have been released. But the FBI has not come close to offering a justification for withholding large portions of the documents under Exemptions 5 and 7(E). The exemptions are deployed with no explanation for why they would apply universally to an email chain that began in 2018 (before the agreement to buy NSO software) and extended to October 2021 (months after the cessation decision) concerning a memorandum sent to an Israeli agency on December 4, 2018. No clue is given, for purposes of Exemption 5, as to what was being deliberated at any specific point in that three-year time span. There is no indication who the recipients of the first email chain are, and no indication of either the recipients or the sender of the second one. And the FBI says nothing about how disclosures dealing with the representations made to an Israeli government body—about a product ultimately rejected—could touch upon sensitive 7(E) information or risk circumvention of the law.

Whatever else may be true about FOIA, both sides agree that the Government has the burden of establishing that an exemption applies. The FBI has not done that here.

### Group H: Docs 320-322 (Barr meeting, July 17-27, 2021)

Once again, the FBI's failure to justify withholding is front and center. This email chain from July of 2021 pertains to a meeting with the Attorney General—only not the sitting Attorney General, but William Barr, who had been out of office for more than seven months. The FBI has made sure, through a barebones Vaughn index, that neither the Court nor Plaintiffs know what

these mysterious documents are about, let alone why Exemption 5 or 7(E) should apply. The FBI plainly has failed to carry its burden.

***Group I: Docs 324, 326 (strategy plan for NSO)***

These two documents are purported to be a "plan for NSO product." The FBI does not claim that there is any deliberation about these plans going on. Based on the description given, it appears to be a final plan and therefore outside the deliberative privilege of Exemption 5. To the extent 7(E) is applied, it fails for the reasons set forth above.

***Group J: Docs 328-329 (describing NSO capabilities), Docs 520-525 (technical details)***

These documents, too, appear to be factual not deliberative. The first one is labeled a "document describing capabilities of NSO product." It is undated. No basis for applying Exemption 5 is shown. The second is also undated and described as an "[i]nternal document provided [sic] technical details of an NSO product." It is withheld solely under Exemption 7(E). Because both apparently deal solely with the capabilities of the rejected NSO technology, there is no basis for concluding that their disclosure would risk circumvention and bring the documents within the scope of Exemption 7(E).

***Group K: Docs 3-36, 372-467 (PowerPoints)***

There appear to be four PowerPoints. The first (Doc 3-36) is dated October 28, 2020, and the third (Doc 428-461) is dated September 4, 2020. The other two (Docs 372-426, 463-467) do not have a date. But the withholding in both instances requires one to believe that the PowerPoints slides had no factual, non-deliberative components that could be segregated from any deliberative part of the presentation. That is not logical or plausible. To the extent 7(E) is applied, it fails for the reasons set forth above.

***Group L: Docs 469-471 (update on acquisition)***

These emails from early 2021 concern the "status of the acquisition of NSO product." Nothing about that description suggests that the emails are deliberative for purposes of Exemption 5 or law enforcement-sensitive for purposes of Exemption 7(E), dealing as they do with the process of purchasing and obtaining delivery of a product.

***Group M: Docs 516-518, 738-786 (ceasing NSO relationship)***

These materials were released in part. The redacted versions show very little other that than on July 22, 2021, the FBI ceased all efforts regarding NSO. (*See* Exh. D to Mazzetti Decl. (e-mail dated July 22, 2021, Bates 516 of the FBI's document production).) While the FBI relies principally on Exemption 5 to withhold them, the descriptions utterly fail to establish that the documents were both deliberative and pre-decisional. In fact, some of them contain time stamps from the late morning and early afternoon of July 22—meaning they are being sent after that morning's decision to cease has already been made. Further, the description provides no indication why anyone, at the point that the cessation decision was made, would be disclosing anything at all in an email that would fall into the category of law enforcement information that would risk circumvention as required by 7(E).

***Group N: Docs 601-625 (anticipating call with the Attorney General)***

These documents suggest that a call with the Attorney General was to take place at some point after October 7, 2021. The NSO project had been dead for nearly three months. The FBI fails to indicate what the topic of the call was to be, nor does it say what exactly is involved in "anticipat[ing]" a call that would trigger any exemption. It is impossible to tell whether the emails are solely factual (for example, when the call is going to happen, what the topic will be, who will participate) and outside Exemption 5. Further, there is not even a suggestion that in

doing this "anticipat[ing]," the FBI was conveying to anyone some law enforcement-sensitive information falling under 7(E).

**Group O: Docs 704-05, 735-737 (regarding NSO group)**

These emails were all sent and received around the time that the FBI was rejecting the use of NSO technology on July 22, 2021. The description from the Vaughn index—"emails . . . regarding NSO group"—provides no basis whatsoever for knowing why particular exemptions were found to be applicable by the FBI.

**Group P: Docs 675, 701-703, 787-788 (regarding tool, July 20, 2021 and after)**

Similarly, description of these emails, also from around the time of the cessation of the use of the product, provides no indication as to why an exemption applies. They are described merely as "regarding NSO Group tool."

**Group Q: Docs 499-501, 503-510, 512-514, 661 (miscellaneous)**

These documents have all been withheld in full under Exemption 5, and either in full or in part under Exemption 7(E). In some cases (for example, Docs 512-514) there is no indication of what deliberations the records refer to, and for all of the records it defies credibility that there is no factual information that can be released. The Government's invocation of Exemption 7(E) fails for the reasons given above.

### III.
### THE FBI HAS FAILED TO MEET THE REQUIREMENTS
### OF THE 2016 FOIA AMENDMENT

Even if the Government could establish that all of the withheld material falls within FOIA's exemptions, it loses for another reason: it has failed to show that disclosure would occasion reasonably foreseeable harm to the interests protected by the exemptions relied upon.[4]

This "foreseeable harm" requirement, as it is known, became law under the 2016 FOIA Improvement Act. *Seife*, 43 F.4th at 235. The Act directs agencies to withhold information only where it "reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A). In other words, it is no longer enough for the agency to establish that the material is covered by a statutory exemption; it must also meet an "independent and meaningful burden" to show harm from disclosure. *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021); *see also Seife*, 43 F.4th at 241 (noting that the Act "poses an additional burden on the withholding agency"). The agency satisfies this burden if it has supplied "a focused and concrete demonstration of why disclosure of the particular type of material at issue" will undermine the exemption's core interests. *Reporters Comm.*, 3 F.4th at 370; a*ccord, e.g., Reporters Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 110 (D.D.C. 2021). "[B]road, hedging statements" do not suffice, *Seife*, 43 F.4th at 243, nor do "boilerplate and generic assertions," *Reporters Comm.*, 3 F.4th at 370.

These assertions are all the Government offers here. Its papers repeatedly and matter-of-factly emphasize that disclosure will cause great harm. *See generally* FBI Mem. at 17-23; Seidel Decl. ¶¶ 57-62, 96-97. But the justifications it provides are neither "focused" nor "concrete."

---

[4] The requirement does not apply where disclosure is "prohibited by law." 5 U.S.C. § 552(a)(8)(A).

Take what the Government says about the category of records it terms "deliberative communications." Seidel Decl. ¶ 57(a). It cites first a broad and generic "chilling effect" on agency deliberations (which is insufficient), before going on to identify purported specific harms based on the subject matter of the communications. *See id*. But in reality the Government uses the same empty language for every subject matter: disclosure of the records will "harm future deliberations" about that subject matter in the future. Nowhere to be found in the Government's papers is a meaningful explanation of what those harms are or why disclosure would lead to that result. *See, e.g., Reporters Comm.*, 3 F.4th at 372 (finding FBI declaration insufficient to show foreseeable harm where it "did not explain the particular sensitivity of the types of information at issue or the role that they play in the relevant agency decisional processes (and, therefore, whether and how their release would harm similar deliberations in the future)"). For this reason, too, the material withheld under Exemptions 5 and 7(E) must be released.[5]

## IV.
## THE CONTRACT AND TALKING POINTS DOCUMENTS CANNOT BE WITHHELD UNDER EXEMPTIONS 1 AND 3

The FBI has determined to withhold in full the contract with NSO (Exh. K. to Seidel Decl., Doc 829-840) under Exemption 1 and 3. It also employs those exemptions to withhold in part documents pertaining to talking points (Groups D and E above). Those determinations are neither logical nor plausible.

---

[5] The foreseeable harm requirement applies to both prongs of Exemption 7(E)—"techniques and procedures" as well as "guidelines"—and independently "guard[s] against general explanations and boilerplate language used to justify withholdings." *Reporters Comm.*, 567 F. Supp. 3d at 128.

Congress amended FOIA in 1974 specifically to set aside court decisions that had directed courts not to review classification decisions in FOIA cases. *See CIA v. Sims*, 471 U.S. 159, 188-89 (1985). As amended, FOIA specifically empowered the courts to undertake de novo review "in <u>all</u> cases" and "extended the language of FOIA's provision for *in camera* review to encompass Exemption 1." *Halpern v. FBI*, 181 F.3d 279, 291 (2d Cir. 1999) (emphasis added).

For both Exemption 1 and Exemption 3, the FBI's explanation for the need for secrecy must be "logical and plausible." *See N.Y. Times Co. v. DOJ*, 756 F.3d 100, 119 (2d Cir. 2014) (quoting *Gardels v. CIA,* 689 F.2d 1100, 1105 (D.C. Cir. 1982)); *Navasky v. CIA*, 499 F. Supp. 269, 274 (S.D.N.Y. 1980) (holding that agency failed to show that materials sought "logically fall into the categories of 'intelligence sources and methods'"). The Government must provide a "relatively detailed analysis" of the withheld information and show how that analysis applies to individual documents under Exemptions 1 and 3. *Halpern*, 181 F.3d at 290.

To be sure, the courts are to accord "substantial deference" to agency affidavits pertaining to national security, *Associated Press v. DOD*, 498 F. Supp. 2d 707, 710 (S.D.N.Y. 2007) (cleaned up), but "deference is not equivalent to acquiescence." *Campbell*, 164 F.3d at 30. The courts are not to "relinquish[]" their "independent responsibility" to review agency determinations de novo, even where the documents at issue pertain to national security. *Goldberg v. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987). As the Second Circuit has stated, "deference to . . . a conclusory 'catch-all' assertion is inappropriate." *Halpern*, 181 F.3d at 295 (adjudicating an agency's invocation of Exemption 1); *see also Associated Press*, 498 F. Supp. 2d at 711 (applying "thorough scrutiny" of the agency's documents after finding that the Department of Defense's affidavit failed to provide "sufficient particularization as to allow the

Court to make any informed determination of whether any given redaction satisfied Exemption 1").

Exemption 1 allows agencies to withhold information that is "in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Under Executive Order 13,526, classification is permitted only as to documents whose disclosure "reasonably could be expected to cause identifiable or describable damage to national security" and "pertains to" at least one of eight enumerated topics. E.O. 13,526 § 1.4.[6] There are other important limits, including the prohibition on classification whose purpose is to: "(1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security." *Id.* § 1.7.

In claiming the right to withhold information related to national security, the Government also turns to Exemption 3, which incorporates the secrecy provisions of other statutes, specifically here the National Security Act, 50 U.S.C. § 3024(i)(1). (*See* FBI Mem. at 14.) The two threshold criteria for an Exemption 3 withholding are that: (1) the statute invoked qualifies as an Exemption 3 withholding statute, and (2) the materials withheld fall within that statute's scope. *ACLU*, 2011 U.S. Dist. LEXIS 132503, at *16. The provision of the National Security Act relied upon by the FBI is a withholding statute, but, as the FBI concedes, its protection is limited

---

[6] As set forth in E.O. 13,526 §1.4, these topics are: (a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources; (e) scientific, technological, or economic matters relating to the national security; (f) United States Government programs for safeguarding nuclear materials or facilities; (g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; and (h) the development, production, or use of weapons of mass destruction.

to safeguarding "intelligence sources and methods from unauthorized disclosure." (*See* FBI Mem. at 14.) Further, the FBI must show do more than refer to possible harm; it must also show a plausible connection between that harm and the disclosures being sought. *ACLU v. DOD*, 492 F. Supp. 3d 250, 262 (S.D.N.Y. 2020) ("[T]he Court credits the potential harm to national security of disclosure, but it does not see—through its review of the classified and unclassified Knight Declaration—the connection between that harm and the disclosure of intelligence sources and methods protected by the National Security Act.")

**The contract.** The contract with NSO fails to qualify for withholding under either exemption. The FBI simply fails to demonstrate what damage to national security would arise from disclosure of a contract that it entered into with a private company. And, given the deplorable record of how the NSO product has been used to violate human rights and spy on journalists and social justice advocates, there is some reason to believe that the withholding of the contract is designed to prevent "embarrassment," a rationale specifically barred by the relevant executive order. Nor can there be any question that the disclosure of a contract for a product that the FBI now claims was never operationalized poses zero risk to the FBI's sources and methods under Exemption 3. If the contract is like every other technology contract that exists in the world, it primarily deals with pricing, payment terms, and such routine legal matters as dispute resolution mechanisms, indemnifications, and representations and warranties—hardly the stuff of spy craft. The only possible intelligence source or method the disclosure of the contract would reveal is one the agency has already revealed: it purchased a license to use NSO's products. *See ACLU*, 492 F. Supp. 3d at 262 ("In [the cases cited by the Government], disclosing the information at issue would have revealed something about how the CIA collected intelligence. Here, based on the Court's review of Knight's declaration, disclosing the existence

of updated guidance would reveal nothing of the sort."). And, for the same reasons, to the extent that the FBI claims that part of the contract is covered by Exemption 7(E), that argument likewise fails because of both what we know about the content of a typical contract and the decision by the FBI not to employ the technology.

**Talking points documents.** The Vaughn index for Groups D and E indicate that some part of documents discussing talking points, as well as drafts of talking points, are being withheld under Exemptions 1 and 3. (*See* Exh. K to Seidel Decl., Docs 122-135, 155-160, 136-152, 162-194, 305-307.) It is neither logical nor plausible that talking points to be used outside the agency contain classified information or information disclosing sources and methods. Perhaps there are discussions of the talking points that make reference to such information, but that seems both unlikely and, on the factual record put in by the FBI, unexplained. In the absence of a cognizable rationale for withholding, the material should be disclosed.

## V.
## AT A MININUM, THE COURT SHOULD
## CONDUCT AN *IN CAMERA* REVIEW

In the event this Court concludes that any of the cited exemptions do apply—and that the Government has satisfied the foreseeable harm requirement—The Times requests that the Court exercise its discretion to conduct *in camera* review to ensure that redactions are no more restrictive than required. *See* 5 U.S.C. § 552(a)(4)(B) (the court "may examine the contents of . . . agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section"); *Halpern*, 181 F.3d at 292 (concluding that *in camera* review was proper "where it might be possible that the agency had exempted whole documents simply because there was some exempt material in them").

*In camera* review is particularly warranted in this case, for two reasons. The first is the inadequacy of the Vaughn index: as noted above, the index's often vague descriptions obscure the substance of the withheld information and therefore impede The Times's ability to meaningfully contest its nondisclosure. The second reason is the nature of the main exemptions at issue here, 5 and 7(E). These are by their nature narrow exemptions that frequently apply to a portion of a record rather than its full contents. *See, e.g., Brennan Ctr.*, 571 F. Supp. 3d at 249 (finding after in camera review that redactions under Exemption 7(E) were inappropriate); *N.Y. Times Co. v. Dep't of State*, 2019 U.S. Dist. LEXIS 113743, *9-10 (S.D.N.Y. 2019) (concluding after in camera review that certain redactions were not justified by deliberative process privilege).

## **CONCLUSION**

For each and every of the reasons set forth above, Plaintiffs respectfully ask this Court for an order (i) denying Defendant's Motion and granting Plaintiffs' Cross-Motion; (ii) declaring that the documents sought by Plaintiffs are public under 5 U.S.C. § 552 and must be disclosed; (iii) directing Defendant to provide the requested records to Plaintiffs within 20 business days of the Court's order; (iv) awarding Plaintiffs the costs of this proceeding, including reasonable attorney's feed, as expressly permitted by 5 U.S.C. § 552(a)(4)(E); and (v) granting such other and further relief as the Court deems just and proper.

Dated: New York, NY
      October 3, 2022

Respectfully submitted,

By: ___/s/ David E. McCraw_____
David E. McCraw
Al-Amyn Sumar
The New York Times Company

Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-4031
Facsimile: (212) 556-1009
Email: mccraw@nytimes.com

*Counsel for Plaintiffs*

Of Counsel:

Samantha Hamilton
(not admitted in S.D.N.Y.)