IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE NEW YORK TIMES COMPANY AND
MARK MAZZETTI,

    Plaintiffs,

          v.                          Civil Action No. 22-cv-01539 (JSR)

UNITED STATES DEPARTMENT OF JUSTICE,

    Defendant.

## DECLARATION OF JOSEPH E. BENDER, JR.

I, Joseph E. Bender, Jr., declare as follows:

1.       I am the Assistant Section Chief (ASC) of the Record/Information Dissemination Section (RIDS), Information Management Division (IMD), Federal Bureau of Investigation (FBI), Winchester, Virginia. In the absence of RIDS Section Chief, Michael G. Seidel, I serve as Acting Section Chief for RIDS. I have held the position since December 2020. I joined the FBI in October 2003, and prior to my current position, I was the Acting ASC from June 2020 to December 2020; Unit Chief, RIDS National Security Unit from January 2017 to June 2020; and an Assistant General Counsel (2003-2006) and Unit Chief (2006-2017), FBI Office of the General Counsel (OGC), National Security and Cyber Law Branch. In those capacities, I provided legal support to operational units of the FBI's National Security Branch. Prior to my joining the FBI, I served as a trial attorney in the U.S. Department of Justice, Tax Division, Southern Criminal Enforcement Section. In that role, I participated in federal criminal

enforcement litigations. I am an attorney licensed in North Carolina and the District of Columbia.

2.     In my official capacity as ASC of RIDS, I supervise approximately 244 FBI employees, supported by approximately 82 contractors, who staff a total of nine (9) Federal Bureau of Investigation Headquarters (FBIHQ) units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the Freedom of Information Act (FOIA) as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities as Acting Section Chief also include the review of FBI information for classification purposes as mandated by Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010), and the preparation of declarations in support of Exemption 1 claims asserted under the FOIA.  The Section Chief, RIDS has been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1.  Accordingly, when serving in the position of the Section Chief, RIDS, in the absence of the incumbent, I assume the designated original classification and declassification authority.

3.     The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith. This declaration incorporates and supplements RIDS Section Chief Michael Seidel's declaration (ECF No. 14, "Seidel Declaration") filed on September 19, 2022.

## PART I
## REVISED VAUGHN INDEX

4.      The FBI previously submitted a Vaughn index, attached to the Seidel Declaration, providing details about the records withheld in whole or in part pursuant to one or more FOIA asserted exemptions. The FBI has now prepared a supplemental *Vaughn* index (the "Revised Index"), attached as Exhibit A to this declaration. The Revised Index provides (1) additional detail regarding the records on FBI's original Vaughn index (hereafter "Original Records"); (2) updated entries for a limited number of Original Records that have been reprocessed since the government's opening papers were filed; and (3) entries for records located in supplemental searches (hereafter "Additional Records"). Entries for records that Plaintiffs are no longer challenging have been marked as such and moved to the end. The Revised Index is intended to supersede the original index (Exhibit K to the Seidel Declaration).

## PART II
## ORIGINAL AND SUPPLEMENTAL SEARCHES

5.      This section provides additional detail on the FBI's searches for records responsive to Plaintiffs' FOIA requests. First, I provide additional detail, beyond what is described in the Seidel Declaration, on the FBI's initial searches (i.e., those conducted before September 14, 2022, which located the Original Records). Second, the FBI describes the supplemental searches the FBI conducted since September 14, 2022, which located the Additional Records.

6.      Plaintiffs contend that the FBI's initial searches were inadequate because the FBI did not use "Phantom" as a search term for electronic searches. However, as explained in the *ex parte* classified declaration, the FBI does not believe that the use of that term is likely to yield

additional responsive records that were not returned by the other search terms, "Pegasus" and "NSO Group."

7.     With respect to the search conducted by the Operational Technology Division (OTD), that was a hand-search conducted by OTD personnel with knowledge of the FBI's testing and evaluation of the NSO tool. OTD had previously gathered records documenting OTD's efforts regarding the NSO tool for purposes of responding to inquiries, and the personnel who were tasked with responding to the FOIA requests on behalf of OTD were already aware of the likely location of responsive records without conducting further electronic searches.

8.     The FBI conducted supplemental searches since September 14, 2022, to ensure that, taken together, it conducted searches reasonably calculated to locate records responsive to Plaintiffs' FOIA requests. Information contained within the Original records provided leads for the FBI to conduct additional searches of the Director's Office (DO), the Office of Congressional Affairs (OCA), and the Office of Public Affairs (OPA), which are further described below.

9.     *Search of the Director's Office.* RIDS personnel provided the Office of the Executive Secretariat (ExecSec)[1] with electronic copies of Plaintiffs' request letters and timeframe associated with the requests. ExecSec searched through its internal tracking system that houses correspondence to and from the Director. This search did not yield any potentially responsive records.

10.     In addition, based on a review of other records already located, the FBI identified four potential custodians—the Director, as well as three officials within the Director's Office— who appear reasonably likely to maintain responsive records. RIDS personnel then searched the

---

[1] The Office of the Executive Secretariat (ExecSec) serves the FBI, the Department of Justice, and others by managing executive-level and public correspondence and communications.

unclassified and classified email accounts of those four individuals using search terms "Pegasus" and "NSO Group."  As a result of these searches, responsive records were located and processed within the Additional Records batch.

11.　　*Search of the Office of Congressional Affairs*. RIDS provided the Office of Congressional Affairs (OCA) with electronic copies of Plaintiffs' request letters and timeframe associated with the requests.  OCA conducted a search for responsive records in the possession of relevant OCA personnel and also searched its internal shared drive that houses OCA documents. As a result of OCA's searches, responsive records were located and processed within the Additional Records batch.

12.　　*Search of the Office of Public Affairs*. RIDS searched the email account of the Assistant Director (AD) of the Office of Public Affairs (OPA) for conversations with Plaintiff, Mark Mazzetti. Records were located with OPA's AD, and other members of OPA, containing communications with Mr. Mazzetti. However, I understand that, based on discussions between the U.S. Attorney's Office and counsel representing the Plaintiffs, none of the records located in this search are at issue.

**PART III**
**ADDITIONAL DETAIL ON THE BASES FOR FBI'S ASSERTION OF EXEMPTIONS IN THE ORIGINAL RECORDS**

13.　　The FBI provides additional details concerning its withholding of information within certain Original Records and the Additional Records, including responses to arguments, questions, or assertions in Plaintiffs' summary judgment papers. The discussion first addresses certain broader issues raised by plaintiffs, and then addresses the groups of records identified in Plaintiffs' brief; Plaintiffs' "Group" designations are also provided in column I of the Revised Index.

14.     Exemption 7(E) protects sensitive non-public information pertaining to law enforcement techniques and procedures, including the precise tool acquired by FBI, which has not been publicly acknowledged by FBI, as well as specific details about how FBI acquired, tested and evaluated the NSO tool, the information FBI gleaned and found significant, and the specific reasons the FBI ultimately decided not to deploy the tool in support of criminal investigations. Some of these details would also reveal intelligence activities and methods protected by exemptions 1 and 3 because they are classified and protected from disclosure by the National Security Act. The classified *ex parte* declaration provides additional information about the information withheld under FOIA Exemptions 1, 3 and 7(E).

15.     Plaintiffs contend that the FBI's invocation of FOIA Exemption 7(E) is improper because the FBI determined in mid-July 2021 not to use NSO's technology. Although the FBI ultimately decided not to deploy the NSO tool in support of criminal investigations, the information withheld under FOIA Exemption 7(E) would still reveal sensitive techniques and procedures for law enforcement investigations, for the following reasons, which are discussed in more detail in the classified declaration.

16.     First, the information withheld under exemption 7(E) would reveal how the FBI goes about testing and evaluating commercially available technology to gain access to encrypted communications. As Director Wray explained in his Congressional testimony in March 2022, the FBI tested the NSO tool as part of its "routine responsibilities to evaluate technologies that are out there…." The NSO tool is one of multiple technologies that FBI has or continues to test and evaluate, and FBI anticipates that it will test and evaluate other similar tools in the future. Simply because the FBI ultimately determined not to deploy the NSO tool in support of criminal investigations does not mean that the FBI will not deploy similar tools in the future.

17.     Second, as Director Wray explained, the FBI evaluated the NSO tool "not just from a perspective of could they be used someday legally but also, more importantly, what are the security concerns raised by those products." He explained that "[w]e test and evaluate all sorts of technologies and products that, if in the wrong hands, can be used against our agents, for example, conducting their operations. So, part of it is, from a counterintelligence security perspective, we need to know what tools are out there that the bad guys can use against our people. . . . because that allows us to inform our own countermeasures and things like that." Although the FBI ultimately determined not to deploy the NSO tool in support of criminal investigations, the FBI continues to evaluate similar technologies and products to identify potential security concerns and countermeasures. The FBI's ability to assess complex software (or any gaps) is itself a law enforcement technique or procedure, and disclosure of this technique or procedure could allow hostile actors to exploit potential weaknesses in the FBI's ability to assess similar software. Revealing details of the FBI's assessment would show how the FBI assesses software of this type, what it is looking for, and what it found significant.

18.     Third, the FBI's testing and evaluation of the NSO tool would reveal sensitive information about the scope and limitations of the FBI's existing capabilities to access encrypted communications in support of criminal investigations.

19.     ***Exemption 7(E): Code words***. In certain records, the FBI has asserted exemption 7(E) to protect the FBI's internal code names for certain specific programs or operations. Disclosure of these code names would risk circumvention of the law for at least two reasons. First, certain code names, including some withheld here, are themed—that is, code names relating to a single topic all fall within a certain category. Therefore, disclosure of code names could reveal the relationship between FBI programs (which might not otherwise be clear) or the

extent of the FBI's efforts on a particular matter. Second, disclosure of a code name could make the FBI's internal systems more vulnerable to hacking or other exploits, since an attacker aware of the code name could search for records tied to that name.

***Groups of Responsive Records***

20.    ***Group A***. These records consist of three FBI form FD-1057s,[2] which provide details concerning three separate meetings held by FBI and/or DOJ staff on October 28, 2020, to discuss the potential deployment of the NSO product in support of criminal investigations. All three were previously withheld in full but have now been released in part. In addition to redactions not challenged, portions remain redacted under FOIA Exemptions 5 and 7(E).

21.    The information withheld pursuant to FOIA Exemption 5 is protected by the deliberative process privilege. First, the material is predecisional because it predates any final decision. All three records document meetings that were held while FBI and DOJ considered whether and how to deploy the NSO tool in support of criminal investigations, prior to the FBI's decision not to deploy the tool. At the time of the meetings in October 2020, no final decision had yet been made about whether (and if so, how) to deploy the tool. Rather, the records documented meetings among FBI and DOJ components that would make recommendations to decisionmakers as to whether (and if so, how) to deploy the tool. Second, the withheld material is deliberative because the meetings documented in the records were an important step in the consultative process of deciding whether or not to deploy the NSO tool in support of criminal

---

[2] FD-1057s: Electronic Communications (EC) replaced the traditional FBI correspondence (i.e., Memoranda and Letters) as the primary vehicle of correspondence within the FBI. The purpose of an EC is to communicate within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network. These forms are often utilized to record and disseminate intelligence/investigative information and for general investigation administration purposes.

investigations. The withheld portions reveal specific considerations that FBI components or DOJ offices or components believed were relevant to the evaluation of whether to proceed with the tool (and if so, how); specific problems that non-decisionmakers identified with particular approaches; and proposed specific next steps in the decision-making process. These portions reflect the personal views of specific FBI or DOJ personnel or components, rather than FBI or DOJ's ultimate conclusions about the tool and its appropriate use. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained within the documents is inextricably intertwined with the deliberative material.

22.     Material is also withheld under FOIA Exemption 7(E). Disclosure of this information would reveal the following techniques and procedures for law enforcement investigations: specific operational needs identified by the FBI, which would in turn would reveal what techniques or procedures FBI had available—and lacked—for gaining lawful access to encrypted information. Also, it would reveal specific details about FBI's assessment of the NSO tool, which would show how the FBI assesses software of this type, what it is looking for, and what it found significant. Additionally, disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access to encrypted information, and in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses.

23.     ***Group B.*** These records, which date to late March and early April of 2021, contain information reflecting intermediate recommendations and proposals by certain FBI components—Criminal Investigative Division (CID) and OTD—for the potential use of the NSO product in support of criminal investigations. Document 4 is a 25-page memorandum documenting the recommendations of Counterterrorism Division (CTD) and OTD with regard to

the potential use of the tool under certain specific conditions and understandings outlined in the memorandum. Documents 5 and 6 consist of a cover document and proposed guidance for federal prosecutors in the event the tool were approved for use—a proposed letterhead memorandum (Bates 68-76) outlining proposed guidelines for the tool's use, and proposed language for potential use in Title III applications (Bates 67). The proposed guidelines and language in the attachments were provided to inform the decision about whether to deploy the tool in support of criminal investigations (and if so, how it might be addressed in discovery in subsequent prosecutions). As the tool ultimately was not approved for use in support of criminal investigations, the attachments were never approved or distributed for use by FBI or DOJ personnel.

24.    These documents were withheld in full under FOIA Exemption 5 and the deliberative process privilege. Portions of documents 4 and 6 were also withheld under FOIA Exemption 5 and the attorney-client privilege and the work product doctrine.

25.    The documents and information withheld under the deliberative process privilege, which are dated March and April 2021, are predecisional because FBI and DOJ were still considering whether (and if so, how) to use the NSO tool in support of criminal investigations. The documents originated with specific components of FBI and reflect their recommendations about whether (and if so, how) to use the NSO tool in support of criminal investigations. Because higher-level approvals would have been required within both FBI and DOJ to use the NSO tool in support of criminal investigations, these documents do not embody or reflect final decisions, but rather recommendations. Second, these records are deliberative because the recommendations, and proposed guidance and language, were an important step in the consultative process of deciding whether or not to deploy the NSO tool in support of criminal

investigations. They form an important part of the consultative process of evaluating whether or not to deploy the tool in support of criminal investigations. The documents identify the specific considerations that some FBI personnel believed were relevant to the question of whether to use it. They also contain detailed discussions of pros and cons of deploying the tool, analyze legal questions regarding criminal procedure and disclosure, and provide proposals for specific ways in which the tool might best be used or avoided. All of these matters reflect the views of only some individuals and components within the FBI, and not the final agency decision (which was not to use the product). The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the documents is inextricably intertwined with the deliberative material.

26.     Certain portions of Documents 4 and 6 covered by the attorney-client privilege consist of FBI lawyers' legal advice and legal analysis regarding questions of criminal procedure and prosecutors' disclosure obligations in criminal cases if the tool were used.

27.     Certain portions of Documents 4 and 6 protected by the work product doctrine contain specific proposed language for use in Title III applications if the tool were used, and specific proposed guidance to prosecutors regarding how to comply with their disclosure obligations in litigation. These portions were drafted in reasonable anticipation of litigation in court in criminal matters.

28.     All of the documents in Group B are also withheld in full under FOIA Exemption 7(E). The disclosure of these documents would reveal the following techniques and procedures: specific operational needs identified by FBI, which would reveal what techniques or procedures FBI had available—and lacked—for gaining lawful access to encrypted information. Also, disclosure would reveal specific details about FBI's assessment of the tool, which reveals FBI's

capabilities for assessing software. Additionally, disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access, and in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses.

29. ***Group C.*** This record, Document number 11 on the Revised Index, consists of an email dated July 22, 2021 attaching an undated PowerPoint proposal related to the NSO product. This record is withheld in full pursuant to FOIA Exemption 5 and the deliberative process privilege and pursuant to FOIA Exemption 7(E); additionally, portions of the PowerPoint are classified and withheld pursuant to FOIA Exemptions 1 and 3.

30. Regarding the deliberative process privilege, the record is predecisional because, although the cover email attaching the document was sent after the "cease efforts" decision, the PowerPoint presentation on its face describes a previous proposal related to the NSO tool that was created for discussion purposes before any decisions were made. It is deliberative because the proposal documented in the PowerPoint was an important step in the consultative process of deciding whether or not to deploy the NSO tool in support of criminal investigations. The document would reveal the specific considerations that FBI or DOJ offices or components believed were relevant to whether to proceed with the tool (and if so, how); identify specific problems that non-decisionmakers identified with particular approaches, including enumerating several risks and advantages of deploying the NSO tool; and disclose recommendations, including proposed specific next steps in the decision-making process. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the document is inextricably intertwined with the deliberative material.

31.     Regarding FOIA Exemption 7(E), disclosure would reveal the following techniques and procedures: specific operational needs identified by FBI, which would reveal what techniques or procedures FBI had available—and lacked—for gaining lawful access to encrypted information. Disclosure would also reveal specific details about FBI's assessment of the tool. Disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access, and in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses.

32.     Certain portions withheld pursuant to FOIA Exemptions 1 and 3 would reveal information pertaining to intelligence activities or methods relating to specific capabilities and specific software for use in national security matters. These portions include detailed discussion of particular software programs and vendors, and also discuss potential counterintelligence risks to the U.S. government and counterintelligence investigations.

33.     ***Group D***. Group D (including Document Nos. 101 and 102, located in the FBI's supplemental searches) consists of emails discussing proposed talking points to be provided to the Director of the FBI. All but one of the documents in this group are emails between and among OCA, OTD, DO, and NSB, discussing, editing, and commenting on draft talking points to be provided to the Director in advance of a classified roundtable meeting with the Senate Select Committee on Intelligence (SSCI) on December 7, 2021, regarding key member issues, based upon questions received from Sen. Wyden's staff prior to the meeting. Senators who sit on the SSCI and certain of their staff members are cleared for access to certain classified intelligence information. The draft talking points appear in the text of the email chains as well as in attachments containing edits and track changes. The talking points in these email chains address

numerous topics, of which NSO is only one. As detailed in the Revised Index, the emails and attachments reflect detailed comments, edits, and discussion about what should be included, and not included, in the talking points to be provided to the Director. Two of the emails (Bates 132-33, 848-50) contain the version of the talking points that OCA ultimately provided to the Director, and those emails have been released in part. In addition, during its supplemental search of OCA, FBI located an unofficial transcript of the SSCI roundtable meeting, a portion of which (Doc. 103, Bates 851-52) contains one question and answer regarding NSO; the answer, which is limited, is different in content from the talking points provided to the Director. That excerpt has been processed and released in full, with the exception of records not responsive to Plaintiffs' request.

34.    Regarding FOIA Exemption 5 and the deliberative process privilege, the SSCI talking points emails are predecisional because (1) with the exception of 132-33 and 848-50, they preceded a decision on what information should be included in the talking points to prepare the Director for a potential inquiry about NSO at the SSCI classified roundtable meeting, and (2) all of the emails preceded the Director's decision regarding what, if anything, to say in the event he received an inquiry about NSO.[3] The version provided to the Director (132-33, 848-50) is still predecisional because it is effectively a staff-level recommendation about what to say, not a final decision on what the Director will say, which only the Director can make and which will depend on a variety of factors including whether the inquiry is made, in what form (which may vary from the talking points), and whether the Director decides to say in light of all the circumstances. The FBI has released the excerpt of the official transcript of the SSCI roundtable meeting which

---

[3] Although the emails at Bates 155-60 are dated December 22, 2021, after the SSCI classified roundtable email, they attach and forward predecisional emails and draft talking points from December 6-7, 2021, without substantive comment.

containing the question the Director did receive regarding NSO, as well as the Director's response. In addition, the FBI has made a discretionary release of portions of the talking points he received (132-33, 848-50) that are similar, though not identical, to the Director's actual statement as reflected in the excerpt of the unofficial transcript. The SSCI talking points emails are deliberative because they form an essential part of the consultative process of determining what information the Director needs to know to prepare for a meeting, and what and how much to say to this particular audience in the event of an inquiry. Talking points are an essential part of the process of briefing higher-level officials, including the Director, on important issues that may arise in calls and meetings with a variety of audiences (Congressional, other agencies or governmental entities, classified board, press/public), as well as for his own background knowledge. Drafts, as well as comments and proposed edits to drafts, are quintessentially deliberative; they do not reveal the final position of the agency and could confuse or mislead the public. The same is true of the version of the talking points provided to the Director, which effectively serve as a recommendation to the Director, not the agency's final position regarding how to respond to an inquiry regarding NSO, and could be confusing or misleading to the extent they differ from information actually revealed. Finally, the withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the documents is inextricably intertwined with the deliberative material.

35.     Regarding FOIA Exemption 7(E), disclosure of the SSCI talking points emails would reveal the following techniques and procedures: specific information about what and how the FBI tested, what the FBI was looking for, the FBI's testing and evaluation of other similar products, and a specific FBI security inquiry regarding potential use of the tool against USG personnel. This information was not included in the final version provided to the Director. But

even if it had been, it would remain protected under exemptions 7(E) because it would have been provided on a confidential basis to an audience cleared to receive classified and law enforcement sensitive information. The information withheld under exemption 7(E) would risk circumvention of the law by revealing how FBI specifically goes about testing products like these, and thus the scope and limits of what FBI is looking for, as well as the capabilities and limitations of technology currently available to FBI, making it easier for criminals to evade the FBI's LE efforts as well as penetrate the FBI's own security. In addition, a portion of these records is withheld in part pursuant to exemption 7(A), because disclosure could reasonably be expected to interfere with pending or anticipated enforcement proceedings. Additional information about this assertion is provided in the classified declaration.

36.     Regarding FOIA Exemptions 1 and 3, portions of the information withheld under exemption 7(E) is also classified and protected from disclosure under the National Security Act because it pertains to intelligence activities and methods. Specifically, the information withheld pursuant to FOIA Exemptions 1 and 3 could reasonably be expected to cause damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover current intelligence activities and methods used by the FBI, and (2) disclosure would reveal the capabilities and limitations of the FBI's existing intelligence activities and methods, which would not only make it easier for adversaries to exploit potential vulnerabilities to target FBI and other U.S. intelligence personnel, but also confirm the FBI's knowledge of the existence of any potential vulnerabilities. With the aid of this detailed information, hostile entities could severely disrupt the FBI's intelligence gathering capabilities. This severe disruption would result in serious damage to the FBI's intelligence gathering efforts.

37.     One of the emails in Group D (Bates 143-44) relates to a different set of talking points to be provided to the Director of the FBI. This classified email is dated December 15, 2021, from OTD to DO, and it provides proposed talking points regarding the NSO product in response to two questions that the Director had previously asked OTD for background purposes. These talking points were previously provided to the Director, and were being provided again in advance of a meeting or call with the Executive Branch component at issue in the Group N records, which had asked a question about the NSO tool at a recent meeting.

38.     Regarding FOIA Exemption 5 and the deliberative process privilege, the email at 143-44 is predecisional because it consists of recommended draft talking points provided by OTD to the Director's staff, in response to questions the Director asked for background purposes and to prepare the Director prior to the meeting or call with the Executive Branch component. The email is deliberative because it formed an essential part of the consultative process of briefing the Director, both for background purposes and for the purpose of preparing for the meeting or call at issue. To the extent they were provided for background purposes, they reveal specific questions posed by the Director and his subordinates' responses. To the extent they were provided for purposes of helping the Director prepare for the call or meeting, they are a recommendation to the Director regarding what information was appropriate to provide if asked about the FBI's testing and use of the NSO tool. It was up to the Director to determine what, if anything, to say in the event he received an inquiry; and the Director would decide whether or not to use the talking points, and in what form, depending on the nature of the inquiry. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the email is inextricably intertwined with the deliberative material.

39.     Regarding FOIA Exemption 7(E), disclosure of the email at Bates 143-44 would reveal the following techniques and procedures: specific information about what and how the FBI tested, what the FBI was looking for, the FBI's testing and evaluation of other similar products, and a specific FBI security inquiry regarding potential use of the tool against USG personnel. The information withheld pursuant to FOIA Exemption 7(E) would risk circumvention of the law by revealing how FBI specifically goes about testing products like these, and thus the scope and limits of what FBI is looking for, as well as the capabilities and limitations of technology currently available to FBI, making it easier for criminals to evade the FBI's LE efforts as well as penetrate the FBI's own security.

40.     Regarding FOIA Exemptions 1 and 3, portions of the information withheld under exemption 7(E) is also classified and protected from disclosure under the National Security Act because it pertains to intelligence activities and methods. Specifically, the information withheld pursuant to FOIA Exemptions 1 and 3 could reasonably be expected to cause damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover current intelligence activities and methods used by the FBI, and (2) disclosure would reveal the capabilities and limitations of the FBI's existing intelligence activities and methods, which would make it easier for adversaries to exploit potential vulnerabilities to target FBI and other U.S. intelligence personnel. With the aid of this detailed information, hostile entities could severely disrupt the FBI's intelligence gathering capabilities. This severe disruption would result in serious damage to the FBI's intelligence gathering efforts.

41.     ***Group E***. Group E consists of emails between and among FBI's OCA, OTD, Science and Technology Branch (STB), National Security Branch (NSB), DO, and in some cases an OGC attorney, discussing, editing, and commenting on a draft response to an inquiry from

Senator Wyden's staff following the Director's roundtable meeting with the SSCI on December 7, 2021. FBI has reprocessed and released the questions posed by Senator Wyden's staff, including an additional question added after the meeting (Bates 138-40). The draft answers appear in the body of the emails and in attachments to the emails. Only one of the three questions/answers concerns NSO. To date, FBI has not finalized or provided a written response to the inquiry regarding NSO.

42.     Regarding FOIA Exemption 5 and the deliberative process privilege, the emails are predecisional because they preceded a decision on whether and how to respond to specific questions posed by Senator Wyden's staff. They are deliberative because they form an essential part of consultative process of determining how best to respond to inquiries from oversight committees. The comments and edits contain the candid and unvarnished advice of subordinates regarding what specific information to provide or not to provide, and what information to emphasize. They are not the final decision of the agency; no response to the inquiry was finalized or provided. For these reasons, they could be confusing or misleading if released. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the documents is inextricably intertwined with the deliberative material.

43.     Regarding the attorney-client privilege, the emails at 172-80 are also protected by the attorney-client privilege because they contain a request for legal review of the draft response and the attorney's response and proposed edits.

44.     Regarding FOIA Exemption 7(E), disclosure of the emails in Group E would reveal the following techniques and procedures: specific information about what and how the FBI tested, what the FBI was looking for, the FBI's testing and evaluation of other similar products, and a specific FBI security inquiry regarding potential use of the tool against USG

personnel. The information withheld pursuant to FOIA Exemption 7(E) would risk circumvention of the law by revealing how FBI specifically goes about testing products like these, and thus the scope and limits of what FBI is looking for, as well as the capabilities and limitations of technology currently available to FBI, making it easier for criminals to evade the FBI's law enforcement efforts as well as penetrate the FBI's own security. The draft response was not finalized and provided, and so the information was not shared, but even if it had been, it would have been shared on a confidential basis to an audience cleared to receive classified and law enforcement sensitive information.

45. Regarding FOIA Exemptions 1 and 3, portions of the information withheld pursuant to FOIA Exemption 7(E) is also classified and protected from disclosure under the National Security Act because it pertains to intelligence activities and methods. Specifically, the information withheld pursuant to FOIA Exemptions 1 and 3 could reasonably be expected to cause damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover current intelligence activities and methods used by the FBI, and (2) disclosure would reveal the capabilities and limitations of the FBI's existing intelligence activities and methods, which would make it easier for adversaries to exploit potential vulnerabilities to target FBI and other U.S. intelligence personnel. With the aid of this detailed information, hostile entities could severely disrupt the FBI's intelligence gathering capabilities. This severe disruption would result in serious damage to the FBI's intelligence gathering efforts.

46. ***Group F.*** This record, Document number 32 in the Revised Index, consists of a chain of emails. The first-in-time email in the chain, dated January 11, 2022, which has been released in part, states that FBI was conducting a "review" and "creat[ing] a timeline of our engagement, testing, and process efforts related to NSO's tool," because FBI was receiving

requests for information from other parts of the government. The withheld portions consist of one FBI employee's response to that email, which includes detailed background on the FBI's analysis and consideration of the NSO tool; a review of one particular component's work regarding the NSO tool; and a summary of FBI-created predecisional documentation about the NSO tool.

47. Regarding the deliberative process privilege, the withheld email is predecisional because, although it postdates the "cease efforts" decision, the withheld email recounts and summarizes the FBI's deliberations, including the views and recommendations of particular components, which were different from the FBI's final decision not to proceed. It therefore consists of predecisional material. And the withheld email is deliberative because the withheld portions of the records reveal certain specific considerations that FBI or DOJ offices or components believed were relevant to whether to proceed with the tool (and if so, how); and the process by which intermediate approvals were sought prior to the final decision not to employ the tool, and the specific components that supported certain actions, all of which were important parts of the consultative process leading to the "cease efforts" decision. Disclosure would reveal the personal views of some FBI or DOJ staff rather than the ultimate policy determination of FBI or DOJ. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the document is inextricably intertwined with the deliberative material.

48. Regarding FOIA Exemption 7(E), disclosure would reveal the following techniques and procedures: specific operational needs identified by FBI, which would reveal what techniques or procedures FBI had available—and lacked—for gaining lawful access to encrypted information. Disclosure would also reveal specific details about FBI's assessment of

the tool. Disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access, and in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses.

49. The portions withheld pursuant to FOIA Exemptions 1 and 3 would reveal information pertaining to intelligence activities or methods relating to the specific means of testing the tool and information related to its acquisition.

50. *Group G*. These records, Document numbers 33 and 34 in the Revised Index, consist of emails and two attachments, which are a final and draft version of a letter from the FBI to the State of Israel's Defense Export Control Agency. Portions of these records have been released. Most of the emails and documents date to 2018, but the last-in-time emails are both dated October 21, 2021.

51. Regarding the deliberative process privilege, the portions withheld pursuant to FOIA Exemption 5—which are portions of emails from August through December 4, 2018—are predecisional because they predate the final version of the FBI letter sent to the government of Israel (Bates 309). They are deliberative because they formed an important part of the consultative process for determining what the memorandum must include in order to be certified, as well as the appropriate person to certify it. Disclosure would reveal the personal views of some FBI staff rather than the ultimate policy determination of FBI about the form and content of the final letter. The withheld substantive information is not "purely factual"; rather, the withheld factual information contained in the documents is inextricably intertwined with the deliberative material.

52.     Regarding FOIA Exemption 7(E), disclosure would reveal the following techniques and procedures: the specifics of FBI programs, technology capabilities (and means for acquisition of technology), and relationships with foreign partners. Disclosure would also reveal specific code names that FBI used for certain FBI programs. Disclosure would risk circumvention of the law by revealing FBI processes and potential issues related to relationships with foreign countries. In addition, the FBI code name would risk circumvention of the law for the reasons given in paragraph 19.

53.     ***Group H***. This group is a single document, number 35 in the Revised Index, and consists of two emails—one dated July 27, 2021, which forwarded an email dated July 17, 2019. Both emails are among FBI OGC and OTD staff and concern, in substance, a meeting with then-Attorney General William Barr in 2019. Significant portions of the 2019 email are withheld as nonresponsive, because they concern meeting topics unrelated to the FOIA requests. The portions withheld under an exemption concern the process of FBI and DOJ's consideration of whether (and if so how) to use the NSO tool in support of criminal investigations.

54.     Regarding the deliberative process privilege, the portions withheld under exemption 5 are predecisional. The 2019 email was written well before the FBI and DOJ made any final decision about whether to use the NSO tool. The 2021 email, although it came several days after the decision to cease efforts, summarizes predecisional discussions. The withheld portions are deliberative because they summarize discussions among FBI and DOJ personnel regarding their own personal views about whether (and if so, how) to use the NSO tool in support of criminal investigations. The withheld material includes detailed discussions of particular approaches; identifies problems that would have to be solved before the tool could be used; and discusses unresolved questions about the use of such a tool in criminal investigations,

including the question of how to protect classified information in the criminal discovery and trial process. The document formed an important part of the early consultative process of testing and evaluating the NSO tool for potential use in criminal investigations, and is therefore deliberative. Disclosure of this material would reveal the personal views of individual government employees rather than any final decisions by DOJ or FBI. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the document is inextricably intertwined with the deliberative material.

55.     Regarding FOIA Exemption 7(E), disclosure would reveal the following techniques and procedures: specific operational needs identified by FBI, which would reveal what techniques or procedures FBI had available—and lacked—for gaining lawful access to encrypted information. Disclosure would also reveal specific details about FBI's assessment of the tool. Disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access, and in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses.

56.     The portions of the 2019 email withheld under exemptions 1 and 3 would reveal information pertaining to intelligence activities or methods relating to specific types of software tools that could be relevant to activities designed to protect national security, and specific difficulties or needs for use of classified software.

57.     ***Groups I and J***. These groups consist of four records, numbers 36, 37, 42, and 43 in the Revised Index. The Group I records are dated July 15, 2019, and the Group J records are undated.

58.     Records 36, 37, and 42 are withheld in full pursuant to the deliberative process privilege. These records predate the "cease efforts" decision. Although record 42 is undated, it is plainly predecisional—for example, it discusses multiple potential options (including the NSO tool) for obtaining lawful access to encrypted information in support of criminal investigations. These records are deliberative because they reveal specific considerations that FBI or DOJ offices or components believed were relevant to whether to proceed with the tool (and if so, how); specific problems that the tool might or might not address; specific problems identified with particular approaches; and proposed specific next steps in the decision-making process. The Group I records lay out internal plans for resources and strategy regarding the approval and use of the NSO tool. And document 42 analyzes multiple potential options for gaining lawful access to encrypted information in support of criminal investigations, including pros and cons. All three of these records reflect important parts in the early decision-making process regarding the potential use of the NSO tool in support of criminal investigations: individual FBI employees used these records to make recommendations and proposals, and communicated them internally, to help the FBI make decisions about whether (and if so, how) to proceed with use of the NSO tool in support of criminal investigations. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the documents is inextricably intertwined with the deliberative material.

59.     All four records in Groups I and J are withheld in full under FOIA Exemption 7(E). Disclosure would reveal the following techniques and procedures: specific operational needs identified by FBI, which would reveal what techniques or procedures FBI had available— and lacked—for gaining lawful access to encrypted information. Disclosure would also reveal specific details about FBI's assessment of the tool. Document 43, in particular, contains

especially detailed analysis based on FBI's assessment. Some of the records would also reveal FBI analysis of other approaches to gaining lawful access to encrypted information where the FBI's use or lack of use of these other approaches has not been officially disclosed. Disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access, and in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses. Disclosure would also reveal the government's potential use (or lack of use) of other techniques or methods not officially disclosed.

60.     ***Group K***. This group consists of four documents, numbers 44, 45, 47, and 48 in the Revised Index, and consists of four PowerPoint presentations—two with dates in the fall of 2020, and two undated.

61.     Regarding the deliberative process privilege, all four records are part of the FBI's deliberation about whether (and if so, how) to use the NSO tool in support of criminal investigations. Two of the documents are dated and the dates are many months before the ultimate decision was made in July 2021 not to proceed. From their contents and the contents of apparently related documents, the two undated records are also predecisional—for example, they contain recommendations and document both certain steps that had been taken but others that were, at the time the documents were written, still open. The records are deliberative because they reveal the specific considerations that FBI or DOJ offices or components believed were relevant to whether to proceed with the tool (and if so, how); identify specific problems that non-decisionmakers identified with particular approaches, including enumerating several risks and advantages of proceeding with the NSO tool; and contain recommendations, including proposed specific next steps in the decision-making process. All these records reflect important parts in the

decision-making process: individual FBI employees used these records to make recommendations and proposals, and communicated them internally, to help the FBI make decisions about whether (and if so, how) to proceed with use of the NSO tool in support of criminal investigations. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the documents is inextricably intertwined with the deliberative material.

62. Regarding FOIA Exemption 7(E), disclosure would reveal the following techniques and procedures: specific operational needs identified by FBI, which would reveal what techniques or procedures FBI had available—and lacked—for gaining lawful access to encrypted information. Disclosure would also reveal specific details about FBI's assessment of the tool. Disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access, and in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses.

63. Portions of three records are also withheld pursuant to FOIA Exemptions 1 and 3. Disclosure would reveal information pertaining to intelligence activities or methods relating to specific capabilities and specific software for use in national security matters, including detailed discussion of particular software programs and vendors; also discusses potential counterintelligence risks and counterintelligence investigations. Two of the documents also discuss relationships with other countries.

64. *Group L*. This document—Document 49—is a single email chain. It is withheld in full pursuant to the deliberative process privilege.

65.     This document is predecisional because it predates and relate to the process of considering the NSO tool in support of criminal investigations, and predates the "cease efforts" decision on July 22, 2021. It is deliberative disclosure would reveal the recommendations of specific components and individuals regarding whether to proceed with using the tool, and plans regarding how to proceed. Disclosure would also show the specific decision-making process, including by revealing necessary intermediate approvals that predated the ultimate decision not to employ the tool. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the document is inextricably intertwined with the deliberative material.

66.     ***Group M***. These records—twenty in all—are chains of emails, with a significant amount of internal duplication. They date from July 20 to 22, 2021, and include primarily (1) internal discussions planning for meetings to discuss how to proceed regarding the NSO tool; and (2) distribution of a notice from the EAD for STB to cease all efforts on use of the NSO tool in support of criminal investigations.

67.     Portions of these emails are withheld pursuant to the deliberative process privilege. In relevant part, those portions either (1) predate the "cease efforts" decision on July 22, 2021, or (2) immediately follow the decision but recount predecisional deliberations. These portions are deliberative because they form an important part of the consultative process that led to the "cease efforts" decision. They would reveal discussions regarding whether the NSO tool would be appropriate for potential use in criminal investigations, and the circumstances in which it could be lawfully used for that purpose, as well as post-decisional discussions reflecting the same predecisional deliberations. If revealed, these communications would harm future deliberations about the FBI's potential lawful use of electronic surveillance technologies in

criminal investigations, and future deliberations regarding similar issues presented by other technologies. Moreover, there is no "purely factual" substantive information withheld under exemption 5 in these documents. All substantive factual information within the withheld portions is inextricably intertwined with privileged deliberations, since it would reveal which facts the authors thought were relevant to the deliberation about whether (and if so, how) to use the NSO tool.

68.     Portions of these records are also withheld pursuant to FOIA Exemption 7(E). Disclosure of these portions would reveal FBI code names, which are protected by FOIA Exemption 7(E) for the reasons discussed in paragraph 19. Disclosure would also reveal some of the specific reasons that the FBI relied on in making its "cease efforts" decision. But the specific reasons that led the FBI not to go forward with using the NSO tool are protected by FOIA Exemption 7(E). For example, whether the FBI determined that the NSO tool would, or would not, be effective, and in turn, whether or not this assessment played a role in FBI's determination to cease efforts, is protected by FOIA Exemption 7(E), since it could shed light on the FBI's assessment of other software or potential use of such software in the future.

69.     Additional detail on individual records in Group M is provided here.

a.     Document 79: this email chain contains an additional email dated July 23, 2021. Although this email postdates the decision, it contains predecisional details. This email is protected by exemption 5 because, if disclosed, it would harm future deliberations about the FBI's potential use of software to gain lawful access to encrypted information for use in criminal investigations, and future deliberations regarding similar issues presented by other potential technologies. It is also protected by FOIA Exemption 7(E) because it would reveal FBI's existing

capabilities and limitations in gaining lawful access to encrypted communications in law enforcement investigations.

b. Documents 70 and 78: these email chains, which are near-duplicates, are withheld in relevant part pursuant to FOIA Exemptions 5 and 7(E). These documents contain emails that postdate the decision but recount predecisional details. They are protected by exemption 5 because, if disclosed, it would harm future deliberations about the FBI's potential use of software to gain lawful access to encrypted information for use in criminal investigations, and future deliberations regarding similar issues presented by other potential technologies. They are also protected by FOIA Exemption 7(E) because it would reveal FBI's existing capabilities and limitations in gaining lawful access to encrypted communications in law enforcement investigations.

c. Documents 72 and 76: these email chains, which are near-duplicates, are withheld in relevant part pursuant to FOIA Exemptions 5 and 7(E). These documents contain emails that postdate the decision but recount predecisional details. They are protected by FOIA Exemption 5 because, if disclosed, it would harm future deliberations about the FBI's potential use of software to gain lawful access to encrypted information for use in criminal investigations, and future deliberations regarding similar issues presented by other potential technologies. They are also protected by exemption 7(E) because it would reveal FBI's existing capabilities and limitations in gaining lawful access to encrypted communications in law enforcement investigations.

70.     ***Group N***. There are two sets of email chains in Group N. The first set consists of internal FBI emails between and among officials in OTD, and including an OGC attorney, about how to brief the Executive Assistant Director ("EAD") for STB for an upcoming call with the Attorney General to discuss the other component's inquiry; an email describing the briefing and the EAD's response; and emails regarding follow-up on the TOP SECRET (TS) email system. The second set of emails in Group N consists of three classified (TS) email chains that FBI identified in a supplemental search. The (TS) emails are between and among the other Executive Branch component, DOJ/ODAG and FBI, and they contain questions and follow-up questions posed by that component to ODAG, internal FBI emails discussing potential responses to the questions, and emails between FBI and ODAG providing a proposed draft response and discussing and commenting on that proposed draft. FBI conducted a supplemental search and located three classified (TS) email chains that relate to the emails in Group N. The identity of the other Executive Branch component and the questions it posed are exempt from disclosure for reasons set forth in the classified *ex parte* declaration.

71.     Regarding FOIA Exemption 5 and the deliberative process privilege, the emails in Group N are predecisional because they preceded a decision on how best to brief a higher-level FBI official (the EAD for STB) about an inquiry from another Executive Branch component, and how the EAD would brief the Attorney General. It ultimately was up to the Attorney General to determine how to respond to that inquiry. The emails are deliberative because they form an essential part of the consultative process of determining how best to respond to an inquiry from another component of the Executive Branch. They contain candid and unvarnished advice and commentary by subordinates that do not represent the policy of the agency and could be misleading or confusing.  In addition, questions posed by the other Executive Branch component

are part of a classified policy process that is described in the classified *ex parte* declaration. Communications between the FBI/DOJ and that component are predecisional to the final outcome of that policy process, and deliberative because gathering the information sought by the questions was an important part of the consultative process of reaching the policy determination at issue. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the Group N emails is inextricably intertwined with the deliberative material.

72. Regarding the attorney-client privilege, certain emails in Group N are also protected by the attorney-client privilege because an OGC attorney provided additional feedback on the briefing points to the EAD. Release of this information would reveal attorney-client communications and call into question the FBI's commitment to protect confidential information shared between agency clients and attorneys and could dissuade agency attorneys and clients from fully sharing such information and endanger agency attorneys' ability to provide the best possible legal representation of their clients, including by discouraging attorneys from circulating draft advice or guidance for discussion.

73. Regarding FOIA Exemption 7(E), disclosure of the emails in Group N would reveal the following techniques and procedures: specific information about how the FBI tested, what the FBI was looking for, regarding potential use of the tool against USG personnel. The information withheld pursuant to FOIA Exemption 7(E) would risk circumvention of the law by revealing how FBI specifically goes about testing products like these, and thus the scope and limits of what FBI is looking for, as well as the capabilities and limitations of technology currently available to FBI, making it easier for criminals to evade the FBI's LE efforts as well as penetrate the FBI's own security. In addition, as explained in the classified *ex parte* declaration,

upon further review of the emails in Group N along with the classified (TS) emails, it was determined that the emails in Group D contain a small amount of classified information pertaining to intelligence sources and methods that was not marked as such. Accordingly, in addition to FOIA Exemption 7(E), the FBI is asserting FOIA Exemptions 1 and 3, in conjunction with the National Security Act, to protect the discrete classified information in the Group D emails.

74.     In the course of reviewing certain records located in the supplemental searches, the FBI has determined that a limited amount of information in the Group N documents is also properly classified and statutorily protected, and should have been marked as such. Accordingly, the FBI is now asserting exemptions 1 and 3 over these limited pieces of information in Documents 81-87. Additional information on these assertions is provided in the classified declaration.

75.     ***Groups O and P***. Group O consists of two documents, 88 and 89 in the Revised Index. Both are email chains; the first dates to July 20 and 21, 2021, and the second dates to July 20-22, 2021. Group P as characterized by the Times consists of three documents (90-92). Document 92 is a duplicate of document 90 (an email sent July 20, 2021), except it was then forwarded without comment on January 31, 2022. However, Document 91 is distinct, and has been moved for discussion to Group Q (miscellaneous).

76.     With Document 91 moved to Group Q, the remaining four documents—88, 89, 90, and 92—are withheld in full or in part pursuant to the deliberative process privilege. The withheld portions are predecisional because they predate and relate to the process of considering the NSO tool for use in support of criminal investigations, and predate the "cease efforts" decision on July 22, 2021. They are deliberative because they form an important part of the

consultative process that led to that decision, and disclosure would reveal the recommendations of specific components and individuals regarding whether to proceed with using the tool, discussions and evaluations of the circumstances in which it could be used in support of criminal investigations, and plans regarding how to proceed. Disclosure of these communications would harm future deliberations regarding similar issues presented by other potential surveillance technologies. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the documents is inextricably intertwined with the deliberative material.

77.    Regarding FOIA Exemption 7(E), disclosure would reveal the following techniques and procedures: specific operational needs identified by FBI, which would reveal what techniques or procedures FBI had available—and lacked—for gaining lawful access to encrypted information. Disclosure would also reveal specific details about FBI's assessment of the tool. Disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access, and in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses.

78.    ***Group Q***. This group consists of three documents that plaintiffs label "miscellaneous," as well as an additional document (91) that we have recharacterized given its lack of relationship to other records.

79.    Document 93 is an FBI internal document prepared by CID and OTD providing background on the NSO tool and proposing guidelines for potential use of NSO tool in criminal investigations, dated May 11, 2021. It is withheld in full pursuant to FOIA Exemptions 5 and 7(E).

80.     The record is predecisional because it is dated May 11, 2021, while FBI was still considering whether and how to use the NSO tool in support of criminal investigations. This document does not reflect any final decisions, but recommendations. It is deliberative because this document reflects proposals about how the NSO tool might be used, including specific details about the most appropriate use. The discussion references specific criminal matters then under investigation (separately protected pursuant to FOIA Exemption 7(A), because the existence of those matters is not public, and disclosure of the investigations could reasonably be expected to interfere with those investigations) for which the authors believed the NSO tool might be appropriate. The suggestion of these specific matters is deliberative because it reveals individuals' views about potential use of the tool. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the document is inextricably intertwined with the deliberative material.

81.     Regarding FOIA Exemption 7(E), disclosure would reveal the following techniques and procedures: specific details about FBI's assessment of the tool. Disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses. Disclosure would also reveal FBI code names, which are protected for the reasons given in paragraph 19, above.

82.     Documents 94 and 95 are related. Document 94 is a briefing document created by CID for the Director's Daily Brief, dated May 11, 2021, and provides assessment and evaluation of the NSO tool for potential use in support of criminal investigations. Document 95, an email, provides feedback from the Deputy Director on the same briefing material.

83. Both records are withheld in full under the deliberative process privilege. They are predecisional because both documents, dated May 11, 2021, predate any final decision regarding the NSO tool and were written while FBI was still considering whether to use the NSO tool for use in criminal investigations. They are deliberative because they reflect evaluations of the NSO tool, as well as the capabilities or limitations of the product, including how it could potentially be used in investigations, but do not embody or reflect any final decisions. Briefing the Director (and, relatedly, determining how to brief the Director) about decisions facing the agency or contemplated agency actions is an important part of the FBI's consultative process. Such briefings reflect considerations of various FBI staff, but not the final decision of the agency. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the documents is inextricably intertwined with the deliberative material.

84. Regarding FOIA Exemption 7(E), disclosure would reveal the following techniques and procedures: specific operational needs identified by FBI, which would reveal what techniques or procedures FBI had available—and lacked—for gaining lawful access to encrypted information. Disclosure would also reveal specific details about FBI's assessment of the tool. Disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access, and in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses.

85. Portions of both records are also withheld pursuant to FOIA Exemptions 1 and 3. Disclosure of those portions would reveal information pertaining to intelligence activities or methods relating to: acquisition and potential security risks posed by use of the NSO tool, and

the government's particular capabilities in its ability to assess and acquire information about the tool, which outsiders could exploit.

86.     Document 91, originally placed in Group P by the Times, has been moved to Group Q for this declaration. Document 91 is a single email chain between OTD and CID dated July 21, 2021. Although this document is responsive, it does not relate directly to FBI's consideration of whether to deploy the NSO tool in support of criminal investigations. Instead, it relates to questions from FBI personnel stationed abroad about potential counterintelligence or operational risks posed by NSO or other software.

87.     Portions of this record are withheld under the deliberative process privilege. The portions are predecisional because they consist of individual FBI employees' views and recommendations about how to evaluate potential risks to FBI personnel from NSO Group software. No final decision had then been made about how to proceed. The withheld portions are deliberative because they would reveal candid views and reactions, tentative conclusions, and recommendations for how to proceed regarding potential risks posed by software from NSO Group or others.

88.     In addition, Document 91 is withheld in full pursuant to exemption 7(E). Disclosure would reveal the following techniques and procedures: specific details about FBI's assessment of the NSO Group tool, and details about the FBI's internal practices and procedures for employees to avoid hacking or other electronic surveillance while stationed overseas. Disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to assess and acquire information about the tool, which outsiders could exploit. Disclosure would also reveal specific practices and potential vulnerabilities of FBI systems or personnel stationed overseas.

89.     Document 91 is also withheld in part pursuant to exemption 7(A). Additional detail about this assertion is provided in the classified declaration.

***Additional Records Located in Supplemental Searches***

90.     As a result of its supplemental searches, the FBI located three additional emails that fall into Group D (Documents 101-02) and Group E (Document 104).  These documents are described on the Revised Index.  They are withheld in full under exemption 5 and the deliberative process privilege, and in part under exemptions 1, 3, and 7(E) for the same reasons set forth in paragraphs 33-36 and 41-45 above, regarding other documents in Groups D and E, respectively.

91.     Document 105 is another document located in the FBI's supplemental searches. IT consists of two emails from the OTD Assistant Director to recipients at Cyber Division (CyD) and DO dated December 4, 2021, commenting on specific aspects of a media report. It does not readily fit into a group identified by the New York Times, so it has been added to Group Q (miscellaneous). It is withheld in full pursuant to exemptions 7(A) and 7(E). Disclosure of the withheld material would reveal law enforcement techniques and procedures related to FBI's assessment of the NSO tool, and would also disclose information related to pending or reasonably anticipated enforcement procedures whose disclosure could reasonably be anticipated to interfere with those proceedings. A more complete basis for the exemption 7(A) and 7(E) assertions cannot be given on the public record and is provided in the classified declaration.

92.     Documents 94 and 95 are related. Document 94 is a briefing document created by CID for the Director's Daily Brief, dated May 11, 2021, and provides assessment and evaluation of the NSO tool for potential use in support of criminal investigations. Document 95, an email, provides feedback from the Deputy Director on the same briefing material.

93.     Both records are withheld in full under the deliberative process privilege. They are predecisional because both documents, dated May 11, 2021, predate any final decision regarding the NSO tool and were written while FBI was still considering whether to use the NSO tool for use in criminal investigations. They are deliberative because they reflect evaluations of the NSO tool, as well as the capabilities or limitations of the product, including how it could potentially be used in investigations, but do not embody or reflect any final decisions. Briefing the Director (and, relatedly, determining how to brief the Director) about decisions facing the agency or contemplated agency actions is an important part of the FBI's consultative process. Such briefings reflect considerations of various FBI staff, but not the final decision of the agency. The withheld substantive information is not "purely factual"; rather, the substantive factual information contained in the documents is inextricably intertwined with the deliberative material.

94.     Regarding FOIA Exemption 7(E), disclosure would reveal the following techniques and procedures: specific operational needs identified by FBI, which would reveal what techniques or procedures FBI had available—and lacked—for gaining lawful access to encrypted information. Disclosure would also reveal specific details about FBI's assessment of the tool. Disclosure would risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access, and in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses.

95.     Portions of both records are also withheld pursuant to FOIA Exemptions 1 and 3. Disclosure of those portions would reveal information pertaining to intelligence activities or methods relating to: acquisition and potential security risks posed by use of the NSO tool, and

the government's particular capabilities in its ability to assess and acquire information about the tool, which outsiders could exploit.

## PART III

### ADDITIONAL DETAIL ON FBI'S DETERMINATION THAT DISCLOSURE WOULD FORESEEABLY HARM THE INTERESTS PROTECTED BY THE RELEVANT EXEMPTIONS

96.     This section provides additional information about the FBI's determination, pursuant to 5 U.S.C. § 552(a)(8), that disclosure of the challenged withholdings under exemptions 1, 5 and 7(E) would foreseeably harm the interests protected by those exemptions.

97.     *Exemptions 1 and 3*:  Disclosure of the contract documents and the classified information withheld from Groups D, E, and N would foreseeably harm an interest protected by exemption 1 because could reasonably be expected to harm national security, for the reasons set forth in paragraphs 36 and 45 above and the classified *ex parte* declaration.  In addition, all of the records withheld under exemption 1 are also withheld under exemption 3 and the National Security Act.  The foreseeable harm requirement in 5 U.S.C. § 552(a)(8) does not apply to exemption 3.

98.     In addition, as required by Executive Order 13526, no information withheld here under exemption 1 has been classified to: "(1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security." E.O. 13526 § 1.7(a).

99.     *Exemption 5—deliberative process privilege*.  Many records have been withheld in full or in part pursuant to exemption 5 and the deliberative process privilege. Disclosure of these records and information would reasonably be expected to harm the integrity of FBI's

deliberations about similar matters in the future. Disclosure would be especially likely to harm FBI's deliberations on the specific topic of the FBI's ability to lawfully access encrypted information, including whether (and if so, when) the use of software exploits to access such information is technically possible, legal, or appropriate. These have been high-profile and sometimes controversial topics in the past several years. Therefore, deliberations about FBI's recent consideration of a controversial tool are particularly sensitive. FBI continues to test and evaluate other similar tools, and it is essential that FBI decision-makers can continue to receive candid advice from subordinates regarding potential surveillance tools, especially if their potential use may be controversial. If the withheld deliberative information were disclosed here, individual FBI employees could reasonably be expected to feel reluctant to share such candid views. Disclosure would be especially harmful for deliberations about potential future use of commercial technologies for gaining access to encrypted communications in criminal investigations. Further specifics for the harms that the FBI reasonably foresees from release are provided on a group-by-group basis below.

   a. *Deliberations about preparation of export control paperwork (Group G)*. The deliberative material in these records would disclose specific discussions among non-leadership FBI employees about the specific contemplated uses of the tool and the specific processes for approving the Israel letter. Disclosure would foreseeably harm future similar deliberations by chilling individual FBI employees from posing questions or providing candid views about the process of contracting in sensitive matters, especially those involving foreign government export controls.

b. *Early deliberations regarding testing and evaluation of NSO tool (Groups H, I and J)*. The deliberative material in these records includes early planning and strategy documents, and a very detailed analysis of multiple options including pros and cons of various approaches, all written by non-leadership FBI employees. It also would reveal questions identified by senior leadership at the FBI and DOJ. Disclosure would foreseeably harm future FBI and DOJ deliberations by making individual employees reluctant to share written plans, questions, or analyses on sensitive matters like the use of commercial surveillance software, since their frank views (which might not be the same as the agency's ultimate decision) could be at risk of disclosure.

c. *Deliberations regarding whether (and if so, how) to deploy tool in support of criminal investigations (Groups A, B, C, F, K, L, P, O, and Q)*. The deliberative material in these records includes presentations from FBI employees at various levels of seniority detailing analyses of pros and cons of various approaches, proposals for specific steps to take, discussions of FBI's internal process for making a decision about whether to use the NSO tool (including whose intermediate approvals were needed). Disclosure would foreseeably harm future FBI and DOJ deliberations by making individual employees reluctant to share written plans, questions, or analyses on sensitive matters, since their frank views (which might not be the same as the agency's ultimate decision) could be at risk of disclosure.

d. *Deliberations regarding proposed talking points for the Director and how to respond to inquiries from Sen. Wyden's staff and another Executive Branch*

*component (Groups D and E)*:  The deliberative material in Groups D and E concern recent deliberations about how best to respond, and how to brief the Director to respond, to oversight and Executive Branch inquiries about sensitive and controversial topics that are likely to recur in the future, including the FBI's testing and evaluation of commercial technologies to access encrypted communications and the potential use of such technologies to support the FBI's intelligence, national security, and law enforcement missions. The FBI Director needs to be able to solicit and receive candid and unfettered advice on these topics, and the ability to do so will be adversely affected if lower-level employees believe their recommendations and proposals will be subject to public scrutiny. Further, to the extent the FBI Director's responses to oversight or Executive Branch inquiries differ from proposed talking points, they could be misleading or confusing.

e.  *Deliberations regarding how to respond to inquiry from another Executive Branch component (Group N)*:  The deliberative material in Group N consists of discussions within FBI, and between FBI and DOJ/ODAG, about how to respond to an inquiry from another Executive Branch component to DOJ about, among other things, the FBI's testing and evaluation of the NSO tool. Disclosure of the deliberations reflected in the Group N emails would discourage agency personnel from engaging in written communications about how best to respond to inquiries from this Executive Branch component, and others, about sensitive topics like the FBI's testing, evaluation, and potential use of commercial technologies for gaining access to encrypted communications. Particularly where, as here, the

topics are controversial, FBI and DOJ officials need to be able to engage in candid discussions and receive unfettered advice and recommendations, to protect the overall quality of government decision-making.

100.    *Exemption 5—attorney-client privilege.* A limited number of records contain attorney-client communications, including questions from FBI clients and advice from FBI attorneys. The most frequent topic addressed in the privileged communications is how criminal disclosure obligations would apply in the event that the NSO tool were approved for use in criminal cases, but other topics are addressed as well. Disclosure of these portions foreseeably would deter agency clients from seeking legal advice in novel contexts, and deter agency lawyers from providing their candid assessments on novel legal questions, including by pros and cons of certain approaches, assessments of legal risks, or predictions of how courts or others would be most likely to view or resolve legal questions. Seeking and providing candid legal advice is critical for the effective functioning of the FBI, the nation's premier law enforcement agency. Public trust is essential for the FBI's operations, and that trust relies on the FBI's own compliance with the law. Ensuring that agency clients and lawyers feel free to seek and provide legal advice on questions of rapidly evolving technology is especially important. Legal input on novel technologies is necessary to ensure the FBI can update its techniques, procedures, and methods as technology develops. Without legal review and input, the FBI may be unable to act in response to new technologies because legal lines are not clear. The attorney-client communications also include comments by OGC attorneys on draft responses to oversight or Executive Branch inquiries in Groups E and N. Disclosure of these communications would foreseeably harm the interests protected by exemption 5 for the reasons set forth in paragraph 72.

101.     *Exemption 5—work product doctrine.* Limited portions of the records are also withheld under the work production doctrine. These portions generally provide specific proposed legal guidance for FBI or DOJ attorneys could have used in criminal litigation had the NSO tool been approved for that use. For the adversary system—which is important for the functioning of the criminal justice system—to be effective, government attorneys must be allowed some privacy to strategize, gather evidence, and record mental impressions. Disclosure of the work product information would foreseeably deter lawyers (or their agents) from making specific, written plans or strategies when litigation is reasonably anticipated. The provision of guidance for criminal matters involving potentially complex questions of disclosure and novel technology is especially important to ensure that the government is able to maintain appropriately vigorous prosecutions while also protecting the rights of criminal defendants.

102.     *Exemption 7(E)*:  For the information withheld pursuant to exemption 7(E), disclosure would foreseeably harm an interest protected by the exemption because disclosure would risk circumvention of the law.  Specifically, disclosure would reveal sensitive details about a variety of law enforcement techniques or procedures that, if they were known generally to the public, could be exploited by hostile actors.  In addition to some of the more specific harms described above for particular documents, three harms are common in these records.

103.     First, some of the withheld material would reveal the FBI's abilities—and potentially any gaps in its abilities, as well—to test, analyze, and understand complex software, including specifically software designed to gain access to encrypted information. Disclosing the FBI's capabilities in this regard would reveal to hostile actors areas of strength and weakness in the FBI's ability to analyze software. Hostile actors could avoid software techniques that, based on reviewing the withheld information, could likely be analyzed and understand easily by the

FBI. Conversely, they could use software techniques that could be more difficult for the FBI to analyze and understand.

104.　Second, some of the withheld material would reveal sensitive information about the scope and limitations of the FBI's existing capabilities to access encrypted communications in support of criminal investigations. As noted in my first declaration, access to encrypted information in criminal matters is an area of significant and persistent interest and concern for the FBI. The withheld information includes very recent, very specific details about what types of encrypted information the FBI could, and could not, access using its existing capabilities. Hostile actors who understand the FBI's capabilities could avoid using software or methods that are likely to be accessible by the FBI; conversely, they could focus on software or methods that are known to be difficult to access.

105.　Third, regarding FBI code names, as noted in paragraph 19 above, disclosure of these code names could permit hostile actors to understand the scope of, or relationship between, FBI programs. This could reveal non-public information on how the FBI is using its resources to fulfill its law enforcement mission, or the FBI's specific priorities. Disclosure could thus permit a hostile actor to avoid areas of FBI priority or focus on areas not prioritized. Second, disclosure of a code name could make the FBI's internal systems more vulnerable to hacking or other exploits, since an attacker aware of the code name could search for records tied to that name.

## SEGREGABILITY

106.　The FBI has made every effort to provide Plaintiffs with all reasonably segregable, non-exempt substantive information.  In some instances, because the substantive content of the segregable, nonexempt portions of records is contained in the Revised Index, the

FBI has not provided redacted versions of those records as doing so would not provide any additional substantive information beyond what is already provided within the index.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibit A attached hereto are true and correct copies.

Executed this 31st day of October 2022.

JOSEPH E. BENDER, JR.
Assistant Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia