**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE NEW YORK TIMES COMPANY and
MARK MAZZETTI,

                    Plaintiffs,

                    v.

UNITED STATES DEPARTMENT OF
JUSTICE,

                    Defendant.

22 Civ. 01539 (JSR)


**CORRECTED REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Counsel for Defendant
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2528/2697
natasha.teleanu@usdoj.gov
peter.aronoff@usdoj.gov


Of Counsel:

SARAH S. NORMAND
PETER ARONOFF
Assistant United States Attorneys

**CONTENTS**

Preliminary Statement.................................................................................................................... 1

ARGUMENT .................................................................................................................................... 2

    I.   The FBI Conducted an Adequate Search...................................................................... 2

    II.  The Withheld Records and Information Were Properly Withheld Under
Exemptions 1, 3, 5, 7(A) and/or 7(E)............................................................................. 4

        A.     The FBI Properly Withheld the Contract Documents and Discrete
Information in Certain Talking Points Documents Under Exemptions 1 and 3 .......... 4

        B.     The FBI Properly Withheld Records and Information Under
Exemption 5 ................................................................................................................. 6

        C.     The FBI Properly Withheld Records and Information Under
Exemption 7(E) ......................................................................................................... 29

        D.     The FBI Properly Withheld Records and Information Under
Exemption 7(A) ......................................................................................................... 33

    III.  *In Camera* Review Is Not Warranted .................................................................. 33

CONCLUSION............................................................................................................................... 34

Page(s)

### Cases

*ACLU v. DHS*,
    738 F. Supp. 2d 111 (D.D.C. 2010) ..................................................................... 22

*Allard K. Lowenstein Int'l Human Rights Project v. DHS*,
    626 F.3d 678 (2d Cir. 2010) ................................................................................. 29

*Am. Ctr. for Law & Justice v. DOJ*,
    325 F. Supp. 3d 162 (D.D.C. 2018) ..................................................................... 22

*Am. Oversight v. DOJ*,
    45 F.4th 579 (2d Cir. 2022) ........................................................................... 18, 19

*Bigwood v. U.S. DOD*,
    No. 11-CV-0602 (KBJ), 2015 WL 5675769 (D.D.C. Sept. 25, 2015) ...................... 3

*Blackwell v. FBI*,
    646 F.3d 37 (D.C. Cir. 2011) ....................................................................... 29, 30, 31

*Citizens for Responsibility & Ethics in Wash. v. DOJ*,
    658 F. Supp. 2d 217 (D.D.C. 2009) ..................................................................... 16

*Citizens United v. United States Dep't of State*,
    No. CV 18-1862 (RDM), 2021 WL 3268385 (D.D.C. July 29, 2021) .................. 6, 7

*Conti v. DHS*, ,
    No. 12 Civ. 5827 (AT), 2014 WL 1274517 (S.D.N.Y. Mar. 24, 2014) ...................... 3

*Doyle v. DHS*,
    331 F. Supp. 3d 27 (S.D.N.Y. 2018) ...................................................................... 3

E.O. 13526 ........................................................................................................... 5, 6

*Garcia v. U.S. DOJ*,
    181 F. Supp. 2d 356 (S.D.N.Y. 2002) .................................................................. 34

*Grand Cent. P'ship, Inc. v. Cuomo*,
    166 F.3d 473 (2d Cir. 1999) ................................................................................... 4

*Immigrant Def. Project v. ICE*,
    208 F. Supp. 3d 520 (S.D.N.Y. 2016) .................................................................... 3

*In re Cnty. of Erie*,
    473 F.3d 413 (2d Cir. 2007) ................................................................................. 18

In re *Grand Jury Investigation*,
    399 F.3d 527 (2d Cir. 2005) ................................................................................. 18

*Judicial Watch, Inc. v. Dep't of State*,
    306 F. Supp. 3d 97 (D.D.C. 2018) ................................................... 22, 23, 24, 25

*Judicial Watch, Inc. v. DOJ*,
    306 F. Supp. 2d 58 (D.D.C. 2004) ....................................................................... 15

*Leopold v. ODNI*,
    442 F. Supp. 3d 266 (D.D.C. 2020) ..................................................................... 22

*Local 3, Int'l Bhd. of Elec. Workers v. NLRB*,
    845 F.2d 1177 (2d Cir. 1988) ............................................................................... 34

*N.Y. Times Co. v. U.S. DOJ*,
    939 F.3d 479 (2d Cir. 2019) ................................................................................. 13

*NRDC v. EPA*,
    19 F.4th 177 (2d. Cir. 2021) ................................................................. 21
*Wilner v. NSA*,
    592 F.3d 60 ................................................................................. 33, 34

### Statutes

5 U.S.C. § 552(a)(8) .......................................................................... passim
5 U.S.C. § 552(a)(8)(i)(I) ........................................................................ 29
5 U.S.C. § 552(b)(1) .......................................................................... passim
50 U.S.C. § 3024(i) ............................................................................... 1

The Government respectfully submits this reply memorandum of law in further support of its motion for summary judgment, and in opposition to plaintiffs' cross-motion for summary judgment.

## Preliminary Statement

The Times[1] challenges limited aspects of the FBI's search for responsive records, as well as the level of detail provided in the FBI's initial Vaughn index and declaration. ECF No. 16 ("NYT Br.") 4-7, 7-24. However, the FBI has since conducted supplemental searches of the two offices that the Times complained were not searched, and processed the handful of additional records identified in those searches. The FBI is also filing herewith a supplemental declaration, revised *Vaughn* index, and classified *ex parte* declaration further describing the FBI's searches and explaining the bases for the withholdings that the Times challenges.

The FBI's detailed submissions logically and plausibly demonstrate why the challenged withholdings are exempt from disclosure under one or more FOIA exemptions, and their release would foreseeably harm the interests protected by those exemptions. With regard to exemptions 1 and 3, the FBI's classified *ex parte* declaration explains why the contract documents are classified and protected from disclosure by the National Security Act of 1947, 50 U.S.C. § 3024(i), in their entirety. The FBI also demonstrates that discrete information in the talking points documents is properly classified and statutorily protected. Those documents were not prepared for a public audience, as the Times speculates, but rather to respond to inquiries from the Senate Select Committee on Intelligence ("SSCI") and another Executive Branch component.

---

[1] Following the terminology in Plaintiffs' brief, ECF No. 16 ("NYT Br."), this memorandum refers to Plaintiffs together—the New York Times and its reporter, Mr. Mazzetti—as "the Times." This memorandum otherwise uses the same defined terms set forth in the Government's opening memorandum of law. ECF No. 13 ("Gov't Br.").

The FBI's supplemental submissions also provide substantial detail about the privileged deliberations, attorney-client communications, and work product reflected in the records withheld under exemption 5, and the law enforcement techniques and procedures withheld under exemption 7(E). Contrary to the Times' facile argument, the fact that the FBI ultimately decided not to use the NSO tool in criminal investigations does not defeat the application of exemption 7(E). The FBI's testing and evaluation of the NSO tool would reveal numerous sensitive law enforcement techniques, including how FBI goes about testing technologies of this type, what it is looking for and finds significant, and how the tool might be used against United States Government ("USG") personnel. And just because the FBI ultimately decided not to deploy the tool in support of criminal investigations does not mean it would not test, evaluate and potentially deploy other similar tools for gaining access to encrypted communications used by criminals.

The FBI's submissions are more than sufficient to sustain the withholdings, without any need for *in camera* review. The Court should therefore grant the Government's summary judgment motion and deny the Times' cross-motion.

## ARGUMENT

### I.    The FBI Conducted an Adequate Search

The Times objects to the FBI's search for responsive records because (1) the FBI did not use "Phantom" as a search term, (2) it did not separately search for responsive records within the Office of Congressional Affairs ("OCA") or the FBI Director's Office, and (3) the search did not yield certain allegedly "extant" documents, namely, correspondence from and to Senator Wyden. NYT Br. 4-7. These objections are either without merit or addressed by the FBI's supplemental searches and declarations.

The law is clear that a search is not inadequate simply because the agency did not employ all possible search terms or the search terms a requester prefers. *See, e.g.*, *Doyle v. DHS*, 331 F. Supp. 3d 27, 55 (S.D.N.Y. 2018); *Immigrant Def. Project v. ICE*, 208 F. Supp. 3d 520, 527 (S.D.N.Y. 2016); *Conti v. DHS*, No. 12 Civ. 5827 (AT), 2014 WL 1274517, at *15 (S.D.N.Y. Mar. 24, 2014); *Bigwood v. U.S. DOD*, No. 11-CV-0602 (KBJ), 2015 WL 5675769, at *9 (D.D.C. Sept. 25, 2015). Instead, the "agency has discretion in crafting a list of search terms that they believe to be reasonably tailored to uncover documents responsive to the FOIA request." *Bigwood*, 2015 WL 5675769, at *9. Here, the FBI explains that it did not include "Phantom" among the search terms for electronic searches because it does not believe that term would identify additional responsive records that were not already captured by the other search terms. Bender Decl. ¶ 6. Additional information regarding the FBI's factual basis for this conclusion is provided in classified *ex parte* declaration.

Plaintiffs' remaining challenges to the search are moot. The FBI has since conducted searches of the two offices that plaintiffs contend should have been searched (OCA and the Director's Office), among other supplemental searches. Bender Decl. ¶¶ 8-11. Those searches yielded a small volume of additional records, *id.* ¶¶ 10-11 & Revised Index Docs. 101-08, including the allegedly missing communications between the FBI and Senator Wyden's office, to the extent they exist. The FBI located an unofficial transcript excerpt containing Senator Wyden's question and Director Wray's answer at the relevant SSCI roundtable meeting, which has been released to the Times in full. *Id*. ¶ 33 & Revised Index Doc 103. FBI has also reprocessed certain records to release the questions from Senator Wyden's staff that prompted the talking points deliberations. *Id.* ¶ 33 & Revised Index Docs. 17, 101, Bates 132-33, 848-50. And FBI has confirmed that although drafts of a written response to those questions were created

and edited, as reflected in the revised index at Docs. 23-29, 31 and 104, a written response was never finalized or sent. Bender Decl. ¶ 41. Accordingly, while a search is not inadequate simply because it did not locate all extant records, *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999), the FBI has either produced the records that the Times identified as missing from the production or confirmed that they do not exist.

For these reasons, and the reasons set forth in the FBI's declarations, the FBI is entitled to summary judgment on the adequacy of its search for responsive records.

## II.    The Withheld Records and Information Were Properly Withheld Under Exemptions 1, 3, 5, 7(A) and/or 7(E)[2]

### A.  The FBI Properly Withheld the Contract Documents and Discrete Information in Certain Talking Points Documents Under Exemptions 1 and 3

The Times challenges the FBI's assertion of exemptions 1 and 3 in only two categories of documents (NYT Br. 7): the "contract" documents (Docs. 97-100) and a small amount of information in certain talking points documents (Group D, Docs. 14-20, 101-02, and Group E, Docs. 23-29, 31, 104). NYT Br. 7, 20-24.[3] The FBI is unable to explain on the public record specifically why the contract documents are classified and protected from disclosure by the National Security Act, and why the FBI cannot produce redacted versions, without revealing information that is itself exempt from disclosure. However, the classified *ex parte* declaration

---

[2] The Times does not challenge the FBI's withholdings under exemptions 6, 7(A), and certain assertions under exemptions 1, 3, and 7(E). NYT Br. 7. The documents no longer at issue are highlighted in blue on the revised index.

[3] The FBI has also asserted exemptions 1 and 3 to protect classified and statutorily protected information in certain documents in Group N, including the (TS) emails located in a supplemental search, *see* Revised Index Docs. 106-08, and limited information in Docs. 81-87 that the FBI has since determined is classified and should have been marked as such. Bender Decl. ¶ 74. In the event the Times challenges these exemption 1 and 3 withholdings, the classified *ex parte* declaration logically and plausibly explains why the information relates to intelligence sources and methods and is properly classified and protected from disclosure under the National Security Act.

logically and plausibly explains why disclosure of the contracts would reveal information pertaining to intelligence sources or methods and harm national security. The FBI's declarations on these points are entitled to substantial deference. *See* Gov't Br. 5 (citing cases). The Times flippantly asserts that the contract documents are "hardly the stuff of spy craft," that their disclosure would "pose zero risk to the FBI's sources and methods under Exemption 3," and that the only possible intelligence source or method at issue is the license that the FBI has already revealed. NYT Br. 23. But the Times is simply wrong, as the classified *ex parte* declaration demonstrates.[4]

The Times' speculation is equally wrong with regard to the limited classified and statutorily protected information withheld from certain talking points documents. The Times asserts that it is not logical or plausible that "talking points to be used outside the agency contain classified information or information disclosing sources or methods." NYT Br. 24. But the outside audience for which the talking points documents at issue (Groups D and E) were prepared is the Senate Select Committee on Intelligence, whose members and staff are cleared for access to certain classified intelligence information. Bender Decl. ¶ 33. Although the classified information in these documents was not ultimately conveyed to the SSCI, *id.* ¶¶ 35, 42, it is entirely logical and plausible that the FBI would have shared classified and statutorily protected intelligence information with the intelligence oversight committees, and doing so would not defeat the application of exemptions 1 and 3.

---

[4] FBI also confirms that, contrary to the Times' conjecture, NYT Br. 23, "no information has been classified to: '(1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security.'" Bender Decl. ¶ 97 (quoting E.O. 13526 § 1.7).

Disclosure of the classified contract documents and the discrete classified information in Groups D and E would also foreseeably harm an interest protected by exemption 1, and thus the requirement of 5 U.S.C. § 552(a)(8) is met. The classified information at issue—all of which is classified at the SECRET level—pertains to intelligence sources or methods that could reasonably be expected to cause serious damage to national security if it were disclosed, which is the interest protected by exemption 1. Seidel Decl. ¶ 43; Bender Decl. ¶ 97; *see* 5 U.S.C. § 552(b)(1) (protecting national security information properly classified under E.O. 13526); E.O. 13626 §§ 1.1(c)(3)-(4), 1.2(a)(2).

Moreover, all of the information protected by exemption 1 is also protected by exemption 3, as it would reveal intelligence sources and methods in contravention of the National Security Act. Seidel Decl. ¶¶ 49-52; Bender Decl. ¶ 97. Exemption 3 does not require a showing of foreseeable harm. *See* 5 U.S.C. §§ 552(a)(8)(i)(II), (a)(8)(B); *Citizens United v. United States Dep't of State*, No. CV 18-1862 (RDM), 2021 WL 3268385, at *10 (D.D.C. July 29, 2021).

### B.  The FBI Properly Withheld Records and Information Under Exemption 5

The Times' challenge to the FBI's assertions of exemption 5 also fails. The Times' arguments are largely premised on what it claims was a lack of sufficient detail in the FBI's initial submissions regarding the deliberations at issue. While the FBI disputes that claim, it has provided substantial additional detail in the supplemental declarations and revised index. Those submissions logically and plausibly establish that the FBI engaged in a series of privileged deliberations—regarding the acquisition of the NSO tool, the early testing and evaluation phase, and the FBI's and DOJ's consideration of potential use of the tool in support of criminal investigations—leading to the FBI's ultimate determination not to deploy the tool. After that decision, the FBI engaged in separate deliberations regarding how to respond to inquiries from Senator Wyden's staff on the SSCI and another Executive Branch component concerning the

FBI's testing and evaluation of the tool. The FBI's declarations and revised index logically and plausibly establish that the FBI properly withheld privileged records and information in each of these categories, pursuant to exemption 5.[5]

### 1.   Acquisition of the NSO tool (Group G)

The earliest privileged records are from Group G, which reflect deliberations regarding the FBI's acquisition of the NSO tool.  Specifically, the Group G records are emails and attachments, mostly from 2018, which reflect FBI's internal deliberations about the contents of a letter from the FBI to the State of Israel's Defense Export Control Agency. The two attachments, which are versions of the letter to Israel, have been released in part: the final version (Doc. 33, Bates 309) and an unsigned but otherwise identical (except for formatting) draft (Doc. 34, Bates 318). Bender Decl. ¶ 50 & Revised Index Docs. 33-34.

The portions of the Group G records withheld under exemption 5 precede the finalization of the letter, consist of deliberations among individual FBI employees about the appropriate form and content of the letter to Israel, formed an important part of that consultative process, and reflect the individual views of specific FBI staff rather than the final view of the agency. Bender Decl. ¶ 51. Disclosure would reveal the personal views of some FBI staff rather than the ultimate policy determination of FBI about the form and content of the final letter. *Id*. There is no "purely factual" substantive information in the withheld material; all substantive factual information is inextricably intertwined with privileged deliberations. *Id.*

Disclosure of the Group G emails would foreseeably harm an interest protected by exemption 5. 5 U.S.C. § 552(a)(8). Disclosure would reasonably be expected to harm future

---

[5] The following sections address each of the groups of records identified in Plaintiffs' memorandum of law. The records are generally described chronologically, starting with the earliest records remaining at issue. In some instances, groups of records identified by the Times are addressed together because they are related or have common reasons for withholding.

similar deliberations by chilling individual FBI employees from posing questions or providing candid views about the process of contracting in sensitive matters, especially those involving foreign government export controls. *Id*. ¶ 99.a.

### 2. Early testing and evaluation phase: Groups H, I, and J

The next set of privileged records concerns the FBI's early testing and evaluation of the NSO tool, as well as some initial planning for its potential use in support of criminal investigations. Bender Decl. ¶¶ 53, 57 & Revised Index Docs. 35-37, 42-45.

Group H is a single document (Doc. 35) consisting of two emails—one dated July 27, 2021, which forwarded an email dated July 17, 2019. Both emails are among FBI Office of General Counsel ("OGC") and Operational Technology Division ("OTD") staff and concern a meeting with then-Attorney General William Barr in 2019. Significant portions of the 2019 email are nonresponsive. The portions withheld under an exemption concern the process of FBI and DOJ's consideration of whether (and if so, how) to use the NSO tool in support of criminal investigations. Bender Decl. ¶ 53. The Group I records are internal documents from OTD laying out resource plans (Doc. 36) and strategic plans (Doc. 37) for potential deployment of the NSO tool. Bender Decl. ¶ 58. In addition, one record from Group J—Document 42—contains detailed analysis of multiple options for obtaining lawful access to encrypted information in criminal investigations. *Id.*

All four of these documents are withheld in full under the deliberative process privilege. *Id*. ¶¶ 54, 58. They predate any decisions about whether or how the FBI and DOJ might use the NSO tool in criminal investigations—indeed, it is clear these records are part of early discussions and deliberations, since they (for example) weigh multiple potential options for solving the lawful access problem, and make proposals for how the FBI and DOJ might allocate resources and analyze whether (and how) the NSO tool was appropriate. *Id*. They formed an important part

of the early consultative process of testing and evaluating the NSO tool for potential use in criminal investigations, and are therefore deliberative. *Id.* There is no "purely factual" substantive information in the withheld material; all substantive factual information is inextricably intertwined with privileged deliberations.

Disclosure of the records in Groups H-J would foreseeably harm an interest protected by exemption 5. 5 U.S.C. § 552(a)(8). Release of this material would reasonably be expected to harm future FBI and DOJ deliberations by making individual employees reluctant to share written plans, questions, or analyses on sensitive matters like the use of commercial surveillance software, since their frank views (which might not be the same as the agency's ultimate decision) could be at risk of disclosure. *Id*. ¶ 99.b.

### 3. Consideration of tool for potential use in criminal investigations: Groups A-C, F, K-L, O-Q

The largest set of records concerns the FBI's (and DOJ's) consideration of whether to use the NSO tool in criminal investigations, and if so, how. With a few exceptions noted below, all of these records predate the "cease efforts" decision. They formed an important part of the FBI's internal consultations about whether the NSO tool could be used both lawfully and practically in criminal investigations, and if so, under what terms and conditions. The earlier documents reflect a wider range of topics with more open questions, while the later documents include more detailed analysis of more specific proposals and questions that arose during the deliberation.

**Group A** consists of three FBI form FD-1057s, which provide detail about three separate meetings held by FBI and/or DOJ staff on October 28, 2020, to discuss the potential deployment of the NSO product in support of criminal investigations. All three were previously withheld in full but have now been released in part. Bender Decl. ¶ 20 & Revised Index Docs. 1-3 (Bates 1-2, 37-40, Bates 1-2, 37-40).

The portions withheld under exemption 5 are predecisional—they come many months before the "cease efforts" decision in July 2021. Bender Decl. ¶ 21. And they are deliberative. *Id*. They reflect meetings that were an essential part of the consultative process of determining whether to use the NSO tool in support of criminal investigations, and they would reveal specific considerations that FBI or DOJ components believed were relevant to the evaluation of whether to use the tool (and if so, how); specific problems that non-decisionmakers identified with particular approaches; and proposed specific next steps in the decision-making process. *Id*. These portions reflect the personal views of specific FBI or DOJ personnel, rather than FBI or DOJ's ultimate conclusions about the tool and its appropriate use. *Id*.

**Groups C and K** are five intra-governmental PowerPoint presentations about the NSO tool (and, for Document 31, also a cover email). Though not all the records are dated, the two that are bear dates in September and October 2020. Bender Decl. ¶¶ 29, 60 & Revised Index Docs. 11, 44-45, 47-48.

These records are protected in full by the deliberative process privilege. All five are predecisional, which is clear from the dates of two records (Documents 44 and 47) and from the content of all five, which demonstrates they were created to facilitate discussion within the FBI (and DOJ) about whether to use the NSO tool in criminal investigations, before (and not after) any decision had been made. Bender Decl. ¶¶ 30, 61. They are also deliberative: they include detailed discussions of the potential risks or advantages of using the NSO tool; recommendations from non-decisionmakers about how to proceed; and proposals for specific steps the FBI or DOJ should take before making a decision about whether to use it. *Id.* All of these records reflect important parts in the consultative process: individual FBI employees used these records to make recommendations and proposals, communicated internally to the FBI or DOJ, to aid in a process

of deciding whether (and if so, how) to use of the NSO tool in support of criminal investigations. *Id*.

**Group L** consists of a single chain of deliberative emails between OTD and CID from late January 2021 discussing the potential deployment of the NSO tool, including the views of different components and the status of intermediate recommendations within FBI. It is withheld in full under exemption 5. Bender Decl. ¶ 64 & Revised Index Doc. 49.

The email chain is predecisional, since it predates the "cease efforts" decision and reflects no final decisions. Bender Decl. ¶ 65. And it is deliberative because disclosure would reveal the recommendations of specific components and individuals regarding whether to deploy the tool, and plans regarding how to proceed with the consultative process. *Id.*

**Group B** is a set of three documents from late March and early April 2021, including Document 6, which has been added to the group after discussion with the Times. They reflect intermediate recommendations and proposals by certain FBI components—CID and OTD—for the potential use of the NSO product in support of criminal investigations. Document 4 (Bates 41-65) is a 25-page memorandum documenting the recommendations of CTD and OTD with regard to the potential use of the NSO tool under certain specific conditions and understandings outlined in the memorandum. Documents 5 and 6 consist of a cover document (Doc. 5, Bates 66) with two attachments (Doc. 6): proposed language for potential use in Title III applications (Bates 67) and a proposed letterhead memorandum outlining proposed guidelines for federal prosecutors in the event the tool were approved for use (Bates 68-76). The proposed guidelines and language were prepared and attached to the memorandum to inform the decision about whether to deploy the tool in support of criminal investigations, and if so, how the tool's use could be appropriately addressed in criminal discovery. The proposed language and guidelines

were never approved or distributed for use by FBI or DOJ personnel, as the NSO tool was ultimately not approved for use in support of criminal investigations. Bender Decl. ¶ 23. These documents are protected by the deliberative process privilege, as well as in part by the attorney-client privilege and the work product doctrine. *Id.* ¶ 24.

Regarding the deliberative process privilege, the records are predecisional because all of them date to March and April of 2021, while FBI and DOJ were still considering whether (and if so, how) to use the NSO tool in support of criminal investigations. Bender Decl. ¶ 25. The documents originate with specific components of FBI and reflect their recommendations about whether (and if so, how) to use the NSO tool in support of criminal investigations. *Id* Because higher-level approvals would have been required within both FBI and DOJ in order to proceed with use of the NSO tool in criminal investigations, these documents do not embody or reflect final decisions, but rather recommendations. *Id*. These records are deliberative because they form an important part of the consultative process of evaluating whether or not to deploy the tool in support of criminal investigations. *Id.* They identify the specific considerations that some FBI personnel believed were relevant to the question of whether to use the tool. *Id.* They contain detailed discussions of pros and cons of deploying the tool, analyze legal questions regarding criminal procedure and disclosure, and provide proposals for specific ways in which the tool might best be used or circumstances in which its use should be avoided. *Id*. All of these matters reflect the views of only some individuals and components within the FBI, and not the final agency decision (which was not to use the product). *Id.*

The portions of Documents 4 and 6 covered by the attorney-client privilege consist of FBI lawyers' legal advice and analysis regarding questions of criminal procedure and prosecutors' disclosure obligations in criminal cases if the tool were used. Bender Decl. ¶ 26.

The portions of Documents 4 and 6 protected by the work product doctrine contain specific proposed language for use in Title III applications if the tool were used, and specific proposed guidance to prosecutors regarding how to comply with their disclosure obligations in litigation. *Id.* ¶ 27. These portions were drafted in reasonable anticipation of criminal litigation. *Id.*

Contrary to the Times' argument, NYT Br. 12, none of the material in the Group B documents constitutes "working law" such that it falls outside of exemption 5. As an initial matter, the proposed guidance and language for Title III applications provided in Document 6 were merely proposals of certain FBI components. They "were never approved or distributed for use by FBI or DOJ personnel," Bender Decl. ¶ 23, and did not bind either government employees or the public, as required to constitute "working law." *See N.Y. Times Co. v. U.S. DOJ*, 939 F.3d 479, 491 (2d Cir. 2019) (Rakoff, J.).[6] Likewise, Document 4 contains analysis and recommendations, not the FBI's final position on whether to use the NSO tool. Bender Decl. ¶¶ 23, 25. In sum, "[b]ecause higher-level approvals would have been required within both FBI and DOJ in order to use the NSO tool in support of criminal investigations," the Group B documents "do not embody or reflect final decisions" about the terms of using the NSO tool in criminal matters, "but rather recommendations" about the circumstances and manner in which such use might, in the views of the specific authors, be appropriate. *Id.* ¶ 25.

---

[6] Even if they had been finalized and circulated, documents like these—government-created tactical guidance on matters such as how to approach criminal discovery—do not raise with the concerns underlying the "working law" exception to exemption 5. They are not "a body of secret law which [the government] is actually applying in its dealings with the public but which it is attempting to protect behind a label," *New York Times*, 939 F.3d at 493 (quotation marks omitted), but rather embody the kind of strategizing and planning for litigation protected by the work product doctrine. As in *New York Times*, these documents "set forth no rule of law that another party could unwittingly violate, and neither could any party accused of wrongdoing cite them in his or her defense." *Id*.

**Group Q** contains three documents (Documents 93-95) dating to May 2021 that reflect FBI's ongoing consideration of whether to use the tool. Document 93 is an internal FBI document prepared by Criminal Investigative Division ("CID") and OTD providing relevant background on the NSO tool and proposing guidelines for potential use of NSO tool in criminal investigations, dated May 11, 2021. Documents 94 and 95 are related: Document 94 is a briefing document created by CID for the FBI Director's Daily Brief, dated May 11, 2021, and provides an assessment and evaluation of the NSO tool for potential use in support of criminal investigations. Document 95, an email, provides feedback from the Deputy Director on the same briefing material. *See* Bender Decl. ¶¶ 78-79, 82.

All three records are withheld in full under the deliberative process privilege. They are predecisional because they predate any final decision regarding the NSO tool and were written while FBI was still considering whether to use the NSO tool for use in criminal investigations. Bender Decl. ¶¶ 80, 83. They are deliberative because they formed an important part of the consultative process of determining whether to use the tool in support of criminal investigations: they reflect evaluations of the NSO tool, as well as the capabilities or limitations of the product, including how it could potentially be used in investigations, but do not embody or reflect any final decisions. *Id.* Document 93 references specific criminal matters then under investigation for which the authors believed use of the NSO tool might be appropriate[7]; the suggestion of these specific matters is deliberative because it reveals individuals' views about potential use of the tool. Bender Decl. ¶ 80. Regarding Documents 94 and 95, briefing the Director (and, relatedly,

---

[7] These references are separately protected under exemption 7(A) because the existence of those matters is not public, and disclosure of the investigations could reasonably be expected to interfere with those investigations. The Times does not challenge the exemption 7(A) withholdings.

determining how to brief the Director) about decisions facing the agency or contemplated agency actions is also an important part of the FBI's consultative process. *Id.* ¶ 83. Such briefings reflect considerations that various FBI staff believe are relevant and important to bring to the attention of the FBI Director, but not the final decision of the agency. *Id.*; *see, e.g.*, *Judicial Watch, Inc. v. DOJ*, 306 F. Supp. 2d 58, 71 (D.D.C. 2004) (briefing materials to prepare Deputy Treasury Secretary in advance of foreign trip "are quintessential information protected by Exemption 5").

**Groups O and P** are four email chains (Documents 88, 89, 90, and 92[8]). All date from July 2021, just before the "cease efforts decision," except that Document 92—which otherwise duplicates Document 90—forwarded the email without comment in January 2022. Bender Decl. ¶ 75.

All four documents are withheld in full or in part pursuant to the deliberative process privilege. The portions withheld under exemption 5 are predecisional because they relate to the process of considering the NSO tool for use in support of criminal investigations and predate the "cease efforts" decision on July 22, 2021. Bender Decl. ¶ 76. They are deliberative because they form an important part of the consultative process that led to that decision, and disclosure would reveal the recommendations of specific components and individuals regarding whether to proceed with using the tool, discussions and evaluations of the circumstances in which it could be used in support of criminal investigations, and plans regarding how to proceed. *Id.*

**Group F** is an email chain, Document 32, from January 2022. The first-in-time email in the chain, dated January 11, 2022, which has been released in part (Bates 284-86), states that FBI was conducting a "review" and "creat[ing] a timeline of our engagement, testing, and process

---

[8] The Times placed Document 91 in Group P, but because it is so different from the other documents, it has been moved to the miscellaneous category below for this discussion.

efforts related to NSO's tool," because FBI was receiving requests for information from other parts of the government. The withheld portions consist of one FBI employee's response to that email, which includes detailed background on the FBI's analysis and consideration of the NSO tool; a review of one particular component's work regarding the NSO tool; and a summary of FBI-created predecisional documentation about the NSO tool. Bender Decl. ¶ 46.

Regarding the deliberative process privilege, the withheld portions of the email are predecisional because, although the email postdates the "cease efforts" decision, the withheld portions recount and summarize the FBI's deliberations, including the views and recommendations of particular components, which were different from the FBI's final decision not to proceed. *Id*. ¶ 47. It therefore consists of predecisional material. *Id.*; *see, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 658 F. Supp. 2d 217, 233-34 (D.D.C. 2009) (holding that records created after an agency decision had been made were protected because they recounted predecisional deliberations, and citing other examples). And the withheld portions of the email are deliberative because they would reveal certain specific considerations that FBI or DOJ offices or components believed were relevant to whether to proceed with the tool (and if so, how), and the process by which intermediate approvals were sought prior to the final decision not to employ the tool, and the specific components that supported certain actions, all of which were important parts of the consultative process leading to the "cease efforts" decision. Second Siedel Decl. ¶ 47. Disclosure would reveal the personal views of some FBI or DOJ staff rather than the ultimate policy determination of FBI or DOJ. *Id.*

**All records in Groups A-C, F, K-L, O-Q:**  There is no "purely factual" substantive information withheld under exemption 5 in these groups of documents. All substantive factual information is inextricably intertwined with privileged deliberations, since it would reveal which

facts the authors thought were relevant to the deliberation about whether (and if so, how) to use the NSO tool. Bender Decl. ¶¶ 21, 25, 30, 47, 61, 65, 76, 80, 83.

Disclosure of the privileged material would foreseeably harm an interest protected by exemption 5. 5 U.S.C. § 552(a)(8). With regard to the withheld deliberative material, disclosure would reasonably be expected to harm future FBI and DOJ deliberations—particularly deliberations about potential future use of commercial technologies for gaining access to encrypted communications in criminal investigations—by making individual employees reluctant to share written plans, questions, or analyses on sensitive matters, since their frank views (which might not be the same as the agency's ultimate decision) could be at risk of disclosure. Bender Decl. ¶ 99.c.

Disclosure of the withheld attorney-client communications would foreseeably deter agency clients from seeking legal advice in novel contexts, and also deter agency lawyers from providing their candid assessments on novel legal questions, including the pros and cons of certain approaches, assessments of legal risks, or their predictions of how courts or others would be most likely to view or resolve legal questions. Bender Decl. ¶ 100. Seeking and providing candid legal advice is critical for the effective functioning of the FBI, the nation's premier law enforcement agency. Public trust is essential for the FBI's operations, and that trust relies on the FBI's own compliance with the law. *Id*. Ensuring that agency clients and lawyers feel free to seek and provide legal advice on questions of rapidly evolving technology is especially important, as legal input on novel technologies is necessary to ensure the FBI can update its techniques, procedures, and methods as technology develops. *Id*. Without legal review and input, the FBI may be unable to act in response to new technologies because legal lines are not clear. *Id*. As the Second Circuit has noted, "[i]t is crucial that government officials, who are expected

to uphold and execute the law . . . be encouraged to seek out and receive fully informed legal advice." *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (quoting In re *Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005)). Upholding attorney-client privilege for government actors "furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business," while "[a]brogating the privilege undermines that culture and thereby impairs the public interest." *Id*. (quoting *In re Grand Jury Investigation*, 399 F.3d at 534).

Disclosure of the withheld work product would impair the adversarial process, the interest protected by the work product doctrine. For the adversary system to be effective, government attorneys must be allowed a zone of privacy to strategize, gather evidence, and record mental impressions. Bender Decl. ¶ 101. Disclosure of the work product withheld here would deter lawyers (or their agents) from making specific, written plans or strategies when litigation is reasonably anticipated. Bender Decl. ¶ 101. The provision of guidance for criminal matters involving potentially complex questions of disclosure and novel technology is especially important to ensure that the government is able to maintain appropriately vigorous prosecutions while also protecting the rights of criminal defendants. *Id.* For similar reasons, the Second Circuit has repeatedly upheld the assertion of exemption 5 to protect work product sought from criminal case files of the FBI and DOJ. *Am. Oversight v. DOJ*, 45 F.4th 579, 591-93 (2d Cir. 2022).

### 4.   Decision not to deploy the tool: Group M

The FBI's deliberations culminated in a decision to cease efforts toward using the NSO tool in criminal investigations. *See* Seidel Decl. ¶ 36. The Group M records, twenty documents in all, are email chains dating from July 20 to 22, 2021, and include primarily (1) internal discussions planning for meetings to discuss how to proceed regarding the NSO tool; and (2)

distribution of a notice from the Executive Assistant Director ("EAD") for the FBI's Science and Technology Branch ("STB") to cease all efforts on use of the NSO tool in support of criminal investigations. They contain significant internal duplication. Bender Dec. ¶ 66.

Portions of these emails are withheld pursuant to the deliberative process privilege. In relevant part, those portions either (1) predate the "cease efforts" decision on July 22, 2021, or (2) immediately follow the decision but recount predecisional deliberations. Bender Decl. ¶ 67. These portions are deliberative because they form an important part of the consultative process that led to the "cease efforts" decision; they would reveal discussions regarding whether the NSO tool would be appropriate for potential use in criminal investigations, and the circumstances in which it could be lawfully used for that purpose, as well as post-decisional discussions reflecting the same predecisional deliberations. *Id.* There is no "purely factual" information in the material withheld under exemption 5; all factual information within the withheld portions is inextricably intertwined with privileged deliberations. *Id.*

Disclosure of the privileged information withheld from the Group M emails would foreseeably harm an interest protected by exemption 5. 5 U.S.C. § 552(a)(8). If revealed, these communications would harm future deliberations about the FBI's potential lawful use of electronic surveillance technologies in criminal investigations, and future deliberations regarding similar issues presented by other technologies. *Id.*

### 5. Talking points for the Director (Group D) and draft response to Congressional inquiry (Group E)

The documents in Groups D and E are withheld in full or in part under exemption 5 and the deliberative process privilege because they consist of predecisional deliberations about proposed talking points for the Director of the FBI (Group D) or a draft response to a congressional inquiry that was never finalized or sent (Group E). Some of the Group E records

also contain communications requesting or providing legal advice that are withheld under the attorney-client privilege.

**Group D (SSCI Talking Points)**: Most of the Group D documents (Doc. 14-20, 101-02) concern talking points to be provided to the Director of the FBI in advance of a classified SSCI roundtable meeting on December 7, 2021, regarding key member issues (the "SSCI Talking Points"). Bender Decl. ¶ 33. These are emails between and among OCA, OTD, DO, and/or NSB, discussing, editing, and commenting on draft talking points to be provided to Director, based upon questions received from Sen. Wyden's staff prior to the meeting. *Id.* The draft talking points appear in the text of the email chains as well as in attachments containing edits and track changes. The talking points in these email chains address numerous topics, of which NSO is only one. The emails and attachments reflect detailed comments, edits, and discussion about what should be included, and not included, in the talking points to be provided to the Director. In two of the emails (Doc 17, Bates 132-33, and Doc. 101, Bates 848-50), which have been released in part, OCA circulates the version of the talking points about NSO that were provided to the Director prior to the meeting. *Id.* The FBI has released the excerpt of the unofficial transcript of the meeting (Doc. 103, Bates 851-52), reflecting FBI's recordation of the single question the Director received at the meeting regarding NSO, as well as the Director's response. The FBI has also made a discretionary release of portions of the talking points provided to the Director (Bates 132-33) that are similar, though not identical, to the Director's actual statement. *Id.* ¶ 34.

The material withheld from the SSCI Talking Points emails under exemption 5 is predecisional for two reasons. First, with the exception of the version that was ultimately provided to the Director (released in part at Bates 132-33 and 848-50), the emails preceded the decision about what information should be included in the talking points to prepare the Director

for a potential inquiry about NSO at the SSCI classified roundtable meeting. *Id.* ¶ 34. Second, all of the SSCI Talking Points emails preceded the Director's ultimate decision regarding what, if anything, to say in the event he received an inquiry on this topic. *Id.* The SSCI Talking Points email are deliberative because they form an essential part of the consultative process of determining what information the Director needs to know to prepare for a meeting with the SSCI, and what and how much to say to this particular audience in the event of an inquiry about NSO. *Id.* Talking points are an essential part of the process of briefing higher level officials, including the Director, on important issues that may arise in calls and meetings with a variety of audiences, as well as for the Director's own background knowledge. *Id.* Drafts, and comments and proposed edits to drafts, are quintessentially deliberative; they do not reveal the final position of the agency and could confuse or mislead the public if released. *Id.*

The Times appears to concede that the draft SSCI Talking Points, and related emails conveying comments and proposed edits, fall within the deliberative process privilege if they reflect discussions about "'what to say about the FBI's testing and evaluation of the NSO tool, and how to formulate that message,'" NYT Br. 13 (quoting *NRDC v. EPA*, 19 F.4th 177, 191 (2d. Cir. 2021), as the supplemental declaration makes clear that they do, Bender Decl. ¶ 34. The only email that does not concern drafts of the talking points is the version that was ultimately provided to the Director (Bates 132-33 and 848-50), which has been released in part. However, contrary to the Times' contention that so-called "final" talking points "are categorically outside the scope of the deliberative process privilege," NYT Br. 13-14, the withheld portions of the talking points provided to the Director are still predecisional and deliberative. They are effectively a staff-level recommendation about what to say in response to an inquiry from the SSCI about NSO, not a final decision on what the Director will say, which only the Director can

make. Bender Decl. ¶ 34. *See Leopold v. ODNI*, 442 F. Supp. 3d 266, 284 (D.D.C. 2020) ("The Agency's final response to a question or statement on a particular topic would be whatever was provided publicly by the [Director of the CIA]."); *Am. Ctr. for Law & Justice v. DOJ*, 325 F. Supp. 3d 162, 173 (D.D.C. 2018) (noting that "the 'final' version of talking points prepared by more junior staffers for a more senior official is rarely the final decision about what the senior official will say," and holding that the final decision was what the Attorney General "actually said to the media"); *Judicial Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d 97, 115 & n.3 (D.D.C. 2018) ("draft responses generated by a nominee and an agency that deliberate about how to respond to questions from Congress about matters of agency policy qualify as deliberative and predecisional"); *ACLU v. DHS*, 738 F. Supp. 2d 111, 112 (D.D.C. 2010) ("final 'talking points' for use in response to media inquiries" protected by deliberative process privilege).[9]

In this instance, the Director received a single question on the topic of NSO at the SSCI roundtable meeting, and he gave a limited answer which varied from the talking points; the question and answer have been released to the Times (Bates 851-52). Bender Decl. ¶ 33. The

---

[9] For its proposed categorical rule that so-called "final" talking points are always subject to disclosure, the Times cites *Judicial Watch, Inc. v. Department of State*, No. 15-687(JEB), 2021 U.S. Dist. LEXIS 144516, at *22-23 (D.D.C. Aug. 3, 2021), in which the Court acknowledged that "the overwhelming consensus among judges in this District is that the privilege protects agency deliberations about public statements, including the use of talking points," but concluded that this logic only applied only to "draft" talking points and not to "final talking points that are viewed as ready for an official to use"). *Judicial Watch* ultimately held, however, that "proposed talking points for potential use" by the Secretary of State during a "potential call with a foreign government official" were privileged because they were "generated as part of the deliberative process of lower-level officials helping the Secretary and others determine what they might say." *Id.* And in *Ecological Rights Foundation v. EPA*, the case *Judicial Watch* relied upon for its distinction between "draft" and "final" talking points, the court acknowledged that other judges on that court disagreed. No. 19-980(BAH), 2021 U.S. Dist. LEXIS 27748, at *59 (D.D.C. Feb. 13, 2021) (noting that other judges had "found that, even if an agency decisionmaker uses a final set of talking points to deliver public remarks, the talking points themselves remain predecisional and deliberative because the official may not stick to the script, or may closely follow the talking points without formally adopting their reasoning").

FBI has also released the portions of the so-called "final" talking points provided to the Director that are similar, although not identical, to what the Director actually said (Bates 132-33 and 848-50). *Id.* But the remaining portions of those talking points remain privileged and protected from disclosure. Indeed, a comparison of what the Director actually said to the portions of the talking points that remain withheld would reveal aspects of the talking points that the Director elected not to convey, thus providing particular "insight into the deliberative process." *Judicial Watch*, 306 F. Supp. 3d at 115 n.3 ("because the final responses to [] written queries [from a congressional committee] are publicly available, it appears that all [the plaintiff] hopes to gain accessing the draft responses is insight into the deliberative process").

**Group D (Doc. 18, Bates 143-45)**: Document 18, within Group D, relates to a different set of talking points to be provided to the Director of the FBI. This classified email is dated December 15, 2021, from personnel within OTD to the Director's Office. Bender Decl. ¶ 37. The email provides proposed talking points regarding the NSO product in response to two questions that the Director had previously asked OTD for background purposes. *Id.* These talking points were previously provided to the Director, and were being provided again in advance of a meeting or call with the Executive Branch component at issue in the Group N records, which had asked a question about the NSO tool at a recent meeting. *Id.*

Document 18 is withheld in full pursuant to exemption 5 and the deliberative process privilege. The email is predecisional because it consists of recommended draft talking points provided by OTD to the Director's staff prior to the meeting or call with the Executive Branch component. Bender Decl. ¶ 38. The email is deliberative because it formed an essential part of the consultative process of briefing the Director, both for background purposes and to prepare for the meeting or call. *Id.* To the extent the talking points were provided for background purposes,

they reveal specific questions posed by the Director and his subordinates' responses. To the extent they were provided for purposes of helping the Director prepare for the call or meeting, they are a recommendation to the Director regarding what information was appropriate to provide to the other Executive Branch if asked about the FBI's testing and use of the NSO tool. *Id.* It was up to the Director to determine what, if anything, to say in the event he received an inquiry, and the Director would decide whether or not to use the talking points, and in what form, depending on the nature of the inquiry. *Id.*

**Group E** consists of emails between and among FBI's OCA, OTD, STB, National Security Branch (NSB), Director's Office, and in some cases an OGC attorney, discussing, editing, and commenting on a draft written response to the questions from Senator Wyden's staff following the Director's roundtable meeting with the SSCI on December 7, 2021. Bender Decl. ¶ 41. FBI has reprocessed and released the questions posed by Senator Wyden's staff, including an additional question added after the meeting (Bates 138-40). *Id.* The draft answers appear in the body of the emails and in attachments to the emails. *Id.* Only one of the three questions/answers concerns NSO. *Id.* To date, FBI has not finalized or provided a written response to the inquiry regarding NSO. *Id.*

The Group E emails are protected by the deliberative process privilege. The emails are predecisional because they preceded a decision on whether and how to respond to the questions posed by Senator Wyden's staff. Bender Decl. ¶ 42. They are deliberative because they form an essential part of consultative process of determining how best to respond to inquiries from oversight committees. *Id.* The comments and edits contain the candid and unvarnished advice of subordinates regarding what specific information to provide or not to provide, and what information to emphasize. *Id.* They are not the final decision of the agency; no response to the

inquiry was finalized or provided. For these reasons, they could be confusing or misleading if released. *Id.* Some of the Group E emails (Docs. 26-27, Bates 172-80) are also protected by the attorney-client privilege because they contain a client request for legal review of the draft response and the OGC attorney's response and proposed edits. *Id.* ¶ 43.

For all of the documents within Groups D and E, the withheld information is not "purely factual"; rather, factual information contained in the documents is inextricably intertwined with the deliberative material. Bender Decl. ¶¶ 34, 38, 42. And disclosure of the records would foreseeably harm the interests protected by exemption 5. 5 U.S.C. § 552(a)(8). The deliberative material in Groups D and E concern recent deliberations about how best to respond, and how to brief the Director to respond, to oversight and Executive Branch inquiries about sensitive and controversial topics that are likely to recur in the future, including the FBI's testing and evaluation of commercial technologies to access encrypted communications and the potential use of such technologies to support the FBI's intelligence, national security, and law enforcement missions. Bender Decl. ¶ 99d. The FBI Director needs to be able to solicit and receive candid and unfettered advice on these topics, and his ability to do so will be adversely affected if lower-level employees believe their recommendations and proposals will be subject to public scrutiny. *Id.* Further, to the extent the FBI Director's responses to oversight or Executive Branch inquiries differ from proposed talking points, they could be misleading or confusing.  *Id.*

### 6. Proposed response to inquiry from another Executive Branch component:  Group N

**Group N** consists of emails containing deliberations within the FBI about how the Department of Justice should respond to an inquiry by another Executive Branch component concerning, among other things, the FBI's testing and evaluation of the NSO tool. Bender Decl.

¶ 70. The identity of the other Executive Branch component, and the questions it posed to DOJ, are also exempt from disclosure for reasons described in the classified ex parte declaration. *Id.*

There are two sets of emails within Group N. The first set (Docs. 81-87) consists of internal FBI emails between and among officials in OTD, and including an OGC attorney, about how to brief the EAD for STB for an upcoming call with the Attorney General to discuss the other Executive Branch component's inquiry; an email describing the briefing and the EAD's response; and emails regarding follow-up on the TOP SECRET (TS) email system. Bender Decl. ¶ 70. The second set of emails in Group N (Docs. 105-07) consists of three classified (TS) email chains that FBI identified in a supplemental search. *Id.* The (TS) emails are between and among the other Executive Branch component, the Office of the Deputy Attorney General ("ODAG"), and FBI, and they contain questions and follow-up questions posed by that component to ODAG, internal FBI emails discussing potential responses to the questions, and emails between FBI and ODAG providing a proposed draft response and discussing and commenting on that proposed draft. *Id.*

The emails in Group N are protected in full by the deliberative process privilege. The internal FBI emails are predecisional because they preceded a decision on how best to respond to an inquiry from another Executive Branch component about the FBI's testing and evaluation of the NSO product, among other things, as well as a briefing of senior-level FBI management and a call with the Attorney General about that inquiry. Bender Decl. ¶ 71. The (TS) emails are predecisional because they similarly preceded a decision on how best to respond to the other component's inquiry. *Id.* The Group N emails are deliberative because they form an essential part of the consultative process of determining how best to respond to an inquiry from another component of the Executive Branch. *Id.* They contain candid and unvarnished advice and

commentary by subordinates that do not represent the policy of the agency and could be misleading or confusing if released. *Id.* In addition, the Group N emails are predecisional to the final outcome of the privileged and classified policy process described in the classified *ex parte* declaration, and deliberative because gathering the information sought by the questions was an important part of the consultative process of reaching the policy determination(s) at issue. *Id.* Thus, although the FBI's "NSO project had been dead for more than three months," NYT Br. 17, other privileged deliberative processes continued. Contrary to the Times' speculation, NYT Br. 17, information withheld from the Group N emails is not "purely factual," but rather is inextricably intertwined with the deliberative material. Bender Decl. ¶ 71.

Certain information in some of the Group N emails (Docs. 81-87) is also protected in part by the attorney-client privilege because an OGC attorney provided additional feedback on the briefing points to the EAD. Bender Decl. ¶ 72. Release of this information would reveal attorney-client communications.

Disclosure of the records in Group N would foreseeably harm the interests protected by exemption 5. 5 U.S.C. § 552(a)(8). Disclosure of the deliberations reflected in the Group N emails would discourage agency personnel from engaging in written communications about how best to respond to inquiries from this Executive Branch component, and others, about sensitive topics like the FBI's testing, evaluation, and potential use of commercial technologies for gaining access to encrypted communications. Particularly where, as here, the topics are controversial, FBI and DOJ officials need to be able to engage in candid discussions and receive unfettered advice and recommendations, to protect the overall quality of government decision-making. Second Bender Decl. ¶ 99e. Release of the attorney-client communications in Group N would also call into question the FBI's commitment to protecting confidential information shared

between agency clients and attorneys, which could dissuade agency attorneys and clients from fully sharing such information and endanger agency attorneys' ability to provide the best possible legal representation of their clients, including by discouraging attorneys from circulating draft advice or guidance for discussion. *Id.* ¶¶ 72, 100.

### 7. Miscellaneous: Document 91[10]

**Document 91** does not logically fall within the categories addressed above. It is a single email chain between OTD and CID dated July 21, 2021. Although this document is responsive, it does not relate directly to FBI's consideration of whether to deploy the NSO tool in support of criminal investigations. Instead, it relates to questions from FBI personnel stationed abroad about potential counterintelligence or operational risks posed by NSO or other software. Bender Decl. ¶ 86.

Portions of this record are withheld under the deliberative process privilege. Bender Decl. ¶ 87. The portions are predecisional because they consist of individual FBI employees' views and recommendations about how to evaluate potential risks to FBI personnel from NSO Group software. No final decision had then been made about how to proceed. *Id.* The withheld portions are deliberative because they would reveal candid views and reactions, tentative conclusions, and recommendations for how to proceed regarding potential risks posed by software from NSO Group or others. *Id.* Disclosure of this record would foreseeably harm the interests protected by exemption 5 by making individual employees reluctant to share their views and analysis of sensitive matters. *Id.* ¶ 99c.

---

[10] The Times placed this email within Group P, apparently because it was dated near the time of the other emails in that group. NYT Br. 18. However, this email is different in kind from the other emails in Group P, and is better considered in the miscellaneous category (Group Q). Bender Decl. ¶¶ 75, 78, 86.

### C.  The FBI Properly Withheld Records and Information Under Exemption 7(E)

As with the exemption 5 withholdings, the FBI's supplemental declaration and revised index provide substantial additional detail about the bases for the FBI's assertions of exemption 7(E). The FBI's submissions logically and plausibly that the information withheld under exemption 7(E) would reveal techniques and procedures for law enforcement investigations, the disclosure of which would risk circumvention of the law.[11] The FBI's declarations are more than sufficient to meet the "low bar" of exemption 7(E), *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011), particularly in light of the deference owed to the agency in this context, *see* Gov't Br. 5 (citing cases).

#### 1.  The FBI's decision not to deploy the tool does not defeat the application of exemption 7(E)

The Times' principal argument against the exemption 7(E) withholdings is that the exemption cannot apply because the FBI ultimately determined not to deploy the NSO tool in support of criminal investigations. *See, e.g.*, NYT Br. 10-11. This argument both ignores the facts set forth in the FBI's original declaration, Seidel Decl. ¶¶ 77-85, and defies common sense. Even though the FBI is not using the tool operationally, the information withheld under

---

[11] Although it is not necessary to decide the issue in this case, the application of 5 U.S.C. § 552(a)(8) to law enforcement techniques and procedures in exemption 7(E) is unclear. Prior to the FOIA Improvement Act of 2016, the Second Circuit had held that information that "would disclose law enforcement techniques and procedures" is protected by exemption 7(E) without any need to show that disclosure would risk circumvention of the law. *See Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678, 681-82 (2d Cir. 2010) (Rakoff, J.). The Court found that the plain text of the exemption itself and the history of amendments to the exemption show that Congress intended to categorically protect law enforcement techniques and procedures from disclosure, without any further showing. *Id*. It follows that where law enforcement techniques and procedures are at issue, the "interest protected" by the exemption, 5 U.S.C. § 552(a)(8)(i)(I), is the nondisclosure of such techniques and procedures, without more. Here, however, the Court need not decide whether the 2016 amendments require a showing of foreseeable harm to protect law enforcement techniques and procedures, because the FBI's declarations logically and plausibly explain why disclosure of the techniques and procedures withheld under exemption 7(E) would risk circumvention of the law.

exemption 7(E) would still reveal sensitive techniques and procedures for several reasons.
Bender Decl. ¶ 15.

First, the information withheld under exemption 7(E) would reveal how the FBI goes about testing and evaluating commercially available technology to gain access to encrypted communications. Bender Decl. ¶ 16. As Director Wray explained in his Congressional testimony in March 2022, the FBI tested the NSO tool as part of its "routine responsibilities to evaluate technologies that are out there…." *Id.* The NSO tool is one of multiple technologies that FBI has or continues to test and evaluate, and FBI anticipates that it will test and evaluate other similar tools in the future. *Id.* Simply because the FBI ultimately determined not to deploy the NSO tool in support of criminal investigations does not mean that the FBI will not deploy similar tools in the future. *Id.*

Second, as Director Wray explained, the FBI evaluated the NSO tool "not just from a perspective of could they be used someday legally but also, more importantly, what are the security concerns raised by those products." Bender Decl. ¶ 17. He explained that "[w]e test and evaluate all sorts of technologies and products that, if in the wrong hands, can be used against our agents, for example, conducting their operations. So, part of it is, from a counterintelligence security perspective, we need to know what tools are out there that the bad guys can use against our people. . . . because that allows us to inform our own countermeasures and things like that." *Id.* Although the FBI ultimately determined not to deploy the NSO tool in support of criminal investigations, the FBI continues to evaluate similar technologies and products to identify potential security concerns and countermeasures. *Id.* The FBI's ability to assess complex software (or any gaps) is itself a law enforcement technique or procedure, and disclosure of this technique or procedure could allow hostile actors to exploit potential weaknesses in the FBI's

ability to assess similar software. *Id.* Revealing details of the FBI's assessment would show how the FBI assesses software of this type, what it is looking for, and what it found significant. *Id.*

Third, the FBI's testing and evaluation of the NSO tool would reveal sensitive information about the scope and limitations of the FBI's existing capabilities to access encrypted communications in support of criminal investigations. Bender Decl. ¶ 18. Additional detail is provided in the classified *ex parte* declaration.

### 2.   Categories of information withheld under exemption 7(E)

The FBI's supplemental declaration provides substantial information about the exemption 7(E) withholdings, on a group-by-group or document-by-document basis. Additional detail is provided in the classified *ex parte* declaration. The law enforcement techniques and procedures protected under exemption 7(E) include the following categories of information.

**Testing and analysis.** The material protected by exemption 7(E) includes information that would reveal the nature and capabilities of the FBI's analysis of the NSO tool. The FBI's ability to assess complex software (or any gaps) is itself a law enforcement technique or procedure, and disclosure of this technique or procedure could allow hostile actors to exploit apparent weaknesses in the FBI's ability to assess tools such as NSO's. *See* Bender Decl. ¶ 17. Hostile actors could avoid software techniques that, based on reviewing the withheld information, could likely be analyzed and understand easily by the FBI. *Id.* ¶ 103. Conversely, they could use software techniques that could be more difficult for the FBI to analyze and understand. *Id.*

Contrary to the Times' argument, *see* NYT Br. 10-11, 14, because the FBI's analysis of the NSO tool reveals FBI's analytic capabilities, it is irrelevant that the FBI ultimately chose not to deploy the NSO tool. It is not the specific technical details of the NSO software itself that is protected; it is the FBI's ability to discover, assess, and analyze them that is. Moreover, to the

extent this material is included in "talking points for an external audience," NYT Br. 14, that does not mean the information was not sensitive or intended to be maintained confidentially. The intended external audiences for the talking points and draft responses in Groups D, E, and N were not the public; they were the SSCI (Groups D and E)[12] and another Executive Branch component (Group N).

**FBI's capabilities (or absence of capabilities) to gain lawful access to encrypted information in criminal matters.** The material protected by exemption 7(E) also includes information that would reveal the FBI's existing capabilities and limitations in gaining lawful access to encrypted communications in law enforcement investigations. Bender Decl. ¶ 18. Often, this information is implicitly revealed when documents identify specific operational needs for which the NSO tool might be useful. *E.g.*, Bender Decl. ¶ 22. Access to encrypted information in criminal matters is an area of significant and persistent interest and concern for the FBI. Seidel Decl. ¶ 80. The withheld information includes very recent, very specific details about what types of encrypted information the FBI could, and could not, access using its existing capabilities. Bender Decl. ¶ 104. Hostile actors who understand the FBI's capabilities could avoid using software or methods that are likely to be accessible by the FBI; conversely, they could focus on software or methods that are known to be difficult to access. *Id.*

**FBI code words.** Some of the exemption 7(E) withholdings protect the FBI's internal code names for certain specific programs or operations. Bender Decl. ¶ 19. Disclosure of these code names would risk circumvention of the law for at least two reasons. First, certain code names, including some withheld here, are themed—that is, code names relating to a single topic

---

[12] The exemption 7(E) information in Groups D and E was not in fact conveyed to the SSCI, but even if it had been, the SSCI members and staff are cleared for access to classified and sensitive law enforcement information.

all fall within a certain category. *Id.* Therefore, disclosure of code names could reveal the relationship between FBI programs (which might not otherwise be clear) or the extent of the FBI's efforts on a particular matter. *Id.* Second, disclosure of a code name could make the FBI's internal systems more vulnerable to hacking or other exploits, since an attacker aware of the code name could search for records tied to that name. *Id.; accord* Bender Decl. ¶ 105.

**Acquisition and contracting.** Although it is not possible in a public setting to describe the specific reasons why the contract documents are protected by exemption 7(E), as well as exemptions 1 and 3, detail is given in the classified declaration. With regard to the records in Group G, which relate to the Israel letter, certain information withheld under exemption 7(E) would reveal relationships with foreign partners. Disclosure would risk circumvention of the law by revealing FBI processes and potential issues related to relationships with foreign countries. Bender Decl. ¶ 52.

### D.  The FBI Properly Withheld Records and Information Under Exemption 7(A)

Three documents (91, 102, and 105), and certain Group D documents, contain assertions of exemption 7(A) to protect information whose release could reasonably be anticipated to interfere with pending or anticipated enforcement proceedings.[13] Additional detail on these assertions cannot be provided publicly and is given in the classified declaration.

### III.   *In Camera* Review Is Not Warranted

Contrary to the Times' argument, NYT Br. 24-25, there is no need for the Court to conduct an *in camera* review of the challenged withholdings, because the government's explanations for its withholdings are sufficiently detailed. *See Wilner v. NSA*, 592 F.3d 60, 76

---

[13] Although the Times has not challenged exemption 7(A) to date, these assertions cover documents located in the supplemental searches (102 and 105) documents with a new assertion (91 and Group D documents).

("We join our sister Circuit in holding that, "[i]f an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record does not suggest otherwise . . . the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions." (citation and internal quotation marks omitted)); *see also Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988) ("*In camera* review is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion."); *Garcia v. U.S. DOJ*, 181 F. Supp. 2d 356, 370 (S.D.N.Y. 2002) ("*In camera* review of documents that have been withheld or redacted is disfavored."). *In camera* review is particularly disfavored where, as here, the withheld records include classified national security information. *See Wilner v.* NSA, 592 F.3d at 76 (affirming court's "affirm our "deferential posture in FOIA cases regarding the uniquely executive purview of national security," and holding that where the government's public affidavits are sufficient, "*ex parte* and in camera review of additional, confidential material is unnecessary and beyond the role assigned to the judiciary by applicable law"). Because the FBI declarations (including the classified declaration) are together sufficiently detailed for judicial review of the claimed exemptions, and set forth justifications for the withholdings that are logical and plausible, *in camera* review is unwarranted.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the Government's opening memorandum of law and its supporting declarations, the Court should grant the Government's motion for summary judgment and deny plaintiffs' cross-motion.

Dated:  October 31, 2022
        New York, New York

                                          Respectfully submitted,

                                          DAMIAN WILLIAMS
                                          United States Attorney
                                          Southern District of New York

                              By:    */s/ Peter Aronoff*
                                          SARAH S. NORMAND
                                          PETER ARONOFF
                                          Assistant United States Attorneys
                                          86 Chambers Street, Third Floor
                                          New York, New York 10007
                                          Telephone: (212) 637-2709/2697
                                          Facsimile: (212) 637-2717
                                          E-mail: sarah.normand@usdoj.gov
                                                    peter.aronoff@usdoj.gov