UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— X

THE NEW YORK TIMES COMPANY and                :
MARK MAZZETTI,

                        Plaintiffs,            :

                v.                             :       No. 22-cv-01539 (JSR)

UNITED STATES DEPARTMENT OF JUSTICE,           :

                        Defendant.             :
—————————————————————————— X


## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

                                    David E. McCraw
                                    Al-Amyn Sumar
                                    The New York Times Company
                                    Legal Department
Of Counsel:                         620 Eighth Avenue
Samantha Hamilton                   New York, NY 10018
(Not Admitted in S.D.N.Y.)          Phone: (212) 556-4031
                                    Facsimile: (212) 556-1009
                                    Email: mccraw@nytimes.com

                                    *Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT

    I.    The FBI Continues to Improperly Withhold Material Under Exemptions 5 and 7(E) ................................................................................................................................... 1

    II.   There Is No Justification for Withholding the Contract Documents Under Exemptions 1 And 3................................................................................................................... 16

    III.  The FBI's Redactions For Nonresponsive Material Violate FOIA ........................... 16

    IV.  The Government's Search Was Inadequate................................................................ 17

    V.   This Court Should Conduct an *In Camera* Review ................................................. 18

CONCLUSION.............................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. DHS*,
243 F. Supp. 3d 393 (S.D.N.Y. 2017)...................................................................... 5, 10

*ACLU v. ODNI*,
2011 U.S. Dist. LEXIS 132503 (S.D.N.Y. Nov. 15, 2011) ........................................ 5

*Am. Immigration Lawyers Ass'n v. EOIR*,
830 F.3d 667 (D.C. Cir. 2016) ................................................................................. 17

*Brennan Ctr. for Justice v. DOJ*,
697 F.3d 184 (2d Cir. 2012)....................................................................................... 2

*Buzzfeed, Inc. v. DHS*,
2022 U.S. Dist. LEXIS 158411 (D.D.C. Sept. 1, 2022) ............................................ 3

*Cause of Action Inst. v. DOJ*,
999 F.3d 696 (D.C. Cir. 2021) ................................................................................. 17

*CREW v. DHS*,
525 F. Supp. 3d 181 (D.D.C. 2021) ........................................................................... 5

*Doherty v. DOJ*,
775 F.2d 49, 52 (2d Cir. 1985)................................................................................... 9

*Ecological Rights Found. v. EPA*,
2021 U.S. Dist. LEXIS 27748 (D.D.C. 2021) ........................................................... 7

*Emuwa v. DHS*,
2022 U.S. Dist. LEXIS 83613 (D.D.C. May 9, 2022)............................................ 3, 4

*Halpern v. FBI*,
181 F.3d 279 (2d Cir. 1999)....................................................................................... 4

*Judicial Watch, Inc. v. Dep't of State*,
2021 U.S. Dist. LEXIS 144516 (D.D.C. Aug. 3, 2021) ............................................ 7

*Lawyers Comm. for Human Rights v. INS*,
721 F. Supp. 552 (S.D.N.Y. 1989) ............................................................................ 5

*N.Y. Times Co. v. DOJ*,
2021 U.S. Dist. LEXIS 20776 (S.D.N.Y. Feb. 3, 2021) ............................................. 18

*Nat'l Day Laborer Org. Network v. ICE*,
2020 U.S. Dist. LEXIS 233246 (S.D.N.Y. Dec. 11, 2020) ................................... 2, 15

*Nat'l Pub. Radio, Inc. v. DHS*,
2022 U.S. Dist. LEXIS 176411 (D.D.C. Sept. 28, 2022) ............................................ 3

*NRDC v. EPA*,
954 F.3d 150 (2d Cir. 2020) ................................................................................... 13

*Reporters Comm. for Freedom of the Press v. CBP*,
567 F. Supp. 3d 97 (D.D.C. 2021) ........................................................................ 4, 5

*Reporters Comm. for Freedom of the Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) ................................................................................. 2, 3

*Seife v. FDA*,
43 F.4th 231 (2d Cir. 2022) ................................................................................... 2, 5

## Statutes

5 U.S.C. § 552 .......................................................................................... 4, 17, 18

Classified Information Procedures Act, 18 U.S.C. App. III. §§ 1-16 ......................... 11

## Other Authorities

Riana Pfefferkorn, *We Now Know What Information the FBI Can Obtain from Encrypted Messaging Apps*, Just Security (Dec. 14, 2021), https://bit.ly/3UBpKCM .................................... 9

Tim Cushing, *Documents Shows Just How Much The FBI Can Obtain From Encrypted Communication Services*, TechDirt (Dec. 2, 2021), https://bit.ly/3TqtNRb ................................. 9

Plaintiffs The New York Times Company and Mark Mazzetti (together, "The Times") respectfully submit this reply memorandum of law in further support of their cross-motion for summary judgment.

## PRELIMINARY STATEMENT

The Government's new papers do not seriously attempt to remedy the inadequacy of its initial submissions, and nor could they. Instead, the Government simply tries to make its case anew. In response to The Times's opening brief, it has completely redone its *Vaughn* index, produced two new declarations, and partially released several documents it previously claimed needed to be withheld in full. Yet, even now, the Government has not come close to meeting its burden under FOIA. It maintains that it may fully withhold hundreds of pages of records—and extensively redact dozens more—based on an overbroad application of Exemption 5, flimsy reasoning under Exemption 7(E), and boilerplate assertions of foreseeable harm. Its invocation of national security via Exemptions 1 and 3 to withhold in full contract-related documents remains dubious. And the Government gives no legal justification for withholding nonresponsive information in records responsive to The Times's requests. If nothing else, the Government's papers underscore the vital need for *in camera* review.

The Government has been given two chances to meet its burden, and it should not be given a third. The Times's motion for summary judgment should be granted.

## I.
## THE FBI CONTINUES TO IMPROPERLY WITHHOLD
## MATERIAL UNDER EXEMPTIONS 5 AND 7(E)

The Government's expanded *Vaughn* Index and new declaration, while filling certain legally deficient gaps in the FBI's original papers, still fall short of showing that Exemption 5 or Exemption 7(E) permit the full scope of withholding sought by the FBI. As detailed below, The

1

Times has waived objections to some withholding in light of the new information, but for other categories the Government has failed to meet its burden of proof under FOIA. While each category of documents, and the Government's proffered justification, must be analyzed on its own facts, certain basic principles related to Exemption 5 and Exemption 7(E) cut across the categories.[1]

**Exemption 5:** The essential requirements of the sole Exemption 5 privilege at issue here, the deliberative process privilege, warrant emphasis.[2] The privilege applies to material that is both pre-decisional and deliberative, and it generally does not cover purely factual information. *Nat'l Day Laborer Org. Network v. ICE*, 2020 U.S. Dist. LEXIS 233246, at *5-6 (S.D.N.Y. Dec. 11, 2020) (citing *Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184, 194 (2d Cir. 2012)). Important too is that the privilege limited to documents that "bear on the formulation or exercise of policy-oriented judgment"; material that is "merely peripheral to actual policy formulation" must be disclosed. *Id.* at *6 (cleaned up).

The principles governing FOIA's "foreseeable harm" requirement also bear repeating, for the Government misapplies it here. To meet the requirement, the Government must make an additional showing (*i.e.*, on top of establishing that an exemption applies to the material) that disclosure will undermine the core interests underlying a FOIA exemption. (NYT Br. at 19-20 (citing *Seife v. FDA*, 43 F.4th 231, 241 (2d Cir. 2022); *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (hereinafter, "*RCFP*")).) For withholdings

---

[1] This brief abbreviates other filings as follows: The Times's opening brief (Dkt. 16) is "NYT Br."; the Declaration of Joseph E. Bender, Jr. (Dkt. 20) is "Bender Decl."; the Government's reply brief (Dkt. 22) is "Gov't Reply"; and the Supplemental Declaration of Michael G. Seidel (Dkt. 23) is "Supp. Seidel Decl." The Times also submits with this brief a declaration attaching as an exhibit the documents produced by the FBI in this case; the exhibit is abbreviated as "Doc. Prod."

[2] The Times no longer disputes withholdings under the attorney client or work product privileges.

pursuant to the deliberative process privilege, the agency must provide "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.* at 19 (quoting *RCFP*, 3 F.4th at 370); *see, e.g.*, *Buzzfeed, Inc. v. DHS*, 2022 U.S. Dist. LEXIS 158411, at *17 (D.D.C. Sept. 1, 2022) (finding no foreseeable harm where agency failed to supply sufficient "information about the document's drafters or recipients, the deliberative process involved, and the document's role in any deliberative process").

The hallmark of an agency declaration establishing foreseeable harm is genuine specificity: the declarant must tailor the harm from disclosure to specific documents or groups of documents. Declarations that parrot vague and generalized assertions of harm are not sufficient. *Compare, e.g.*, *Nat'l Pub. Radio, Inc. v. DHS*, 2022 U.S. Dist. LEXIS 176411, at *23-24 (D.D.C. Sept. 28, 2022) ("Nowhere does DHS explain *why* disclosure of these *specific types* of reports would chill deliberations more than that of any generic documents to which the deliberative process privilege applies."), *with Emuwa v. DHS*, 2022 U.S. Dist. LEXIS 83613, at *6-13 (D.D.C. May 9, 2022) (finding sufficient supplemental declaration on foreseeable harm that contained "specific[]" and "robust" explanations from declarant with personal knowledge of "how immigration officials conduct their business").

In trying to meet the foreseeable harm standard for materials covered by Exemption 5, the Government purports to give much more detail about the asserted harms from disclosure. But there is little new in terms of substance. The portions of the declaration addressing foreseeable harm follow a simple pattern: they summarize at a high level of generality the contents of a given set of documents and then say perfunctorily that disclosure would chill employee deliberations on the subject. (*See* Bender Decl. ¶¶ 96-99.) The most glaring example is the Government's

3

proffered assertions of harm for two large sets of documents. (*Id.* ¶ 99(b)-(c).) In both cases —

seeking to justify the full or partial withholding of 26 separate documents that total 229 pages —

the FBI gives virtually the same one-sentence explanation: disclosure will make employees more

reluctant to share their views on "sensitive matters" in the future. (*Id.*) There is no indication,

either, that the declarant's claims of foreseeable harm have been informed by conversations with

employees involved in the deliberations or by his personal experience with the subject matter.

*See, e.g.*, *Emuwa*, 2022 U.S. Dist. LEXIS 83613, at *6. The Second Circuit's critique of similar

declarations in another FOIA case bears repeating here: "Although the author of one of

the declarations wrote much, she said little; and she said nothing in particular that would justify

withholding the documents the requester sought." *Halpern v. FBI*, 181 F.3d 279, 285 (2d Cir.

1999). The statute demands more.

**Exemption 7(E):** Exemption 7(E) allows the withholding of two types of information:

(a) law enforcement records that "would disclose techniques and procedures for law enforcement

investigations or prosecutions," and (b) records that "would disclose guidelines for law

enforcement investigations if such disclosure could reasonably be expected to risk circumvention

of the law." 5 U.S.C. § 552(b)(7)(E). (*See* NYT Br. at 8-9.) Overlaying that exemption, as with

Exemption 5 (discussed above), is the independent requirement that the Government show

foreseeable harm from disclosure. As applied to Exemption 7(E), the requirement means that the

Government now needs to show that disclosure poses a risk of circumvention under the first

prong of the exemption as well as the second. (*See* NYT Br. at 20 n.5 (citing *Reporters Comm.*

*for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 110 (D.D.C. 2021)).)[3] It also provides a

---

[3] The Government half-heartedly disputes this point and then asks the Court not to resolve it. (Gov't
Reply at 29 n.11.) But how the foreseeable harm requirement applies to Exemption 7(E) is a central
question here because the Government has time and again failed to show that disclosure of the withheld

"meaningful safeguard against agencies' use of general explanations and boiler plate language to justify withholdings." *CREW v. DHS*, 525 F. Supp. 3d 181, 192 n.4 (D.D.C. 2021). (*See* NYT Br. at 20 n.5.)

In analyzing Exemption 7(E)'s applicability to the NSO documents, The Times distinguishes those materials that deal solely with the NSO tools from those that that discuss information about actively used investigative technology, programs, or procedures. For instance, several documents apparently compare the capabilities of the NSO tools to other tools at the FBI's disposal. The Times has dropped its challenges as to those withholdings shielding tools that are operative and in use.

But many of the documents discuss only the abandoned NSO technology, and the FBI's continued reliance on boilerplate statements of possible risk of circumvention as to those materials violates basic FOIA principles. *See ACLU v. DHS*, 243 F. Supp. 3d 393, 403 (S.D.N.Y. 2017) (government cannot rely on generic boilerplate justifications to establish circumvention); *ACLU v. ODNI*, 2011 U.S. Dist. LEXIS 132503, at *34 (S.D.N.Y. Nov. 15, 2011) (same); *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 566 (S.D.N.Y. 1989) (same). Specifically, the Government improperly tries under Exemption 7(E) to shield (a) factual details about the specific operation of the NSO technology or (b) documents concerning the business

---

material would risk circumvention of the law. And the Government's answer to that question is obviously wrong. It says agencies need not show that disclosure of law enforcement techniques and procedures would risk circumvention because the interest protected by Exemption 7(E) is simply "the nondisclosure of such techniques and procedures, without more." *Id.* The Second Circuit recently rejected exactly that kind of argument in the context of Exemption 4. *See Seife*, 43 F.4th at 241 ("Defendants' position [that the interest is protected by Exemption 4 is simply 'confidentiality'] is belied by both the structure of the statute and common sense. Congress expressly enacted the FIA to address situations where information would fall within an exemption and yet no harm would result from disclosure, emphasizing that in those circumstances the information must be disclosed."). The interest protected by Exemption 7(E) is clear: to avoid the risk of circumvention of the law.

transaction that allowed the FBI to obtain the NSO technology. There is no risk of circumvention for a technology that has been abandoned, and a multimillion-dollar government business transaction should not be hidden behind a law enforcement exemption.[4]

More specifically, The Times continues to assert the following challenges:

**Group A: Bates 1-2, 37-38, 39-40 (documenting meetings)**

Since submitting its opening brief, the Government has reviewed these documents, previously withheld in full, and made minor disclosures. The context of the redactions within the documents suggests that the FBI has improperly redacted factual information pursuant to Exemption 5, and that more information can and should be disclosed. (*See* Doc. Prod. at 1-6.) Indeed, the declaration acknowledges that these types of documents, known as FD-1057 forms, are typically used "to record and disseminate intelligence/investigative information"—which would appear to be factual. (Bender Decl. ¶ 20 n.2.) To the extent the FBI invokes Exemption 7(E), it relies on boilerplate justifications to withhold information about a law enforcement tool that the FBI decided to abandon in July 2021.

**Group B: Bates 41-65, 66, 67-76 (CID guidance regarding NSO products)**

In light of the new information from the Government, The Times no longer contests withholding of these documents.

**Group C: Bates 83-97 (SharePoint presentation from the Operational Technology Division about a "proposal of NSO product," dated July 22, 2021)**

The FBI, in its new declaration, has not provided any further information making it logical and plausible that a slide presentation about a software product contains no discrete

---

[4] The Times does not challenge the justification for targeted redactions pursuant to Exemption 7(E) to protect code names. (*See* Bender Decl. ¶ 19.) Unless otherwise indicated, The Times continues to challenge all other redactions under Exemption 7(E).

factual information subject to disclosure under Exemption 5. And the Government's invocation of Exemption 7(E) falls flat. As explained in more detail below, the FBI's capabilities for "gaining lawful access to encrypted information" (Bender Decl. ¶ 31) are a matter of public knowledge. Nor does the Government actually demonstrate that releasing basic information about the NSO software or the FBI's "assessment" of it (*id.*) could plausibly lead to circumvention of the law.

**Group D: Bates 122-135, 143-44, 155-160, 848-852, 854-856 (talking points documents)**

The Government has now partially released two of these documents, one of which is newly located. In light of the Government's new submissions, The Times no longer contests the withholding of most of these documents. But there is no justification for the Government to continue to withhold portions of the final talking points provided to the Director in advance of the SSCI briefing. (Doc. Prod. at 7-8, 80-82.) As The Times argued in its opening brief, talking points in their final form are not exempt from disclosure under the deliberative process privilege. (*See* NYT Br. at 14 (citing *Judicial Watch, Inc. v. Dep't of State*, 2021 U.S. Dist. LEXIS 144516, at *20-21 (D.D.C. Aug. 3, 2021)).)[5] "[A] rule that deems [final talking points] as mere recommendations about what a decisionmaker should say undermines FOIA's larger aims by effectively allowing an agency to withhold all records related to its public communications and protecting even final decisions from public view." *Ecological Rights Found. v. EPA*, 2021 U.S. Dist. LEXIS 27748, at *61-62 (D.D.C. 2021). The declaration claims that the talking points were

---

[5] The Government observes that the court in *Judicial Watch* ultimately found that the talking points were exempt. (Gov't Reply at 22 n.9 (citing *Judicial Watch*, 2021 U.S. Dist. LEXIS 144516, at *22-23).) But that was because the talking points, based on the Government's evidence, were not "viewed as ready for an official to use." *Judicial Watch*, 2021 U.S. Dist. LEXIS 144516, at *21; *see id.* at *22 (noting that there was no indication "that there was a plan for [the talking points] to be used at all"). Here the Government has presented no such evidence.

"effectively" a recommendation to the Director for what to say at the briefing (Bender Decl. ¶ 34), but that seems to be founded on nothing more than speculation on the part of the declarant. The "final" status of the talking points means that a decision had been made about what the Director would say; the fact that the Director later communicated something different does not change that. It is hard to see, too, why the release of final talking points could cause reasonably foreseeable harm to an agency's deliberative process.

**Group E: Bates 136-142, 145-152, 162-181, 183-94, 305-307, 857-859, 885-890 (talking points for Wyden)**

In light of the new information from the Government, including the production of additional responsive records earlier today, The Times no longer contests the withholding of these documents, with the exception, as noted below, of any material redacted or withheld on the ground that it is nonresponsive to The Times's requests.

**Group F: Bates 284-286 (NSO information, Jan. 11-12, 2022)**

In revising its *Vaughn* index to bolster its argument for the application of Exemption 5, the FBI now says that these emails provide "detailed background on the FBI's review of the NSO Group tool." (Dkt. 20-1 at 3.) But the Government's new declaration also indicates that much of the email chain is not truly advisory or otherwise deliberative but instead descriptive of the review process. According to the declaration, the emails discuss the process the Government was using to document analyses from various governmental components, including creation of a timeline for "engagement, testing, and process efforts" and a description of "the process by which intermediate approvals were sought." (Bender Decl. ¶¶ 46, 47.) Those sections factually describing the Government's review process are not deliberative and not exempt under Exemption 5.

Turning to Exemption 7(E), as to certain documents, the FBI raises concern that disclosure of some of the material would reveal what techniques or procedures the FBI had available to gain "lawful access to encrypted information." (*Id.* ¶ 48.) What the FBI fails to explain is whether any of that is truly secret. Lawful access methods have been the subject of public discussion by the DOJ for years. In fact, in October of 2019, the Department of Justice held a "Lawful Access Summit," which featured the public remarks of both FBI Director Wray and Attorney General Barr.[6] Even more recently, the FBI made headlines when it released (in a response to a FOIA request) a document detailing the agency's ability to lawfully access encrypted communications.[7] The title of one article put it this way: "We Now Know What Information the FBI Can Obtain from Encrypted Messaging Apps."[8] Exemption 7(E), of course, does not apply to information generally known to the public. *Doherty v. DOJ*, 775 F.2d 49, 52 n.4 (2d Cir. 1985). The Government has not made its case that the withheld sections actually encompass only non-public information.[9] Its other justifications for invoking 7(E) fail for reasons given above.

### Group G: Bates 308-309, 310-318 (getting Israeli approval to obtain the technology)

Since submitting its opening brief, the Government has reviewed these documents and made some further minor disclosures. More can and should be disclosed. The NSO deal was

---

[6] The officials remarks and descriptions of the Summit can be found here: https://www.fbi.gov/about/mission/lawful-access.

[7] Tim Cushing, *Documents Shows Just How Much The FBI Can Obtain From Encrypted Communication Services*, TechDirt (Dec. 2, 2021), https://bit.ly/3TqtNRb.

[8] Riana Pfefferkorn, *We Now Know What Information the FBI Can Obtain from Encrypted Messaging Apps*, Just Security (Dec. 14, 2021), https://bit.ly/3UBpKCM.

[9] It is odd that the Government made no partial release of the document here, since its *Vaughn* index indicates that all relevant exemptions were applied only to portions of the document. (Dkt. 20-1 at 3.)

unique: The FBI was obtaining a private Israeli company's technology but needed the Israeli government's approval, which required assurances that the technology would be used only by the Government. (Doc. Prod. at 13, 22.) The withheld documents, according to the Government, involve discussions of the "form and content" of the letter that was ultimately sent to the Israeli government. (Bender Decl. ¶ 51.) The Government ignores its obligation to provide a meaningful justification for withholding and instead doubles-down on a recitation of generic harms. For Exemption 5, it trots out the standard language about how employees will be less likely to provide advice and recommendations in similar future situations if Exemption 5 is not invoked. (*Id.* ¶ 51.) But the Government makes no serious attempt to meet the heightened requirement of showing why disclosure of this specific and specialized advice on a one-of-a-kind letter to the Israeli government would create such a risk. (*Id.* ¶ 99(a).)

The Government's case is even weaker for Exemption 7(E). The FBI relies on the broad and opaque claim that disclosure "would risk circumvention of the law by revealing FBI processes and potential issues related to relationships with foreign countries." (*Id.* ¶ 52.) It is a thorough mystery why revelations about a one-of-a-kind letter to a single foreign ally would affect "processes and potential issues"—whatever that empty phrase means—related to other countries or would have anything at all to do with wrongdoers' ability to circumvent the law if records about this diplomatic communication were revealed. Nor does the Government shed any light on why its "relationships with foreign partners" consists of a "technique" or "procedure" for 7(E) purposes. (*Id.* ¶ 52.) *See ACLU*, 243 F. Supp. 3d at 402 ("[T]he phrase 'techniques and procedures' . . . refer[s] to how law enforcement officials go about investigating a crime.") (cleaned up).

10

**Group H: Bates 320-322 (Barr meeting)**

The Government has now significantly amended its description of these documents. We now know that one page is a cover email from July 27, 2021. (Bender Decl. ¶ 53.) It in turn forwards a July 17, 2019, email concerning a meeting with Attorney General Barr. (*Id.*) There are four problems with the Government's withholding of these pages:

First, the FBI withholds "significant portions" of the 2019 email not because it is exempt under FOIA, but because it is "nonresponsive." (*Id.* ¶ 53.) As discussed below, nonresponsive material cannot be withheld under FOIA; only exempt material can be.

Second, the discussion in the email appears to be solely about the use of the NSO technology and not about tools actually in use by the FBI. (*Id.* ¶ 54.) The FBI makes no meaningful attempt to show how a risk of circumvention could possibly be a realistic concern now that the NSO technology has been rejected and is not used. (*See id.* ¶ 55.) There is nothing for wrongdoers to circumvent. Yet, the Government chooses not to address that reality and instead recycles the same platitudes that it would use in fending off disclosure about technology it actually uses.

Third, the email contains a discussion of "how to protect classified information in the criminal discovery and trial process." (*Id.* ¶ 54.) That is publicly known legal information, *see* Classified Information Procedures Act, 18 U.S.C. App. III. §§ 1-16, and it should be disclosed.

Fourth, as with many other records, the Government has failed to segregate and disclose basic factual information in the emails, including header information. Such material must be released.[10]

---

[10] The Times does not challenge the partial withholding of the emails pursuant to Exemptions 1 and 3. (Bender Decl. ¶ 56.)

***Group I: Bates 324, 326 (strategy plan for NSO)***

The Government has now provided additional information on this category in hopes of establishing that the documents are pre-decisional. But the Government still describes the main document as "internal plans for resources and strategy regarding the approval of and use of the NSO tool." (Bender Decl. ¶ 58.) That is the description of a final document not a draft or deliberative one. And the Government continues to dodge the question of how the "risk of circumvention" requirement of 7(E) is met for a technology that is abandoned and not used.

***Group J: Bates 328-329 (describing NSO capabilities), Bates 520-525 (technical details)***

Similarly, the Government revises its description of these documents to make them sound more deliberative. (*See* Bender Decl. ¶¶ 57-59.) Nonetheless, the main document (Bates-numbered 520 to 525) is still described in the revised *Vaughn* index as "providing technical details of an NSO product." (Dkt. 20-1 at 3.) That description makes clear that the document must be largely factual, and the document's focus solely on NSO technology vitiates the FBI's argument that the disclosure raises the risk of circumvention.

***Group K: Bates 3-36, 372-467 (PowerPoints)***

As with the SharePoint presentation in group C, these documents almost certainly contain segregable factual information not subject to Exemption 5, and the Government's boilerplate justifications are insufficient under Exemption 7(E).

***Group L: Bates 469-71 (email chain)***

The Government again seeks to justify the full withholding of this email chain. It vaguely says the document would reveal matters like "plans regarding how to proceed" and the "necessary intermediate approvals that predated the ultimate decision not to employ the tool." (Bender Decl. ¶ 65.) These statements are less than clear, but they suggest the document speaks

much more to the process or procedure for making a specific decision than the substance of the actual deliberations—*i.e.*, "the give-and-take of the consultative process." *NRDC v. EPA*, 954 F.3d 150, 156 (2d Cir. 2020). And though the Government's *Vaughn* index indicates that the document is being withheld in part on the basis of Exemption 7(E), the new declaration is silent on the justification for doing so.

***Group M: Bates 516-518, 738-786 (cease effort email and others)***

The Government has now provided more context for the extensive redactions to these emails, all but one of which post-date the decision to "cease all efforts" on the potential use of the NSO tool. (Bender Decl. ¶¶ 66-69.) But the justification for such a high degree of redaction remains implausible. For Exemption 5 in particular, it is hard to understand the basis for redacting at least 7 unique emails that post-date the cease efforts email on July 22, 2021. (*See generally* Doc. Prod. at 31-79.) To the extent these emails recount pre-decisional deliberations, more targeted redactions for that material must be applied. Nor is clear on what basis the Government can justify redactions to the cease efforts email itself.

On 7(E), the Government argues its reasons for opting not to use the NSO tool are protected. (Bender Decl. ¶ 68.) But it falls back on the speculative and illogical claim that disclosure could reveal something about the FBI's assessment or potential use of <u>other</u> software in the future. (*Id.*) To the extent the redacted material reflects the FBI's capabilities for lawfully accessing encrypted communications (*id.*), those capabilities are again widely known.

***Group N: Bates 601, 603, 604, 607-609, 614-619, 623-625, 860-884 (anticipating call with Attorney General)***

The Government's new submissions explain that these emails relate to an inquiry about NSO software by an unnamed executive branch component. (*Id.* ¶ 70.) Some of these documents

were located in a supplemental search. What is most notable here, though, is the redaction of the identity of the component and the nature of its inquiry. These are factual matters not subject to the deliberative process privilege. The Government now claims, belatedly, that the information falls within Exemptions 1 and 3 but says nothing in its public filings about the reasons for that. (*Id.*) For the newly discovered emails, the Government similarly declines to say anything meaningful on the public record about the decision or decision-making process to which these emails pertain. The fact that the Government has put so much of its case in the *ex parte* declaration—which has the effect of undermining The Times's ability to meaningfully challenge the withholding—underscores the need for *in camera* review.

### Group O: 704-705, 735-737 (emails "regarding NSO Group")

The Government has now partially released these emails after withholding them in full. But it has more explaining to do. Most importantly, document 81 (Bates-numbered 704 to 705, located at Doc. Prod. 26-27) appears to have an attachment bearing the partially redacted title "Deployment_Guidelines." The Government's papers do not even mention this attachment, much less give a basis for withholding it. It must therefore be released. And, as with the emails in Group M (with which these records overlap), the redactions here appear more extensive than necessary to protect genuinely deliberative information. The Government also gives the same flawed justifications for its 7(E) redactions.

### Group P: 675, 787-788 (emails regarding "NSO Group tool" and "products")

The Government's new submissions add little of substance to justify its wholesale withholding of these emails. The stated subjects of the emails in the *Vaughn* index—the "status of approval of NSO product" and "NSO Group products"—remain vague, and the justifications for withholding the documents under Exemptions 5 and 7(E) could hardly be more generic.

14

Certainly the Government has provided nothing in its initial or new submissions that could justify withholding in full.

**Group Q: 499-501, 503-510, 512-514, 701-703 (miscellaneous)**

The Government fares no better for these documents. It again fails to meaningfully explain why the factual information in the records cannot be segregated and released. The omission is particularly glaring for two documents: an FBI internal document that provides "background on the NSO tool" and an eight-page briefing document that almost certainly contains factual context for its intended reader. (*See* Dkt. 20-1 at 6.) The Government's invocation of 7(E) is not credible for the reasons given above.

One record in this group, document 91 (Bates-numbered 701 to 703), does not appear to contain any deliberative content at all. The Government's recent papers indicate that the document "relates to questions from FBI personnel stationed abroad about potential counterintelligence or operational risks posed by NSO or other software." (Bender Decl. ¶ 86.) Yet the FBI concedes that the document "does not relate directly to FBI's consideration of whether to deploy the NSO tool in support of criminal investigations." (*Id.*) In other words, the document apparently played no role in "the formulation or exercise of policy-oriented judgment." *Nat'l Day Laborer Org. Network*, 2020 U.S. Dist. LEXIS 233246, at *5. The Government also invokes 7(E), but as elsewhere it fails to explain how disclosing information about the possible "risks" of a software the FBI decided not to use (*id.* ¶ 87) could enable circumvention of the law.

## II.
## THERE IS NO JUSTIFICATION FOR WITHHOLDING THE CONTRACT
## DOCUMENTS UNDER EXEMPTIONS 1 AND 3

The Government's public filings contain essentially no response to The Times's

argument that the contract documents are not properly classified; the subject is addressed entirely

in the *ex parte* declaration.[11] (Gov't Reply at 4-5.) Based on the public record, however, the

Government's claim that nothing in in these records—two of which are simply standard GSA

documents[12]—can be disclosed without harming national security or exposing intelligence

sources or methods is neither logical nor plausible. The contract forms record basic information

about the transaction, and the FBI has already disclosed purchased a license to use Pegasus.

There is no more secret here.

## III.
## THE FBI'S REDACTIONS FOR NONRESPONSIVE
## MATERIAL VIOLATE FOIA

On at least six occasions,[13] the Government has redacted or withheld information from

records containing responsive material on the ground that the information is not responsive to

The Times's FOIA requests. In doing so it violated FOIA. "[O]nce an agency identifies a record

---

[11] The Times no longer challenges the withholding of talking points documents pursuant to Exemptions 1 and 3. (*See* Bender Decl. ¶¶ 36, 40, 45.)

[12] Two of the records are simple SF 1449 forms. (Dkt. 20-1 at 6.) *See GSA Forms Library*, U.S. General Services Administration, https://www.gsa.gov/forms-library/solicitationcontractorder-commercial-products-and-commercial-services.

[13] The Government has clearly or apparently withheld nonresponsive information in: (i) document 17 (there is no explanation for the absence of Bates-numbered pages 134 and 135 in the documents produced by the Government); (ii) document 23, *see* Dkt. 20-1 at 2 (noting that certain pages were withheld as "not responsive"); Doc. Prod. at 11 (redacting information as "outside the scope"); (iii) document 35, *see* Bender Decl. ¶ 53 (stating that "[s]ignificant portions of the 2019 email are withheld as nonresponsive"; (iv) document 101, *see* Doc. Prod. at 81-82 (redacting information as "outside the scope"); (v) document 103, *see* Doc. Prod. at 84 (redacting information as "outside the scope"); and (vi) the email chain produced earlier today, *see* Doc. Prod. at 85 (redacting information as "[n]on responsive").

16

it deems responsive to a FOIA request, the statute compels disclosure of the responsive record—

i.e., as a unit—except insofar as the agency may redact information falling within a statutory

exemption." *Am. Immigration Lawyers Ass'n v. EOIR*, 830 F.3d 667, 677 (D.C. Cir. 2016)

(citing 5 U.S.C. § 552(a)(3)(A), (b)) (hereinafter, "*AILA*"); *accord Cause of Action Inst. v. DOJ*,

999 F.3d 696, 699 (D.C. Cir. 2021). That is to say, there is "no statutory basis for redacting

ostensibly non-responsive information from a record deemed responsive." *AILA*, 830 F.3d at

670. The FBI must, therefore, release all such information in the records produced to The Times.

## IV.
## THE GOVERNMENT'S SEARCH WAS INADEQUATE

The Government's search for responsive records remains inadequate for two reasons. The

first is its failure to use "Phantom" as a search term. (*See* NYT Br. at 5-6.) The Government

insists that failure was justified but has put the entirety of the explanation in its *ex parte*

declaration. (*See* Gov't Reply at 3.) The Times stands on the arguments made in its opening

brief.

The second reason is one that the Government essentially conceded in its filings earlier

today: it has not searched for responsive records in the possession of all relevant custodians and

did not locate documents known to exist. (*See* NYT Br. at 4-7.) In its most recent declaration, the

Government states that its supplemental search did not include the files of key individuals in the

Office of Congressional Affairs (OCA). (Supp. Seidel Decl. ¶ 9.) Notably the Government does

not explain the reasons for that failure. It also says it has not been able to locate the agency's

"actual response" to Senator Wyden's staff in response to questions posed after the SSCI

briefing, possibly because (though it remains unclear) the agency did not think to check its

"separate record system used specifically for correspondence with Congress." (*Id.* ¶ 6.) The

17

Times reserves its objections here pending a report from the Government about the results of its search and the status of any missing documents.

## V.
## THIS COURT SHOULD CONDUCT AN *IN CAMERA* REVIEW

As The Times noted in its opening brief, *in camera* review is appropriate in this case for two reasons: the vagueness of the Government's justifications for nondisclosure and the segregability of nonexempt material from that which is exempt. (NYT Br. at 24-25.) The Government's new submissions only make the case for *in camera* review stronger. The new *Vaughn* index and declaration still do little to illuminate the nature of the withheld information, employing vague descriptions of withheld material and repeating the same boilerplate assertions of harm. (*See, e.g.* Bender Decl. at ¶¶ 21, 25, 30, 34, 38, 42, 47, 51, 54, 58, 61, 65, 67, 71, 76, 80, 83, 93.) And for the reasons above, there is very likely material that can be segregated and released. *See, e.g.*, *N.Y. Times Co. v. DOJ*, 2021 U.S. Dist. LEXIS 20776, at *17 (S.D.N.Y. Feb. 3, 2021) (noting that *in camera* review is appropriate where the "agency['s] claims [are] too sweeping" and ordering such review).

## CONCLUSION

For each and every of the reasons set forth above, Plaintiffs respectfully ask this Court for an order (i) denying Defendant's Motion and granting Plaintiffs' Cross-Motion; (ii) declaring that the documents sought by Plaintiffs are public under 5 U.S.C. § 552 and must be disclosed; (iii) directing Defendant to provide the requested records to Plaintiffs within 20 business days of the Court's order; (iv) awarding Plaintiffs the costs of this proceeding, including reasonable attorney's feed, as expressly permitted by 5 U.S.C. § 552(a)(4)(E); and (v) granting such other and further relief as the Court deems just and proper.

Dated:  New York, NY
             November 14, 2022

Respectfully submitted,


By: ___/s/ David E. McCraw_____
David E. McCraw, Esq.
Al-Amyn Sumar, Esq.
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-4031
Facsimile: (212) 556-1009
Email: mccraw@nytimes.com

*Counsel for Plaintiffs*

Of Counsel:

Samantha Hamilton, Esq.
(not admitted in New York)