UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| NEW YORK TIMES,<br><br>　　　　Plaintiff,<br><br>　　-v-<br><br>UNITED STATES DEPARTMENT OF<br>JUSTICE,<br><br>　　　　Defendants. |

22-cv-1539 (JSR)

<u>MEMORANDUM ORDER</u>

JED S. RAKOFF, U.S.D.J.:

　　This case involves two requests under the Freedom of Information Act ("FOIA") filed with the Department of Justice ("DOJ") and Federal Bureau of Investigations ("FBI") by the New York Times (the "Times") and one of its national security reporters, Mark Mazzetti. They concern the DOJ and FBI's use of spyware and other digital surveillance products from the Israeli technology company NSO Group, including its flagship product "Pegasus," which is used to surveil encrypted communications on smartphones. Pegasus has been sold to numerous governments around the world and has been implicated in surveillance of civil society figures, political dissidents, journalists, activists, and businesspeople. Previous reporting by the Times indicates that the FBI and other U.S. government agencies have purchased Pegasus and possibly other NSO products to test the technology and explore whether they could be used legally in the United States. The FBI has confirmed such purchases. However, in July 2021,

the FBI determined not to use the NSO technology in criminal investigations and it has not used it in any to date.

The first of plaintiff's FOIA requests seeks contracts and correspondence between the FBI and NSO Group between January 2018 and the present. The second FOIA request seeks internal reports, policies, memos, and guidelines concerning use of NSO products and the relationship between the use of the products and U.S. wiretapping laws, as well as all correspondence within the DOJ and FBI discussing the use of NSO products. The Government has gone through repeated rounds of reprocessing plaintiff's requests in this case, often making further productions in response to the Times' filings. Accordingly, the Court's order as laid out below primarily relies on the parties' reply briefs (at Dkt. 22 and 24), as well as the associated declarations filed in support of those reply briefs and a revised "Vaughn" index (Dkt. 20-1). As discussed, below, the parties also submitted a letter following oral argument on the parties' summary judgment briefing indicating further agreement as to certain documents and categories. This Memorandum Order addresses the remaining issues.

## I.  **Legal Standard**

The Freedom of Information Act reflects a general presumption that government records should be open to the public, although it also permits withholding of large categories of documents under one or more FOIA "exemptions," at least to the extent that the agency also determines that disclosure would foreseeably harm an interest

protected by the exemption. <u>See generally</u> 5 U.S.C. § 552. An agency may meet its burden to show documents were properly withheld by submitting "[a]ffidavits or declarations[1] supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption . . . ." <u>Carney v. Dep't of Justice</u>, 19 F.3d 807, 812 (2d Cir. 1994). "The affidavits submitted by an agency are accorded a presumption of good faith." <u>Wilner v. Nat'l Sec. Agency</u>, 592 F.3d 60, 69 (2d Cir. 2009).

As relevant here, the parties' remaining disputes primarily concern the "deliberative process" privilege (part of Exemption 5); Exemption 7(E), which relates to the disclosure of techniques used in law enforcement investigations; and, to a lesser extent, exemptions concerning classified information or other national security-related exemptions. The Court briefly addresses these exemptions in turn:

"FOIA Exemption 5 . . . exempts 'inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency' from the disclosure otherwise required under the Act." <u>Brennan Ctr. For Justice v. DOJ</u>, 697 F.3d 184, 194 (2d Cir. 2012).[1] "The privilege is based 'on the policy of protecting the decision making processes of government agencies,'" and the "exemption 'properly construed, calls for

---

[1] All internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

'disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'" Id. at 195-96. More specifically, it protects documents that are "(1)'predecisional,' i.e., 'prepared in order to assist an agency decisionmaker in arriving at his decision,' and (2) 'deliberative,' i.e., 'actually ... related to the process by which policies are formulated.'" Id. at 195. "A predecisional document will qualify as 'deliberative' provided it formed an essential link in a specified consultative process, reflects the personal opinions of the writer rather than the policy of the agency, and if released, would inaccurately reflect or prematurely disclose the views of the agency." Id. at 202.

Exemption 7(E) exempts from disclosure records that would "disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law . . . ." 5 U.S.C. § 552(b)(7)(E). Notably, the Government "does not have to prove that circumvention is a necessary result; the statute exempts information that would 'risk circumvention of the law.'" Mayer Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir. 2009). Further, the statute does not require that disclosure would actually produce a risk of circumvention, but only that it "could reasonably be expected to" do so. Id. (quoting

4

5 U.S.C. § 552(b)(7)(E)). "In short, the exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." Id. Exemption 7(E) accordingly "protects information that would train potential violators to evade the law or instruct them how to break the law," and further "exempts from disclosure information that could increase the risks that a law will be violated or that past violators will escape legal consequences." Id.

The Government has also made certain withholdings pursuant to Exemptions 1 and 3, which concern classified information. Specifically, Exemption 1 covers information that is "properly classified pursuant to . . . Executive Order." 5 U.S.C. § 552(b)(1). E.O. 13,526 § 1.4 permits classification of documents whose disclosure "reasonably could be expected to cause identifiable or describable damage to national security" and "pertains to" topics such as military plans, foreign government information, intelligence activities, sources, methods, or cryptology, foreign relations, scientific, technological, or economic matters relating to national security, and the vulnerabilities or capabilities of systems, projects, or other items relating to national security. Exemption 3, meanwhile, shields from disclosure items explicitly exempted from disclosure by other statutes -- and, as relevant here, the National Security Act, 50 U.S.C.

§ 3024(i)(1). That statute protects intelligence sources and methods from unauthorized disclosure. Id.; ACLU v. DOD, 492 F. Supp. 3d 250, 262 (S.D.N.Y. 2020).

Additionally, pursuant to 2016 congressional amendments, the Government must show not just that withheld material falls under an applicable exemption but also that disclosure would result in a "distinct foreseeable harm" to the interests protected by the exemption. Reporters Comm. For the Freedom of the Press v. FBI, 3 F.4th 350, 369 (D.C. Cir. 2021); id. ("[T]he foreseeable harm requirement "impose[s] an independent and meaningful burden on agencies.")

## II. **Analysis**

The parties' remaining disputes concern numerous different categories of documents, which the Court addresses in turn. While the Court concludes that most of the Government's withholdings were appropriate, and therefore grants the Government's motion for summary judgment as to those documents, it also concludes that some withholdings were not appropriate and therefore grants the Times' motion with respect to certain documents. Any further production required by this order should be made within 14 days.

### A. Group A: Revised Vaughn Index 1-3

These are FBI form FD-1057s -- a form of electronic communication apparently similar to an inter-agency memorandum -- regarding three meetings by FBI and/or DOJ staff on October 28, 2020 to discuss the

6

potential use of the NSO product to support criminal investigations. Declaration of Joseph E. Bender ("Bender Decl." ¶ 20, Dkt. 20. Though previously withheld in full, FBI has now produced redacted versions. Id.

These documents are in effect internal agency memos summarizing discussions among FBI and DOJ staff regarding whether and how to deploy the NSO technology. Bender Decl. ¶ 21. Portions withheld under the deliberative process privilege consist of "specific considerations that FBI components or DOJ offices or components believed were relevant to the evaluation of whether to proceed with the tool (and if so, how)," as well as "specific problems that non-decisionmakers identified with particular approaches" and "proposed specific next steps in the decision-making process." Id. These contents are plainly both "pre-decisional" and "deliberative," in that they predate and summarize a piece of the process by which the FBI's final decision was made. Id.; Brennan Ctr., 697 F.3d at 194.

The Times -- while appearing to acknowledge that some redaction of these documents under Exemption 5 was appropriate -- contends that "[t]he context of the redactions within the documents suggests that the FBI has improperly redacted factual information pursuant to Exemption 5, and that more information can and should be disclosed." N.Y. Times Reply Mem. ("Times Reply") at 6, Dkt. 24. But while the Times has submitted the redacted documents it has received, it does not explain what within the context of those documents suggests improper redaction of factual information. The synopsis lines of each

Form FD-1057 demonstrates that the point of each meeting was to "discuss potential deployment" or something similar of the NSO product or similar technologies. Sumar Decl. Document Production, Dkt.26-1 at 1. As such, it is not surprising that much of the forms' subsequent content would contain pre-decisional points of view of various agency staff members. While there are plainly some redactions to the Form FD-1057s that are not covered by Exemption 5 -- for instance, redactions appearing to cover the names of staff members or FBI file numbers, presumably withheld pursuant to Exemption 7(e), id.; Bender Decl. ¶ 22 -- the Times indicates it is no longer challenging such exemptions. Joint Letter re-Narrowed Issues ("Joint Letter") at 1.

The Government has also withheld portions of Group A pursuant to Exemption 7(E) that would reveal "specific operational needs identified by the FBI, which would in turn would reveal what techniques or procedures FBI had available—and lacked—for gaining lawful access to encrypted information." Bender Decl. ¶ 22. The Times' primary response is that, given the FBI's ultimate decision not to deploy the NSO tool, it is implausible to think disclosure would risk circumvention of law enforcement investigations. His si unpersuasive on its face, as well as highly speculative.

Accordingly, the Court declines to order further production or to conduct an in camera review with respect to the documents in Group A and grants the Government's motion for summary judgment with respect to these documents.

**B. Groups C & K: Revised Vaughn Index 11, 44-45, 47-48 (Powerpoint presentations)**

These are five PowerPoint presentations that the FBI has withheld in full concerning potential uses of the NSO technology that were created prior to the FBI's final decision to not use that technology. Bender Decl. ¶¶ 30, 60-61. The Times does not appear to dispute that these presentations were prepared prior to the FBI's decision not to use the NSO technology[2] and that they reflect pre-decisional proposals about how the technology might be used -- proposals, in other words, that plainly fall within the heart of Exemption 5. N.Y. Times Reply at 6-7, 12. According to the FBI, these predecisional presentations "reveal the specific considerations that FBI or DOJ offices or components believed were relevant to whether to proceed with the tool (and if so, how); identify specific problems that non-decisionmakers identified with particular approaches, including enumerating several risks and advantages of proceeding with the NSO tool; and contain recommendations, including proposed specific next steps in the

---

[2] In its initial summary judgment brief, the Times argued that -- since emails containing the relevant Powerpoints were sent on 7/22/20, the day the FBI made its final decision not to employ the NSO technology -- it was implausible to think that the Powerpoints in fact reflected predecisional deliberations. N.Y. Times Mem. at 13, Dkt. 16. However, since the Government augmented its production and submitted a revised Vaughn index in response to the Times' motion, the Times does not appear to dispute the Government's explanation that, "although the cover email attaching the document was sent after the 'cease efforts' decision, the PowerPoint presentation on its face describes a previous proposal related to the NSO tool that was created for discussion purposes before any decisions were made." Bender Decl. ¶ 30, 61.

decision-making process," and "individual FBI employees used these records to make recommendations and proposals, and communicated them internally, to help the FBI make decisions about whether (and if so, how) to proceed with use of the NSO tool in support of criminal investigations." Bender Decl. ¶ 61; id. ¶ 30 (similar).

Notwithstanding the plain application of Exemption 5, the Times insists that it is neither "logical" nor "plausible" that these presentations could contain no "discrete factual information" that the Government could segregate and from the presentations' deliberative aspects and disclose. N.Y. Times Reply at 6-7, 12. This because the deliberative process privilege does not, "as a general matter, cover "purely factual" material." Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d. Cir. 1999). However, as the D.C. Circuit has recognized, "the fact/opinion test, while offering a quick, clear, and predictable rule of decision, is not infallible and must not be applied mechanically . . . because the privilege serves to protect the deliberative process itself, not merely documents containing deliberative material." Mapother v. Dep't of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993). Thus "[w]here an agency claims that disclosing factual material will reveal its deliberative processes, [a court] must examine the information requested in light of the policies and goals that underlie the deliberative process privilege." Id. at 1537-38.

The Court fails to understand why there is anything implausible about the FBI's contention that "[t]he withheld substantive

information is not 'purely factual'; rather, the substantive factual information contained in the Document[s] is inextricably intertwined with the deliberative material." Bender Decl. ¶ 30; id. ¶ 61 (similar). While legal briefs and judicial opinions often contain segregable "facts" sections, presentations and proposals frequently do not -- and the FBI has reasonably explained that the facts in the presentations in question are inextricably tied up with the subjective assessments of FBI or DOJ personnel and components not reflected in the FBI's ultimate decision, such that it is not possible to disclose discrete isolated facts. Id.

Of course, as the Times points out, this Court could verify that each fact in the relevant Powerpoint presentations is in fact not plausibly segregable form deliberative material by reviewing the slides in camera and determining for itself as to every piece of the withheld documents whether some underlying "fact" could be disclosed without likewise making disclosures about the agency's predecisional deliberations. But the possibility of in camera review exists in every case, as does the possibility that a court that undertakes such review could conceivably find pieces of a withheld document that it believes could be disclosed. Given a reasonable showing by the Government that the withheld material is in fact subject to withholding under Exemption 5 -- a proposition of which the Court is here convinced, and which the Times does not appear to even dispute as to at least very significant portions of the withheld material -- conducting further in camera review to verify assertions by the Government this Court has been

given no reason to doubt is not required nor a productive use of either this Court's or the parties' time. <u>Local 3, Int'l Broth. of Elec. Workers, AFL-CIO v. NLRB</u>, 845 F.2d 1171, 1180 (2d Cir. 1988) ("<u>In camera</u> review is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion"); <u>Larson v. Dep't of State</u>, 565 F.3d 857, 870 (D.C. Cir. 2009) ("If the agency's affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without <u>in camera</u> review of the documents.").

The Court therefore concludes that the bulk of Groups C and K were properly withheld under Exemption 5 (and the Court therefore need not address the Government's withholding of the same documents pursuant to Exemptions 7(E)[3]) -- with one exception. One of the documents in Group C -- entry number 11 in the Government's revised Vaughn Index, described as an "Email from [the Office of Technology Division] dated July 22, 2021 with SharePoint proposal of NSO product" -- contains both one of the PowerPoint presentations discussed above and a cover-email that appears to <u>post-date</u> the FBI's decision to not employ the NSO technology. That email itself is plainly not pre-decisional, and

---

[3] The Court is aware that certain portions of these documents were also classified and withheld pursuant to Exemptions 1 and 3; however, the Court understands that these withholdings are no longer disputed. Joint Letter at 1.

the Government has said nothing about its contents that indicates it contains or recounts predecisional material. Likewise, the Government's claim for withholding under Exemptions 7(E) and 1 and 3 appear to relate to the attached PowerPoint presentation, not the cover email. Bender Decl. ¶ 31-32. Accordingly, the Times' motion is granted with respect to the cover email.

### C. Group F: Revised Vaughn Index 32

This is a chain of emails sent on 1/11/22 or later -- after the FBI determined not to use the NSO tool. Bender Decl. ¶ 46. The first of these emails, which the Government produced, describes the FBI's "review" of its analysis and testing of the NSO tool in response to inquiries from other agencies. Id. The Government withheld a reply to that email by an FBI employee that "include[d] detailed background on the FBI's analysis and consideration of the NSO tool; a review of one particular component's work regarding the NSO tool; and a summary of FBI-created predecisional documentation about the NSO tool." Id.

While this email post-dates the Government's decision to not use the NSO tool, the FBI represents that it "recounts and summarizes the FBI's deliberations, including the views and recommendations of particular components, which were different from the FBI's final decision not to proceed." Id. ¶ 47. The Times does not appear to dispute -- at least in principle -- that a record such as this one that is created following an agency's final decision may nonetheless qualify as "predecisional" -- and exempt from disclosure -- to the

extent it "recount[s] or reflect[s] predecisional deliberations." Citizens for Responsibility & Ethics in Wash. v. DOJ, 658 F. Supp. 2d 217, 233-34 (D.D.C. 2009); N.Y. Times Reply at 8. Nor does it appear to dispute that withholding was improper as to the portions of this email that in fact contain the FBI's deliberations. N.Y. Times Reply at 8. Instead, the Times once again contends there must be segregable factual material not subject to withholding. Specifically, it argues that the portions of the email that the Government reports describe as "the process by which intermediate approvals were sought prior to the final decision not to employ the tool" and the creation of a "timeline for engagement, testing, and process efforts" should be considered factual, rather than deliberative. Id.; Bender Decl. ¶¶ 46-47.

The Court disagrees. The portions of the withheld email that the Times contends are "factual" are, quite literally, descriptions of the FBI's deliberative process, including how the FBI went about setting up its internal testing and approval process. Bender Decl. ¶¶ 46-47. Such descriptions are likely intimately intertwined with the "views and recommendations of particular [FBI] components," id. ¶ 47, and, even if that were not the case, it would make little sense to conclude that FOIA's deliberative process privilege does not extend to a detailed description of the agency's decisionmaking process. Mapother, 3 F.3d at 25 ("[T]he privilege serves to protect the deliberative process itself, not merely documents containing deliberative material."). As such, the Court concludes that the Government's

withholding pursuant to Exemption 5 was appropriate, and it need not evaluate the parties' arguments relating to the application of the law enforcement exemption (Exemption 7(E)). The Government's motion for summary judgment is granted with respect to Group F.

### D. Group G: Revised Vaughn Index 33-34

These are various emails with two attachments: draft and final versions of letters from the FBI to Israel's Defense Export Control Agency. Bender Decl. ¶ 50. Most of the emails are from 2018, but the most recent are from October 2021 -- post-dating the decision of July of that year to not employ the NSO technology. Id. The Government has withheld pursuant to Exemption 5 emails sent between August and December 2018 regarding the proposed content of the letter. Id. ¶ 51. It also

The Times does not appear to dispute that these emails are both predecisional and deliberative and are therefore facially subject to Exemption 5. N.Y. Times Reply at 10. Instead, the Times contends that the Government has failed to show that disclosure of these emails would cause foreseeable harm to an interest protected by Exemption 5, on the theory that -- because the emails concern "specific and specialized advice on a one-of-a-kind letter to the Israeli government" -- the typical concern that disclosure might chill government officials from fully debating and evaluating a proposed course of action does not apply. N.Y. Times Reply at 10.

The Court disagrees. It takes little imagination to see why

"reveal[ing] the personal views of some FBI staff rather than the ultimate policy determination of FBI about the form and content of the final letter" threatens to cause foreseeable harm in the context of proposed communications with a foreign government -- where it is of course essential that the Government speak with one unified voice and that, when doing so, it have already benefited from a full airing of points of view among staff. Bender Decl. ¶ 51. Disclosure might both undermine the Government's official presentation of its views to a foreign government -- to the extent that Government might perceive internal disagreement within the Government, and perhaps even come to see individual employees as potential friends or foes -- and dissuade governmental employees from fully articulating different points of view before a final decision is made. Id. Accordingly, the Court concludes that the portions of emails withheld in Group G pursuant to Exemption 5 were properly withheld.

The Government has also withheld portions of these emails pursuant to FOIA Exemption 7(E), contending that "disclosure would reveal . . . the specifics of FBI programs, technology capabilities (and means for acquisition of technology), and relationships with foreign partners[, and] . . . specific code names that FBI used for certain FBI programs" and that disclosure of these things "would risk circumvention of the law by revealing FBI processes and potential issues related to relationships with foreign countries." Bender Decl. ¶ 52. The Times does not challenge the withholding of "code names," Joint Letter at 1, but does challenge the other 7(E) withholdings.

16

In the context of communications with a foreign power, this Court affords the Government's assessment of the harms likely to be caused by disclosure particular weight. <u>ACLU v. DoD</u>, 901 F.3d 125, 134 (2d Cir. 2018). Nevertheless, even in this sensitive area, an agency must offer "sufficient information to evaluate whether those judgments are logical and plausible." <u>Id.</u> And, except with respect to the Government's unchallenged withholding of code names, the Government fails to give any information showing why or how information in the letter to Israel about the NSO technology would reveal anything about law enforcement techniques or investigations, nor does it explain why "potential issues related to relationships with foreign countries" qualifies for withholding under Exemption 7(E). Bender Decl. ¶ 52. Accordingly, the Times' motion is granted with respect to those documents in Group G withheld under Exemption 7(E) except as concerns code names.

### E. Group H: Revised Vaughn Index 35

This is a single document consisting of two emails: one dated 7/27/21, which forwards another dated 7/17/19. Bender Decl. ¶ 53. While the Government initially withheld significant portions of this document as "non-responsive," the Court understands from a joint letter submitted by the parties that the Government subsequently agreed to produce these portions, leaving withholdings only under Exemptions 5 and 7(E).

It is unclear from the Times' briefing whether it disputes those

portions of Group H withheld under Exemption 5, and, in any event, it fails to respond to the Government's characterization of both emails (including the post-decision 7/27/21 email) as containing "detailed discussions of particular approaches" and describing the pre-decision deliberations of various staff members. Bender Decl. ¶ 54; NY Times Reply at 11. Although the Times briefly speculates that the document may contain segregable factual information, the Court sees no reason to believe that this is so and credits the Government's representation that "the substantive factual information contained in the document is inextricably intertwined with the deliberative material." Bender Decl. ¶ 54. The Times also notes that it does <u>not</u> dispute the Government's withholding from these emails pursuant to FOIA Exemptions 1 and 3. NY Times Reply at 11 n.10.

That leaves the Government's withholding pursuant to Exemption 7(E), as to which the Government contends that disclosure would "reveal what techniques or procedures FBI had available--and lacked--for gaining lawful access to encrypted information," as well as "specific details about FBI's assessment of the tool." Bender Decl. ¶ 55. The 2019 email discussed "testing and evaluating the NSO tool for potential use in criminal investigations," including by "identif[ying] problems that would have to be solved before the tool could be used" and "discuss[ing] unresolved questions about the use of such a tool in criminal investigations. . . ." Bender Decl. ¶ 54. The Government convincingly explains that disclosing discussions such as these about how to test and evaluate technologies for gaining access to encrypted

18

information could reveal information about the FBI's actual and expected capabilities, which could help "allow hostile actors to explit potential weaknesses in the FBI's ability to assess similar software." Bender Decl. ¶¶ 16-17, 30-31. Accordingly, the Times' motion is denied and the Government's granted with respect to Group H in its entirety.

### F. Groups I & J: Revised Vaughn Index 36, 37, 42 and 43

The Government withholds the bulk of these records (Group I, 36-37, and document 42 from Group J) on the basis of the deliberative process privilege, arguing that all these documents reflect detailed accounts of options the FBI was considering for how to use the NSO technology before it decided not to. Bender Decl. ¶ 58 ("The Group I records lay out internal plans for resources and strategy regarding the approval and use of the NSO tool. And document 42 analyzes multiple potential options for gaining lawful access to encrypted information in support of criminal investigations, including pros and cons."). The Times responds that the description of the documents in Group I -- described as "internal plans for resources and strategy regarding the approval of and use of the NSO tool" -- implies it is a final document, not a deliberative one. The Court disagrees. Since the NSO tool was not used, it seems plain that the plans for using it reflected in these documents -- which were never put in place -- were part of the Government's internal deliberative process for considering how and whether to use the NSO tool. Id. And Vaughn index entry 42, which includes a "pro-con" list regarding "multiple potential options for

gaining" access to encrypted information, including the NSO tool, plainly consists of internal predecisional deliberations (although the Court recognizes it is not dated). Id.

The Government also withholds all of Groups I and J under Exemption 7(E), arguing that disclosure would reveal "specific operational needs identified by FBI, which would reveal what techniques or procedures FBI had available, and lacked, for gaining lawful access to encrypted information" as well as "specific details about FBI's assessment of the tool." Bender Decl. ¶ 59. The Government further represents that "Document 43 . . . contains especially detailed analysis based on the FBI's assessment," and that these records "would also reveal FBI analysis of other approaches to gaining lawful access to encrypted information where the FBI's use or lack of use of these other approaches has not been officially disclosed." Id. The Court believes the Government has established that this kind of disclosure could be reasonably expected to increase the risk of circumvention of law enforcement, and accordingly concludes that Groups I and J were properly withheld under Exemption 7(E). The Court therefore grants the Government's motion for summary judgment with respect to these documents.

### G. Group L: Revised Vaughn Index 49

This is a single email chain withheld under Exemption 5. Bender Decl. ¶ 65. The emails are from January 26-29, 2021, and thus predate the July 2021 decision not to deploy the NSO technology. See Revised

Vaughn Index 49. The emails contain "recommendations of specific components and individuals regarding whether to proceed with using the tool, and plans regarding how to proceed," and also contain information regarding "the specific decision-making process, including by revealing necessary intermediate approvals that predated the ultimate decision not to employ the tool." Bender Decl. ¶ 65.

The Court agrees with the Government that the portions of the emails containing "recommendations of specific components and individuals" are plainly covered by Exemption 5. Further, with respect to any <u>actual</u> "intermediate approvals" by particular individuals or offices that were made prior to the ultimate decision not to proceed, the Court agrees that those approvals would fall under Exemption 5. However, the Court does not see how descriptions of "the specific decision-making process" -- as opposed to the views actually expressed during that process -- is covered by Exemption 5. <u>See</u> <u>United States</u> <u>Fish and Wildlife Service v. Sierra Club</u>, 141 S.Ct. 777, 785 (2021). Accordingly, no later than 14 days following the date of this order, the Government should reprocess this entry and produce any portions of it describing "the specific decision-making process," to the extent those can be segregated from intermediate decisions actually made by intermediate decisionmakers. To the extent the Government concludes no such portions can be segregated, the Government should submit this email to the Court for <u>in camera</u> review.

**H. Group M: Revised Vaughn Index 50-52,59-65, 70, 72-80**

These are 20 chains of emails dating from July 20-22, 2021 that "include primarily (1) internal discussions planning for meetings to discuss how to proceed regarding the NSO tool; and (2) distribution of a notice from the EAD for STB to cease all efforts on use of the NSO tool." Bender Decl. ¶ 66. Under Exemption 5, the Government withholds portions that either predate the 7/22/21 cease-efforts decision, or immediately follow it and recount prior deliberations. Id. ¶ 67. The withheld portions include "discussions regarding whether the NSO tool would be appropriate for potential use in criminal investigations, and the circumstances in which it could be lawfully used for that purpose, as well as post-decisional discussions reflecting the same predecisional deliberations." Id.

The Times argues that it is implausible to think the post-decision emails contain sufficient descriptions of predecisional deliberations to justify the Government's withholdings. NYT Reply at 13. But the Court does not see why; it is more than plausible and in fact likely that employees might respond in the immediate aftermath of a decision not to use a technology they thought might be used with questions and descriptions of their understanding of the pre-decisional status of deliberations. And that is exactly what the Government represents happened here. The Court therefore concludes that the Government has met its burden to show that withholding of Group M pursuant to Exemption 5 was appropriate. Larson, 565 F.3d at 870.

The Government further withheld portions of these emails under Exemption 7(E), in part because disclosure might reveal code names.

Bender Decl. ¶ 68. The Court understands that the Times does not contest withholding on this basis. See Joint Letter at 1.

In addition, the Government withheld portions under Exemption 7(E) that contain the FBI's assessment as to whether "the NSO tool would, or would not, be effective," which "could shed light on the FBI's assessment of other software or potential use of such software in the future." Bender Decl. ¶ 68. Certain of the withheld portions also discuss the "FBI's existing capabilities and limitations in gaining lawful access to encrypted communications in law enforcement investigations. . . ." Id. ¶ 69. The Times responds that some information concerning the FBI's ability to lawfully obtain encrypted information has already been made public, whether through the FBI or DOJ's own statements or other disclosures made by FBI. NY Times Reply at 9, 13. But the fact that the Times may believe from prior comments by Government officials or other disclosures that it knows something about the FBI's capabilities in this regard hardly makes the full extent of those capabilities a matter of public record, and the Government here represents that the withheld information concerning FBI's capabilities covers "very recent, very specific details about what types of encrypted information the FBI could, and could not, access using its existing capabilities" -- details that "[h]ostile actors" could use in order to avoid law enforcement access. Bender Decl. ¶¶ 103-04. The Court sees no basis to disregard the FBI's descriptions of this information as sensitive (and plainly subject to Exemption 7(E)) just because some former government officials'

comments, previous disclosures, or press reports have purported to describe FBI's capabilities in this area.

The Times' other argument with respect to the Exemption 7(E) withholdings from Group M is that it is "speculative and illogical that disclosure could reveal something about FBI's assessment or potential use of other software in the future." NYT Reply at 13. But the Court does not see why. For one thing, how the FBI assesses the efficacy of technologies such as the NSO technology is itself arguably a "technique[] or procedure[] for law enforcement investigations or prosecutions," the disclosure of which "could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(e). For another, to the extent disclosure would reveal the FBI's assessment of the NSO tool's efficacy -- and, relatedly, the capabilities and gaps in the FBI's toolset for getting at encrypted information -- that would also disclose information protected by Exemption 7(E). See Mayer, 562 F.3d at 1193 ("[T]he exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.").

The Court therefore concludes the Government has met its burden to show that the relevant portions of Group M were properly withheld under Exemptions 5 and 7(E) and therefore grants the Government summary judgment as to these documents.

### I. Group N: Revised Vaughn Index 81-87

These are two email chains: one largely internal to FBI regarding how to respond to an inquiry by another Executive Branch entity (the identify of which was disclosed to the Court in a classified ex parte declaration) concerning the NSO tool, including emails on the Top Secret Email system, and second, classified email chains between the other Executive Branch entity, the FBI, and other Department of Justice offices containing questions and follow-up concerning that other entity's inquiry. Bender Decl. ¶ 90.

The Government withheld these emails under Exemptions 5 (both with respect to the deliberative process privilege, and, with respect to certain emails, the attorney-client privilege), 7(E), and, with respect to classified information in the emails, Exemptions 1 and 3. The Court understands that the Times does not challenge any withholdings pursuant to attorney client privilege. See Joint Letter at 1. With respect to the other withholdings, the Government convincingly explains that the withheld emails -- although dated from October 2021, following the cease-efforts decision -- are nonetheless predecisional because the predate and concern the Attorney General's response to the other Executive Branch entity's inquiry. Bender Decl. ¶ 71. And they appear plainly deliberative, "contain[ing] candid and unvarnished advice and commentary by subordinates that do not represent the policy of the agency" regarding how the FBI and Attorney General should respond to the inquiry by the other Executive Branch entity. Id. The Times does not make any meaningful argument that these

discussions fall outside the deliberative process exemption, but instead argues that the identity of the other Executive Branch entity and the nature of its inquiry -- if not FBI's discussion of how to best respond -- are themselves "factual matters not subject to the deliberative process privilege." NY Times Reply at 14. But the Court concludes on the basis of both the publicly filed information in the Bender declaration, and the ex parte classified declaration submitted to the Court that the underlying questions as well as the identity of the Executive Branch component asking them were appropriately withheld under Exemptions 1 and 3. Accordingly, without ruling on the appropriateness of the Government's withholding of these documents under Exemption 7(E), the Court grants the Government's motion for summary judgment with respect to all of Group N.

### J. Groups O and P: Revised Vaughn Index 88-90, 92

These consist of two email chains: one dated July 20-21, 2021, and the second dated July 20-22, 2021. The withheld portions all predate the 7/22/21 cease-efforts decision. Bender Decl. ¶ 76. And they contain individuals' and offices' "recommendations . . . whether to proceed with using" the NSO technology, "discussions and evaluations of the circumstances in which it could be used in support of criminal investigations," and "plans regarding how to proceed." Id. Such discussions are plainly subject to the deliberative process

privilege.[4] The Government also represents that disclosure of these emails -- which, as discussed above, contain "discussions and evaluations of the circumstances in which [the NSO technology] could be used in support of criminal investigations" -- would reveal "specific operational needs identified by FBI" and "techniques or procedures FBI had available - and lacked — for gaining lawful access to encrypted information." Bender Decl. ¶¶ 76-77. The Court therefore agrees that disclosure would "risk circumvention of the law by identifying specific areas of weakness in the government's ability to gain lawful access, and in the government's ability to assess and acquire information about the tool," and is therefore subject to Exemption 7(E). Accordingly, the Court grants the Government's motion for summary judgment with respect to Groups O and P.

### K. Group Q: Revised Vaughn Index 91, 93-95

Document 93 involves a May 11, 2021 internal document "providing background on the NSO tool and proposing guidelines for potential use of the NSO tool in criminal investigations," which the Government has withheld in full pursuant to Exemptions 5 and 7(E). Bender Decl. ¶ 79. The Government contends that it "reflects proposals about how the NSO

---

[4] The Court notes that while the Times originally focused its argument with respect to Group O on the Government's withholding of an attachment bearing the partially redacted title "Deployment Guidelines," and the Court directly asked Government counsel about this attachment at oral argument, the parties have since informed the Court that the attachment is simply a duplicate of another document the withholding of which the Times does not challenge, so the withholding of this attachment is no longer at issue. See 11/21/22 Letter.

tool might be used, including specific details about the most appropriate use." Id. ¶ 80. The discussion further "references specific criminal matters then under investigation . . . for which the authors believed the NSO tool might be appropriate." Id. ¶ 80. With respect to Exemption 7(E), the Government represents that disclosure would reveal "specific details about FBI's assessment of the tool," revelation of which could "risk circumvention of the law by identifying specific areas of weakness in the government's ability to assess and acquire information about the tool, which hostile individuals or entities could use to exploit the FBI's weaknesses." Id. ¶ 81.

The Court finds it difficult to credit the Government's representation that all of this document reflects predecisional deliberations, given its description in the revised Vaughn Index as "providing background on the NSO tool." Vaughn Index 93. Since such background might be extricable from deliberations and proposals regarding prospective use, the Court would be inclined to order further disclosure or at least conduct in camera review were Exemption 5 the sole basis for withholding. However, the document is also fully withheld under Exemption 7(E), and, as to that exemption, the Court agrees with the Government that even revelation of this "background" could reveal "specific details about FBI's assessment of the tool," disclosure of which might allow others to ascertain areas where the Government either has or lacks the capability to obtain encrypted information. Accordingly, the Court believes that the full withholding of this document under Exemption 7(E) is justified.

Documents 94 is a May 11, 2021 briefing document created for the FBI Director's daily brief, containing "assessment and evaluation of the NSO tool for potential use in support of criminal investigations," while Document 95 is an email with the Deputy Director's feedback on the briefing material. Bender Decl. ¶ 82. These records (dated 5/11/21) predate the cease efforts decision, and plainly involve predecisional "evaluations" and assessments, as well as feedback on such evaluations, that do not "embody or reflect any final decisions." Bender Decl. ¶ 83. The briefing material and subsequent email also identify "specific operational needs identified by FBI, [disclosure of which] which would reveal what techniques or procedures FBI had available -- and lacked -- for gaining lawful access to encrypted information." Id. ¶ 84. The Court has little trouble concluding these documents were properly withheld under both Exemptions 5 and 7(E).

Finally, Group Q includes document 91 -- a single email chain between [the Operational Technology Division] and [the Criminal Investigative Division]." Bender Decl. ¶ 86. The document "does not relate directly to FBI's consideration of whether to deploy the NSO tool in support of criminal investigations" and "[i]nstead . . . relates to questions from FBI personnel stationed abroad about potential counterintelligence or operational risks posed by NSO or other software." Bender Decl. ¶ 86. Portions of this document are withheld under Exemption 7(A), which allows withholding of information that "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The Court understands from the

parties that the Times no longer disputes withholding under this exemption. <u>See</u> Joint Letter at 1.

The Court agrees with the Times that, as to portions of this document not withheld under 7(A), withholding under Exemptions 5 and 7(E) is inappropriate. The Government has conceded that the document "does not relate directly to FBI's consideration of whether to deploy the NSO tool in support of criminal investigations," so -- even to the extent the document may contain as the Government represents "individual FBI employees' views and recommendations about how to evaluate potential risks to FBI personnel from NSO Group software," Bender Decl. ¶ 87 -- these views and recommendations do not have appeared to play any deliberative role in the formulation of any actual policy. Meanwhile, as to Exemption 7(E), given the Government's concession that the email chain does <u>not</u> concern the FBI's prospective use of the "NSO tool in support of criminal investigations," the Court does not see how disclosure of the email "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions . . . ." 5 U.S.C. § 552(b)(7)(E). The Court appreciates that the FBI may have genuine "counterintelligence" needs relating to protecting against "potential practices and potential vulnerabilities of FBI systems or personnel stationed overseas." Bender Decl. ¶¶ 86-88. But, except with respect to the Exemption 7(A) withholdings, the Government has not asserted that anything about document 91 implicates classified information, even though it seems obvious that the Executive

could classify material that could expose FBI personnel abroad to successful counterintelligence operations. In any event, the Court does not see how this material is properly withheld under Exemption 7(E).

Accordingly, the Court grants the Government's motion for summary judgment with respect to documents 93, 94, and 95, but grants the Times' motion with respect to document 91 (except with respect to the unchallenged Exemption 7(A) withholdings). The Government must produce those portions of document 91 not withheld under Exemption 7(A).

### L. Contract Documents: Revised Vaughn Index 97-100

The Times finally disputes the Government's withholding of certain contract documents with the NSO group under Exemptions 1 and 3, arguing that the contract likely deals with "pricing, payment terms, and such routine legal matters as dispute resolution mechanisms, indemnifications, and representations and warranties," rather than properly classified material or material implicating national security. NY Times Mem. 23-24. But, following this Court's review of the ex parte classified declaration submitted to it, it concludes that disclosure of these documents would necessarily entail more than the Times conjectures, and that the Government has more than met its burden to show these documents are subject to withholding. See Ctr. For Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 926-27 (D.C. Cir. 2003) (noting "the propriety of deference to the executive in the context of FOIA claims which implicate national security").

Accordingly, the Government's motion for summary judgment is granted and the Times' denied with respect to these documents.

### M. Adequacy of the Government's Search

The Times finally contends that the Government's search was inadequate because it failed to use the term "Phantom" (an NSO product) as a search term. NYT Reply at 17.[5] However, following review of both the Government's *ex parte* classified declaration, the Court agrees with the Government that use of the term "Phantom" would not likely yield any additional records beyond those returned by the search terms "Pegasus" and "NSO Group." See also Bender Decl. ¶ 6.

### III. Conclusion

For the reasons described above, the Government's motion for summary judgment is granted in part and the Times' motion is granted in part. Any additional productions required by this order must be made no later than 14 days following the issuance of this Order.

SO ORDERED.

New York, NY
July 7, 2022

JED S. RAKOFF, U.S.D.J.

---

[5] The Times also originally argued that the search was inadequate because it did not include files of individuals in the Office of Congressional Affairs, but the Government has by now undertaken an additional search of these files. Joint Letter at 2.